**IN THE MATTER OF**
**AN ARBITRATION UNDER THE RULES OF THE**
**UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW**

**THE RENCO GROUP, INC.**

**CLAIMANT,**

**v.**

**THE REPUBLIC OF PERU**

**RESPONDENT**

# CLAIMANT'S AMENDED NOTICE OF ARBITRATION AND STATEMENT OF CLAIM

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-4003
(212) 556-2100
(212) 556-2222 (Facsimile)

Counsel for Claimant

August 9, 2011

**EXHIBIT 1 to NOTICE OF REMOVAL**

# TABLE OF CONTENTS


I. Parties ..... 2

II. Preliminary Statement ..... 2

III. Factual Background ..... 4

A. The Republic of Peru Implemented Environmental Regulations in an Effort to Attract Foreign Private Investments and to Privatize the Complex ..... 4

B. DRP Agreed to Implement Technological and Operational Improvements, but Respondent Retained Sole Liability for Third-Party Claims and Several Environmental Projects, including Remediation ..... 6

C. DRP Complied With and Exceeded Its Obligations Under the Stock Transfer Agreement ..... 9

1. DRP Complied with its Investment Obligations ..... 9

2. DRP is in Compliance with its PAMA Obligations ..... 9

3. In Addition to Meeting its Contractual Obligations, DRP Made Significant Additional Investments to Improve Conditions in the La Oroya Community ..... 10

D. Activos Mineros and Peru Improperly Refused to Accept Responsibility and Liability for Third-Party Lawsuits Brought Against Claimant Renco, Its Affiliates and Executives ..... 11

IV. Peru's Conduct Breaches its Obligations under the Treaty ..... 13

A. Peru's Pattern of Unfair Treatment of DRP Violates Article 10.5 of the Treaty ..... 15

B. Peru's Pattern of Treating DRP Less Favorably than it Treats Centromin / Activos Mineros Violates Article 10.3 of the Treaty ..... 16

C. Peru's Breach of its Obligations to Renco under the Stock Transfer Agreement and Guaranty Constitute a Violation of the Treaty ..... 17

D. Peru's Unfair Treatment of DRP Continues and Has the Potential to Culminate in an Expropriation of Renco's Investment, in Violation of Article 10.7 of the Treaty ..... 18

VI. Agreement to Arbitrate ..... 18

VII. Number of Arbitrators; Claimant's Party-Appointed Arbitrator; Proposed Language and Place of Arbitration ..... 21

VIII. Request for Relief ..... 21

1. Pursuant to Article 10.16 of the United States-Peru Trade Promotion Agreement that was signed on April 12, 2006 and entered into force on February 1, 2009 (the "Treaty")[1] and the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL Arbitration Rules"), the Renco Group, Inc. ("Renco" or the "Claimant") submits this Notice of Arbitration and Statement of Claim against the Republic of Peru ("Peru" or the "State") for claims arising out of Renco's investment in the La Oroya Metallurgical Complex (the "Complex"), including the Contract of Stock Transfer between Empresa Minera del Centro del Peru S.A. ("Centromin") and Doe Run Peru S.R. LTDA ("DRP"), The Doe Run Resources Corporation ("Doe Run Resources"), and Renco, dated October 23, 1997 (the "Stock Transfer Agreement")[2] and the Guaranty Agreement between Peru and DRP, dated November 21, 1997 (the "Guaranty"),[3] and related agreements. Specifically, Renco seeks full reparation for Peru's multiple violations of the Treaty, including for Peru's breach of the Stock Transfer Agreement and the Guaranty, which qualify as "investment agreements" under the Treaty.

2. This dispute arises from Peru's violations of the Treaty and international law, including Peru's (i) pattern of continuing unfair and inequitable treatment of DRP in violation of Article 10.5 of the Treaty, (ii) pattern of treating DRP less favorably than it treats Centromin and its successor-in-interest Activos Mineros in violation of Article 10.3 of the Treaty, (iii) failure to grant DRP adequate extensions of time to complete environmental projects, (iv) failure and refusal to honor its contractual obligations to Claimant, including the obligations to appear in and defend the lawsuits brought by third parties who claim personal injuries, assume responsibility and liability for any damages that any such third parties may be awarded, and indemnify, release, protect and hold Claimant harmless from such third-party claims, and (v) failure to remediate the soil in and around the town of La Oroya.

[1] **Exhibit C-1**, United States-Peru Trade Promotion Agreement, signed on April 12, 2006, and entered into force on February 1, 2009 (the "Treaty").

[2] **Exhibit C-2**, Contract of Stock Transfer between Empresa Minera del Centro del Peru S.A., Doe Run Peru S.R.LTDA, The Doe Run Resources Corporation, and The Renco Group, Inc., dated October 23, 1997 (English).

[3] **Exhibit C-3**, Guaranty Agreement between the Republic of Peru and Doe Run Peru S.R.LTDA, dated November 21, 1997 (English).

## I. Parties

3. Renco has its principal place of business at One Rockefeller Plaza, 29th Floor, New York, NY 10020. Its telephone number is 212-541-6000, and its facsimile number is 212-541-6197. Renco is a legal entity organized under the laws of New York, United States of America.

4. The Republic of Peru is the constituted *de jure* government of the people and territory of Peru, and it is represented by Mr. Carlos Jose Valderrama Bernal, President of the Special Committee, Ministry of Economy and Finance, whose address is Jr. Junin 319, Fifth Floor, Cercada, Lima, Peru. His telephone number +511-315-5930, extension 2450.

The Republic of Peru is also represented by the Ministry of Energy and Mines, which has its principal place of business at Avenida Las Artes Sur 260 San Borja Lima, Peru. Its telephone number is +511-618-8700, and its facsimile number is +511-224-4441. The Ministry of Energy and Mines is a public entity, which is part of the Executive Power of the government of Peru.

For purposes of disputes arising under the Treaty, notices and other documents must be served on Peru by delivery to:[4]

> Dirección General de Asuntos de Economía Internacional
> Competencia e Inversión Privada
> Ministerio de Economía y Finanzas
> Jirón Lampa 277, piso 5
> Lima
> Peru

## II. Preliminary Statement

5. For over seven decades, from 1922 to 1997, the mining Complex was operated—first by its founder Cerro de Pasco and then, starting in 1974, by Centromin—with little focus on the environment. During that time, the operation of the Complex contaminated the soil in and around the town of La Oroya with heavy metals, including lead. In 1997, a consortium of U.S. investors, including Renco, won the bid for the right to purchase the Complex and thereafter transferred it to their wholly-owned affiliate, DRP. As a critical inducement to encourage the U.S. investors to purchase the Complex in light of existing and ongoing contamination,

[4] **Exhibit C-1**, Treaty at Annex 10-C.

Centromin and the Republic of Peru contractually committed themselves to clean up the area in and around the town of La Oroya. They also retained and assumed all responsibility and liability for any and all claims that third parties might bring not only during the period that the new owners completed environmental projects to improve the Complex, but also for the time thereafter. In other words, DRP agreed to implement projects designed to improve the Complex so that its future environmental impact would be reduced, while Centromin and the Republic of Peru agreed to clean up in and around the town of La Oroya and to accept liability for all potential third-party claims going forward—for the period during which DRP would be implementing its environmental projects, and subsequent thereto.

6. DRP is complying with its contractual obligations and has made significant additional investments to improve conditions in the La Oroya community. But, Centromin, its successor Activos Mineros, and the Republic of Peru have refused to remediate the soil in and around the town of La Oroya, and also have refused to accept responsibility for the claims brought by the citizens living in and near the town of La Oroya who claim various injuries resulting from alleged exposure to environmental contamination from the Complex.

7. After DRP has spent over $300 million, completed almost all of the environmental projects that it committed to do, and made significant additional investments to improve conditions in the La Oroya community, the Republic of Peru has taken actions that have prevented Renco from realizing the value of its investment. The government of Peru has subjected Renco and DRP to a pattern of unfair and inequitable treatment and a pattern of treating DRP less favorably that it treated Centromin and its successor, Activos Mineros, all in violation of international law and the Republic of Peru's obligations under the Treaty.

8. Specifically, Peru imposed on DRP additional environmental projects and requirements, while simultaneously and improperly refusing to grant DRP the needed additional time to fulfill these new obligations. Moreover, during all of this time, Peru engaged in a smear campaign in the press against DRP intended to create an erroneous public opinion that DRP was responsible for the contamination of La Oroya and remiss in its remediation obligations. All of these actions resulted in DRP's inability to secure financing sufficient to maintain operation of the Complex and forced DRP to cease all operations in June 2009. This treatment by Peru is in direct contrast to Peru's treatment of Centromin and its successor, Activos Mineros, who easily

received an extension of its time to start and complete their soil remediation project without adding projects or other obligations or subjecting them to negative press.

9. Peru's unfair treatment of DRP continues and has the potential to culminate in an expropriation of the Complex. After one of Peru's creditors placed DRP into involuntary bankruptcy, Peru filed several claims in an attempt to become the largest creditor and control the fate of the company. Those claims have been rejected by the Peruvian bankruptcy agency, but Peru immediately appealed that decision and continues to pursue its attempt to take control of the Complex.

## III. Factual Background

### A. The Republic of Peru Implemented Environmental Regulations in an Effort to Attract Foreign Private Investments and to Privatize the Complex

10. The La Oroya Complex is comprised of smelters, refineries and related equipment that process the poly-metallic minerals found in the central Andes region of Peru, into copper, lead, zinc and other metals, including silver and gold. The Complex was founded in 1922 by Cerro de Pasco, and Peru nationalized the Complex in 1974, transferring ownership and control to Centromin, a State-owned corporation.

11. During the more than half of a century that Cerro de Pasco and Centromin owned and operated the Complex, they caused significant environmental contamination in and around the town of La Oroya. The government of Peru publically recognized in the 1970s that the La Oroya Complex was one of the worst polluters in the country, but during the ensuing 20 years under Centromin's control, Centromin continued to contaminate the soil and waters in and around the town of La Oroya, with little or no environmental oversight or State regulation.

12. In the early 1990s, Peru sought to privatize its mining industry, including the La Oroya Complex. Given the extent of the contamination affecting La Oroya, Peru could not elicit the desired interest from private investors in the Complex without a proper environmental legal framework, and without agreeing to retain liability for claims, including claims for personal injury and any other claims of harm or injury resulting from many years of continuous environmental contamination.

13. In 1991, with an eye toward securing private investors in Peru's mining industry, Peru adopted its Environmental and Natural Resources Code, implemented environmental regulations, and designated the Ministry of Energy and Mines as the competent body to address environmental matters relating to the mining sector. It also mandated the remediation and technological improvements of various industrial sites around the country, including at the La Oroya Complex,[5] and required each mining company to conduct an Environmental Impact Assessment.

14. Centromin conducted an assessment with respect to the Complex, and submitted to Peru's Ministry of Energy and Mines a list of environmental projects (and estimated costs) to bring the Complex within the environmental standards prescribed by the law.

15. On January 13, 1997, the Ministry of Energy and Mines adopted Centromin's environmental proposals, in the form of the Programa de Adecuación y Manejo Ambiental (the "PAMA"), which contained a list of environmental projects aimed at helping to mitigate and prevent environmental degradation, to be completed over an initial period of ten years (later extended twice until March 2012).

16. Ten days later, on January 23, 1997, Peru called for privatization of the Company which owned the Complex,[6] and the Special Committee on Privatization of Centromin issued a Public International Bidding No. PRI-16-97 "to promote private investment in the Company, through a stock transfer and the increase of its stock capital in virtue of new contributions from a corporation or consortium that would fulfill the pre-qualification requirements established by [the law]."[7]

17. The bid was awarded to a consortium that included Renco. Renco and its affiliates are the owners of some of the largest mining, metals and manufacturing companies in the world, and they have a strong track record of achieving high environmental standards of operations and developing innovative new environmental technologies. The consortium assigned its rights to a

---

[5] Supreme Decree No. 016-93-EM (1993).

[6] Supreme Resolution No. 018-97-PCM dated January 23, 1997. The Stock Transfer Agreement defines the "Company" as Metaloroya.

[7] **Exhibit C-2**, Stock Transfer Agreement at VII.

Peruvian subsidiary of Renco, DRP, as required, authorized and approved by the relevant Peruvian authorities.

18. On October 23, 1997, DRP, Doe Run Resources, Renco, and Centromin executed the Stock Transfer Agreement, pursuant to which DRP acquired the majority shares of the Company for a purchase price of US$ 121.4 million.[8] The buyer then invoked its rights to acquire the remaining shares for US$ 126.4 million. As part of that transaction, Peru issued the Guaranty, which guaranteed the "representations, assurances, guaranties and obligations assumed by" Centromin under the Stock Transfer Agreement. Renco would not have agreed to acquire the Company without the guaranty of Peru.

### B. DRP Agreed to Implement Technological and Operational Improvements, but Respondent Retained Sole Liability for Third-Party Claims and Several Environmental Projects, including Remediation

19. The Stock Transfer Agreement contained various ongoing commitments by both parties, including the allocation of the environmental PAMA projects among the parties, and Centromin's agreement to retain and assume responsibility and liability for all third-party claims of injury, including personal injury arising from contamination.

20. Specifically, DRP agreed to make substantial environmental improvements at the Complex so as to reduce the impact on the environment from future operations of the Complex. In accordance with this commitment, DRP's obligations were essentially twofold: (1) to invest US$ 120 million over the initial five years to improve the Complex;[9] and (2) to build various treatment plants and facilities at the Complex as well as to install the necessary equipment and management systems to reduce the impact of its operations on the environment, as contemplated by the PAMA. For example, DRP agreed to construct new sulfuric acid plants, a water treatment plant for the copper refinery, an industrial liquids treatment plant, a wall to retain the drainage of lead mud from the Zileret plant, sewage water treatment plants and a garbage disposal facility at the Complex. DRP also agreed to create a closed circuit for the speiss granulation waters, install equipment to improve anode cleaning in the zinc plant, and develop a system for copper and lead slag management and disposal.

---

[8] By merger agreement dated December 30, 1997 (two months after the parties executed the Stock Transfer Agreement), the Company merged completely into DRP, which assumed all of the Company's contractual rights and obligations, per the Tenth Clause of the Stock Transfer Agreement.

[9] **Exhibit C-2**, Stock Transfer Agreement at Fourth Clause.

21. Centromin and Peru agreed, *inter alia*, to retain responsibility and liability for contamination that had occurred to date (and for which Centromin and its predecessors were solely responsible) *and* that would continue to occur and exist. This commitment translated into two specific obligations at issue in this arbitration.

22. First, among other things, Centromin and Peru agreed to remediate the soil in and around La Oroya that was affected by gaseous and particle emissions from the smeltering and refining operations.[10]

23. Second, during the period approved for DRP to complete its PAMA projects (currently through year 2012), Centromin and Peru agreed to retain and immediately assume responsibility for defending against third party claims, accept liability for any and all third-party claims attributable to the activities of DRP, Centromin, and its predecessors, and to release DRP and its affiliates from any obligation regarding those claims. Separately, Centromin and Peru may seek to resolve apportionment of liability as between themselves and DRP, but DRP will be liable for such potential apportionment *only* in the narrow and limited circumstances[11] in which the claims arose: (1) directly due to acts by DRP that are *unrelated* to the PAMA, which are *exclusively attributable to DRP*, and *even then*, only insofar as the third-party claims are the result of DRP's "use of standards and practices that were less protective of the environment or of public health than those that were pursued by Centromin until the date of execution of this contract"; or (2) directly from a default of DRP's PAMA obligations or of its environmental obligations set forth in Clauses 5.1 and 5.2 of the Stock Transfer Agreement.[12] Neither of these circumstances is present here. Moreover, Centromin's and Peru's obligations to take full responsibility for all third-party claims extend to claims that third parties may bring even *after* the period approved for DRP to complete the PAMA projects has expired (currently 2012),[13] and during that period of time Centromin and Peru may separately seek to resolve apportionment of liability as between themselves and DRP, but DRP will be liable for such potential apportionment only in cases where such third-party claims result directly from (1) acts

---

[10] *Id.* at Clause 6.1(c). Gaseous and particle emissions from the operations of the Complex by Cerro de Pasco (for over 50 years) and Centromin (for over 20 years) impacted the soil in and around the town of La Oroya with numerous heavy metals, including lead.

[11] *Id.* at Clause 6.2.

[12] *Id.* at Clause 5.3.

[13] *Id.* at Clause 6.3.

that are solely attributable to DRP's operation after that period[14] or (2) a default of DRP's PAMA obligations or of its environmental obligations set forth in Clauses 5.1 and 5.2 of the Stock Transfer Agreement.[15]

24. Both during and after the period approved for DRP to complete the PAMA projects. Centromin and Peru agreed to protect, defend, indemnify, release and hold DRP (and its affiliates) harmless for any damages or liabilities related to such third-party claims for which Centromin and Peru have "assumed liability and obligation."[16]

25. Without these critically important commitments by Centromin and Peru as to potential claims by third parties, Renco and its affiliates would not have agreed to purchase the Company, which was well-known to have polluted the area.

26. Moreover, the Stock Transfer Agreement contained a broad *force majeure* clause providing that neither party to the contract "may demand from the other the fulfillment of obligations in the contract . . . when the fulfillment is delayed, hindered or obstructed by causes that arise that are not imputable to the obliged party and this obligation has not been foreseen at the time of the execution of the contract." The clause specifically contemplates causes such as "extraordinary economic alterations."

27. Finally, pursuant to the Guaranty, Peru guaranteed "the representations, assurances, guaranties and obligations assumed by" Centromin under the Stock Transfer Agreement.[17] Peru's Guaranty extends for as long as Centromin "has pending obligations" under the Stock Transfer Agreement.[18] Peru's Guaranty also "survive[s] the transfer of any of the rights and obligations of Centromin [under the Stock Transfer Agreement] and any liquidation of Centromin."[19]

---

[14] In the event that the damages are attributable to both Centromin and DRP during this period, DRP will assume liability proportionately to its contribution to the damage. *Id.* at Clause 5.4(c).

[15] *Id.* at Clause 5.4.

[16] *Id.* at Clause 6.5 and Clause 8.14.

[17] **Exhibit C-3**, Guaranty at 2.1.

[18] *Id.* at 4.

[19] **Exhibit C-2**, Stock Transfer Agreement at Tenth Clause.

### C. DRP Complied With and Exceeded Its Obligations Under the Stock Transfer Agreement

#### 1. DRP Complied with its Investment Obligations

28. DRP satisfied its obligation to invest US$ 120 million in the first five years. From 1997 to 2002, DRP invested approximately US$ 120.2 million in the Complex, as confirmed by Centromin in an official certification, dated February 13, 2003.

#### 2. DRP is in Compliance with its PAMA Obligations

29. DRP is in compliance with the PAMA obligations and actually has exceeded initial expectations in this regard.

30. The PAMA projects initially proposed by Centromin, and approved by Peru's Ministry of Energy and Mines, underestimated the amount of work required to comply with the PAMA. The Ministry of Energy and Mines acknowledged that the engineering work was prepared at the time with limited technical detail and a very basic level of engineering that did not contemplate the remediation of some environmental problems, which in some cases were significant. DRP thus proposed, and the Ministry of Energy and Mines approved, additional investments that DRP would make at its own cost. Moreover, the Ministry of Energy and Mines required DRP to complete additional, so-called "complementary projects." These "complementary projects" were not contemplated at the time of the purchase and were not included in the original PAMA.

31. In light of these circumstances, in 2004, DRP requested a five-year extension to complete the PAMA and, in this respect, took part in a thorough and extensive process in support of its request. However, Peru did not grant the five-year extension that DRP requested. Instead, in 2006, Peru extended the deadline by only two years and ten months, until October 31, 2009, while simultaneously imposing on DRP various new and onerous obligations, including "complementary projects," more stringent environmental standards, and continuous and daily inspections.[20] DRP worked hard to comply with these new obligations, as well as to fulfill its other obligations imposed by the PAMA and the Ministry of Energy and Mines, and substantially completed all but one of the PAMA projects.

---

[20] One of the projects that Peru required DRP to complete was a copper modernization project that increased DRP's costs by over US$ 100 million.

32. In 2009, after DRP became aware that it would be unable to complete the final project in part due to the short time-frame and additional projects imposed by the Ministry of Energy and Mines, and at the request of its lender. DRP made several requests to the Ministry of Energy and Mines for an extension of time to complete the remaining PAMA project. DRP had invested approximately $300 million by this time. and only one project remained (the sulfuric acid plant), but the Ministry of Energy and Mines refused to grant an extension at the time. Because DRP was unable to secure an extension of its PAMA obligations, DRP's lending institutions refused to renew the revolving loan that DRP was using to finance its day-to-day operations, forcing DRP to partially close the Complex in March 2009 and cease all operations in June 2009.

33. Three months later, on September 26, 2009, the Peruvian Congress finally passed a law granting DRP an extension of 30 months to complete construction of the last remaining environmental project. This important extension soon became illusory and ineffective, because Peru's Ministry of Energy and Mines passed implementing regulations that only applied to DRP, targeted DRP and undermined the benefits of the new law. For example, the regulations required DRP, *inter alia*, to pay 100% of its gross proceeds into a trust that would only release funds after securing three months' worth of PAMA schedule obligations, thus making it virtually impossible for DRP to pay its workers or suppliers, or generally to operate the Complex. These prohibitive regulations were harassing and contributed to DRP's inability to obtain the necessary financing or to restart the facility. These harassing and improper regulations were properly repealed, but not until June 2010. after significant financial damage and other harm was already done.

3. <u>In Addition to Meeting its Contractual Obligations, DRP Made Significant Additional Investments to Improve Conditions in the La Oroya Community</u>

34. In addition to performing its contractual obligations, DRP voluntarily spent additional sums on social programs for the citizens of the La Oroya area, such as:

- Offering special programs for the women from the communities: training programs focused on budget planning, child rearing, nutrition, and social responsibility, training a team of health promoters to educate the communities about health risks and orient pregnant women on pre-natal care, and extensive small business training;

- Instituting the Human and Social Ecology Program, which monitors the health of at risk children and provides daily nutritional lunches;
- Sponsoring training programs in animal husbandry targeted to the farming communities around La Oroya. In the Forestation and Andean Gardening program, DRP and community participants planted more than 121,000 seedlings and 132,000 square meters of gardens by 2006; and,
- Improving infrastructure at 17 schools, three playgrounds, a medical post, a laundry area, and a public dining room. Infrastructure improvements consisted of works like installing computer labs, installing washrooms and running water, refurbishing existing structures, and constructing additions.

**D. Activos Mineros and Peru Improperly Refused to Accept Responsibility and Liability for Third-Party Lawsuits Brought Against Claimant Renco, Its Affiliates and Executives**

35. In early August 2007, DRP learned that fliers soliciting plaintiffs for future litigation were being distributed in La Oroya. The fliers, prepared by the law firm SimmonsCooper LLC of East Alton, Illinois, U.S.A., stated, among other things, that "with the lawyers' help, you can ask the courts of law of the United States and make Doe Run pay for the medical treatment of your children and for their injuries."

36. On October 4, 2007, a group of plaintiffs filed lawsuits in the United States alleging various personal injury damages as a result of alleged lead exposure and environmental contamination from the Complex. The plaintiffs voluntarily withdrew the lawsuits and then refiled the lawsuits in August and December 2008, which are comprised of 11 cases on behalf of 35 minor plaintiffs—all of whom are citizens and residents of La Oroya—in the Circuit Court of the State of Missouri, Twenty-Second Judicial Circuit, City of St. Louis, Missouri, U.S.A. (the "Lawsuits"). The allegations in each lawsuit are virtually identical, stating "[t]his is an action to seek recovery from Defendants for injuries, damages and losses suffered by each and every minor plaintiff named herein, who were minors at the time of their initial exposures and injuries as a result of exposure to the release of lead and other toxic substances . . . in the region of La Oroya, Peru."

37. In addition to seeking damages for alleged personal injuries, the plaintiffs seek punitive damages, and name as defendants Renco and Doe Run Resources, as well as their affiliated companies DR Acquisition Corp. and Renco Holdings, Inc., and directors and officers Marvin K. Kaiser, Albert Bruce Neil, Jeffrey L. Zelms, Theodore P. Fox III, Daniel L. Vornberg, and

Ira L. Rennert (together, the "Renco Defendants"). The plaintiffs did not bring claims against Activos Mineros, the Republic of Peru, or DRP, choosing instead to sue DRP's U.S.-based affiliates in the courts of the United States. The Lawsuits seek to hold DRP's U.S.-based owners and corporate affiliates, as well as directors and officers of these U.S.-based affiliated companies, liable for the alleged actions of DRP. Pursuant to applicable law and governing corporate documents, DRP is obligated to indemnify the Renco Defendants for any judgment that may be entered against them in the Lawsuit, as well as for any costs incurred in relation to the Lawsuits. More importantly, Activos Mineros and Peru are obligated to join these Lawsuits, defend the actions, and indemnify, release, protect and hold Renco, DRP and their affiliates harmless from any and all liability.

38. On October 31, 2007, in the same month that the Lawsuits were first filed, the then-President of Peru's Council of Ministers, Jorge del Castillo Galvez, wrote a letter to the United States Ambassador to Peru Michael McKinley, expressing the Republic of Peru's "deepest concerns" about the Lawsuits that had just been filed.[21] As the party that will be liable for any ultimate damages award under the Stock Transfer Agreement and the Guaranty, the Republic of Peru does not wish for the cases to proceed in the United States where, for example, punitive damages are possible. In his letter, Mr. del Castillo Galvez explained that, under principles of international law, the courts in the United States should "refuse to review the case" because the owner and operator of the Complex is DRP, a Peruvian company, the plaintiffs are Peruvian, the facts that are the basis of the Lawsuits have taken place in Peru, and any such claims should be brought in Peru.

39. The Lawsuits have proceeded slowly to date and pending motions, some of which move to dismiss the Lawsuits, have not yet been heard. On January 1, 2011, the Renco Defendants removed the case to federal court. Plaintiffs then moved to remand the case. On June 22, 2011, the United States District Court for the Eastern District of Missouri, Eastern Division, ruled that the case was properly removed to federal court. Defendants plan to request a stay of the case. On July 29, 2011 the court set a briefing schedule for Defendants' proposed motion to stay the case, ruling that all briefing must be concluded by September 22, 2011. After the stay has been ruled upon, the court will hold an additional scheduling conference to discuss discovery and other substantive motions.

[21] **Exhibit C-4**. Letter from Mr. Jorge del Castillo Galvez to Ambassador Michael McKinley, dated October 31, 2007.

40. On October 12, 2010, counsel for Renco and its affiliates wrote to Activos Mineros, the Ministry of Energy and Mines, and the Ministry of Economics and Finance of Peru to request that they honor their contractual obligations to take on the defense of the Lawsuits and release, protect and hold harmless Renco and its affiliates from those third-party claims. Renco and its affiliates reiterated their requests in letters dated November 12, 2010, December 14, 2010, February 18, 2011 and July 12, 2011. By letters dated November 5 and 26, 2010 and January 21, 2011, Activos Mineros responded, refusing to appear and defend the Lawsuits or to accept or assume any responsibility or liability. The Republic of Peru has not responded to date. As outlined above, Peru has suffered no prejudice in its defense of the claims, because no substantive proceedings have yet taken place. Further delay by Peru will result in irreparable financial and reputational harm to Renco.

## IV. Peru's Conduct Breaches its Obligations under the Treaty

41. Chapter 10 of the Treaty applies to measures adopted or maintained by a Party relating to a covered investment.[22] The Treaty defines the term "investment" broadly as "every asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, including . . . (a) an enterprise; (b) shares, stock, and other forms of equity participation in an enterprise; (c) bonds, debentures, other debt instruments, and loans; (d) futures, options, and other derivatives; (e) turnkey, construction, management, production, concession, revenue-sharing, and other similar contracts; (f) intellectual property rights; (g) licenses, authorizations, permits, and similar rights conferred pursuant to domestic law; and (h) other tangible or intangible, movable or immovable property, and related property rights, such as leases, mortgages, liens, and pledges; . . . ."[23] Renco's indirect ownership of DRP through its shareholding interest, DRP itself, and the Guaranty and Stock Transfer Agreement qualify as covered investments under this definition.

42. Chapter 10, Section B, of the Treaty grants a U.S. investor the right to submit to arbitration any investment dispute between an investor (either on its own behalf or on behalf of a Peruvian subsidiary that it owns or controls directly or indirectly) and Peru for breach of the Treaty obligations contained in Section A of Chapter 10 of the Treaty,[24] or of any "investment

[22] **Exhibit C-1**, Treaty at Article 10.1.

[23] *Id.* at Article 10.28 at 10-24 and 10-25.

[24] *Id.* at Articles 10.16(1)(a)(i)(A).

agreement" between the U.S. investor and a Peruvian national authority.[25] An "investment agreement" is defined as any written agreement between a national authority of a Party and a covered investment of another Party, on which the investor relies in establishing or acquiring an investment other than the written agreement itself, that grants certain rights to the investor.[26] The Stock Transfer Agreement and the Guaranty, which were contemplated, prepared and executed as part of a single investment transaction, qualify as "investment agreements" under the Treaty.

43. Section A of Chapter 10 of the Treaty sets out various substantive protections that Peru is obligated to afford to U.S. investments. The Treaty provides, *inter alia*, that Peru must (i) accord U.S. investments fair and equitable treatment and full protection and security,[27] (ii) treat U.S. investors and investments no less favorably than it treats its own investors and investments,[28] and (iii) not expropriate or nationalize U.S. investments, either directly or indirectly, through measures equivalent to expropriation or nationalization, except for a public purpose, in a non-discriminatory manner, on payment of prompt, adequate, and effective compensation, and in accordance with due process of law.[29]

44. The Treaty also requires Peru to treat U.S. investors and investments no less favorably than it treats investors and investments from countries other than the United States.[30] In bilateral investment treaties with other countries, Peru has agreed to observe any obligation into which it has entered with regard to investments of nationals from these other countries.[31] This commitment by Peru, known as an "umbrella clause," extends to the present case.

---

[25] *Id.* at Articles 10.16(1)(a)(i)(C).

[26] *Id.* at Article 10.28 at 10-25.

[27] *Id.* at Article 10.5(1).

[28] *Id.* at Article 10.3.

[29] *Id.* at Article 10.7(1).

[30] *Id.* at Article 10.4.

[31] *See, e.g.*, Article 4(2) of the Agreement between the Government of the Kingdom of Thailand and the Government of the Republic of Peru for the Promotion and Protection of Investments (signed and entered into force on November 15, 1991); Article 3(4) of the Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of The Netherlands and the Republic of Peru (signed on December 27, 1994, entered into force on February 1, 1996); Article 2(2) of the Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of Peru for the Promotion and Protection of Investments (signed on October 4, 1993, entered into force on April 21, 1994).

45. For the reasons set forth below, Peru's misconduct violates international law and the Treaty. Its actions and omissions continue to harm and impair Renco's substantial investment in the La Oroya Complex, and risk depriving Renco of its investment altogether without fair compensation.

**A. Peru's Pattern of Unfair Treatment of DRP Violates Article 10.5 of the Treaty**

46. Peru has engaged in a pattern of conduct of unfair and inequitable treatment in violation of Article 10.5 of the Treaty by, *inter alia*, imposing on DRP additional environmental projects and requirements, which increased the amount of time and money that DRP was required to spend, while simultaneously and improperly refusing to timely grant DRP the needed additional time to fulfill these new obligations.

47. Indeed, in addition to the actual project costs vastly exceeding Peru's initial estimates in 1997, the actual environmental infrastructure that existed at La Oroya at the time of the transfer caused DRP to spend additional sums and to do additional projects that were not originally anticipated, which became mandated by the government through resolutions. When DRP reasonably sought an extension of time in light of the changes required by Peru, Peru granted only a limited extension and imposed additional and onerous obligations upon DRP.

48. In part due to this short time-frame and these additional projects, DRP was understandably unable to complete the final PAMA project and reasonably sought a second extension in 2009, which the Ministry of Energy and Mines unreasonably refused. When the Congress of the Republic of Peru finally granted the extension by passing Law 29410, the Ministry of Energy and Mines improperly deprived DRP of the full benefits of the law by issuing harassing and onerous implementing regulations targeted at DRP that DRP could not possibly meet.

49. Moreover, during all of this time, Peru engaged in a smear campaign in the press against Renco and DRP. For example, during a time in which Peru knew that DRP was attempting to negotiate agreements with creditors and obtain financing, Peruvian President Alan Garcia stated in the press that he intended to cancel DRP's license to operate, stating that, "A company that abuses the country or plays games like Doe Run should be stopped."[32] Regarding negotiations between DRP and the government over reopening the Complex, Garcia was

[32] *See* Reuters, July 28, 2010, "Peru Garcia says Doe Run license being canceled."

quoted as saying that the government "will not allow a firm to blackmail the country."[33] Moreover, Peruvian Minister for Mining and Energy, Pedro Sanchez stated that, regardless of media statements made by the company, it "should be clear that they will not re-contaminate La Oroya as they have done before."[34] Peru's statements to the press were intended to create an erroneous public opinion that DRP was responsible for the contamination of La Oroya and remiss in its remediation obligations.

50. Peru's unfair refusal to timely grant reasonable PAMA extensions and its disparaging public campaign against Renco and DRP have created a hostile investment environment and have prevented DRP from securing new financing necessary to resume operations of the Complex.

51. In addition, and as discussed more fully below, Peru and Activos Mineros refused to honor their commitment to appear in and defend and assume responsibility and liability for the Lawsuits. Renco and DRP relied on this contractual commitment when they agreed to purchase the Company. As Centromin and Peru were well aware, the sale transaction would not have occurred without this critically important commitment by Centromin and Peru. The refusal by Peru and Activos Mineros to honor this commitment is a breach of Renco's and DRP's legitimate expectations when they made their substantial investment in Peru and constitutes yet another example of the unfair and inequitable treatment that they have experienced at the hand of Peru.

### B. Peru's Pattern of Treating DRP Less Favorably than it Treats Centromin / Activos Mineros Violates Article 10.3 of the Treaty

52. Peru's unfair treatment of DRP is in direct contrast to its treatment of Centromin/Activos Mineros, a company owned by Peru, in violation of Article 10.3 of the Treaty. As described above, DRP went through an extensive request process for each of the PAMA extensions that it received. This process included conducting detailed studies, submitting the reports of the studies to the Ministry of Energy and Mines, providing the public with notice and conducting public hearings. With respect to the first of the extensions that Peru begrudgingly granted, Peru imposed upon DRP obligations to complete more projects and to satisfy additional environmental standards. Peru also subjected DRP to continuous daily inspections by an

[33] *See* Living in Peru, July 28, 2010, "Peru cancels permit for US-owned smelter over pollution."

[34] *See* Dow Jones Commodities News, August 5, 2010, "Peru Minister: Doe Run Peru Can't Reopen Plant without Upgrade."

inspector living in La Oroya. With respect to the second extension that Peru granted, Peru subjected DRP to financial conditions so onerous that DRP could not possibly complete its last remaining PAMA project.

53. Meanwhile, Centromin requested a PAMA modification in 2000 that included an extension of its time to complete its PAMA projects. Centromin did not even notify DRP. DRP had no opportunity to object or participate in the process. Peru did not require Centromin to conduct studies or submit reports or notify the public or conduct public hearings. Peru granted Centromin's request for a PAMA modification without imposing any additional obligations or more stringent environmental standards on Centromin.

54. Moreover, while Peru subjected DRP to rigorous inspections, Peru seemingly imposed little quality control over Centromin, or more recently, Activos Mineros. For example, one of Centromin's PAMA projects was the proper abandonment and closure of the arsenic trioxide deposit that Centromin used during its operations of the Complex. While Centromin claims to have completed this project and Peru seems to be satisfied that this project is complete, samples indicate that the deposit still leaks substantial amounts of arsenic into the river.

55. In addition, even though its PAMA was modified to extend its deadline to remediate the soil in and around La Oroya until 2010, Centromin and Activos Mineros failed to remediate the soil and, in fact, never made any substantial progress toward completing this project. Centromin has suffered no consequences whatsoever as a result of these failures, even though the deadline to complete its PAMA obligations has passed. The Ministry of Mines has not imposed fines on Activos Mineros or burdened it with additional projects or stricter financial restrictions. Peruvian officials have not engaged in a smear campaign against Activos Mineros in the press. Rather, Activos Mineros—its PAMA already expired—quietly sits in a state of nonperformance, while Peru vilifies DRP whose PAMA deadline has not yet passed.

### C. Peru's Breaches of its Obligations to Renco under the Stock Transfer Agreement and Guaranty Constitute a Violation of the Treaty

56. Peru has failed to observe its obligations to Renco under the Stock Transfer Agreement and the Guaranty, which were executed as part of a single transaction and are investment agreements, by failing to, *inter alia*, (1) appear in and defend the Lawsuits; (2) assume responsibility and liability for any damages that the plaintiffs may recover in the Lawsuits; (3) indemnify, release,

protect and hold Renco and its affiliates harmless from those third-party claims; (4) remediate the soil in and around the town of La Oroya, and (5) honor the *force majeure* clause in the Stock Transfer Agreement by granting DRP reasonable and adequate extensions of time to fulfill the PAMA.

57. This constitutes a breach of both Article 10.16(1)(a)(i)(C) of the Treaty and of the umbrella clause, made applicable to this case by virtue of Article 10.4 of the Treaty.

**D. Peru's Unfair Treatment of DRP Continues and Has the Potential to Culminate in an Expropriation of Renco's Investment, in Violation of Article 10.7 of the Treaty**

58. Peru's unfair treatment of DRP continues and has the potential to culminate in an expropriation of the Complex, in violation of Article 10.7 of the Treaty.

59. Because DRP was unable to obtain financing, DRP was unable to pay certain of its suppliers. In February 2010, one supplier placed DRP into involuntary bankruptcy. DRP had been working with its creditors to reach a repayment deal, but on October 1, 2010, the Peruvian bankruptcy agency published a list of outstanding creditors. DRP was surprised to learn that the government of Peru filed several claims in an attempt to become the largest creditor, and thus control the fate of the company.

60. Peru's largest (and patently bogus) claim against DRP is for payment of the cost of completion of the remaining PAMA project. But the time for completion of the PAMA has not yet passed, and in any event DRP never agreed to pay Peru the remaining cost in case of non-completion of a PAMA project.

61. On March 1, 2011, INDECOPI decided that this claim by Peru was unfounded and rejected it. INDECOPI similarly rejected other claims by Peru. Nevertheless, Peru appealed the decision on March 7, 2011 and continues to pursue its unfounded claims.

## V. <u>Agreement to Arbitrate</u>

62. In the event "that a disputing party considers that an investment dispute cannot be settled by consultation and negotiation," Article 10.16(1) of the Treaty provides that:

> (a) the claimant, on its own behalf, may submit to arbitration under this Section a claim

(i) that the respondent has breached
(A) an obligation under Section A,
(B) an investment authorization, or
(C) an investment agreement;

and

(ii) that the claimant has incurred loss or damage by reason of, or arising out of that breach; and

(b) the claimant, on behalf of an enterprise of the respondent that is a juridical person that the claimant owns or controls directly or indirectly, may submit to arbitration under this Section a claim
(i) that the respondent has breached
(A) an obligation under Section A,
(B) an investment authorization, or
(C) an investment agreement;

and

(ii) that the claimant has incurred loss or damage by reason of, or arising out of that breach,

provided that a claimant may submit pursuant to subparagraph (a)(i)(C) or (b)(i)(C) a claim for breach of an investment agreement only if the subject matter of the claim and the claimed damages directly relate to the covered investment that was established or acquired, or sought to be established or acquired, in reliance on the relevant investment agreement.

63. The investor concerned may submit such a claim to arbitration under the UNCITRAL Arbitration Rules.[35]

64. The Treaty sets out a few additional requirements and suggestions before an arbitration can be brought, all of which have been met here.

65. In Article 10.17 of the Treaty, Peru "consents to the submission of a claim to arbitration under this Section in accordance with this Agreement." Under the Treaty, a party may pursue arbitration if (a) it has provided written notice of its intention to submit the claim to arbitration ("notice of intent") at least 90 days before submitting any claim to arbitration,[36] and (2) six months have elapsed since the events giving rise to the claim.[37] Moreover, to submit a claim for breach of an investment agreement, the claimant should not have submitted "the same alleged breach" to an administrative tribunal or court of the host State or to any other binding

---

[35] **Exhibit C-1**, Treaty at Articles 10.16(3)(c) and 10.16(4).

[36] *Id.* at Article 10.16(2).

[37] *Id.* at Article 10.16(3).

dispute settlement procedure.[38] In addition, the Treaty suggests that the parties should initially seek a resolution through consultation and negotiation.[39]

66. Each of these requirements and suggestions has been met here. First, Renco dispatched its Notice of Intent on December 29, 2010, which Peru received on January 3, 2011, notifying Peru of Renco's intention to submit the claims described herein to arbitration in accordance with Section B of the Treaty.[40] The 90-day period has thus expired. Second, as set forth above, more than six months have lapsed since the events giving rise to Renco's claims. Third, Renco has not submitted its claim for breaches of the Stock Transfer Agreement and the Guaranty either to the courts or administrative tribunals of Peru or to any other applicable dispute settlement procedure. Finally, Renco attempted to resolve the present dispute with Peru and Activos Mineros. Claimant's representatives met with various government officials on numerous occasions for this purpose. Claimant also delivered letters requesting that Peru and Activos Mineros honor certain of their obligations, and notifying them that Claimant would resort to any and all available legal remedies if the matter could not be resolved. All efforts at a negotiated solution have failed.

67. Finally, as required by Article 10.18(2) of the Treaty, Renco waives its right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceeding with respect to any measure alleged to constitute a breach referred to in Article 10.16, except for proceedings for interim injunctive relief, not involving payment of monetary damages, before a judicial or administrative tribunal of Peru. To the extent that the Tribunal may decline to hear any claims asserted herein on jurisdictional or admissibility grounds, Claimant reserves the right to bring such claims in another forum for resolution on the merits.

---

[38] *Id.* at Article 10.18(4)(a).

[39] *Id.* at Article 10.15.

[40] Claimant's Notice of Intent to Commence Arbitration, dated December 29, 2010.

## VI. Number of Arbitrators; Claimant's Party-Appointed Arbitrator; Proposed Language and Place of Arbitration

68. Article 10.19(1) of the Treaty provides that the tribunal shall be comprised of three arbitrators, one arbitrator appointed by each of the disputing parties and the third, who shall be the presiding arbitrator, appointed by agreement of the disputing parties.

69. Claimant, Renco, hereby appoints L. Yves Fortier as its party-appointed arbitrator. Mr. Fortier may be contacted at:

Ogilvy Renault
Suite 2500, 1 Place Ville Marie
Montreal, Quebec H3B 1R1
CANADA
Phone: (514) 847-4740
Facsimile: (514) 286-5474
Email: yfortier@ogilvyrenault.com

70. Renco proposes that the arbitral proceedings be conducted in English, and that the place of arbitration be fixed in The Hague, Netherlands.

## VII. Request for Relief

71. Peru's continuing violation of its obligations under the Guaranty to step-in, defend, and release Renco from third party claims in the US harms Renco on a daily basis and requires urgent action. To date Peru has suffered no prejudice in its defense of the claims, because no substantive proceedings have taken place, as outlined above. However, on July 29th, the court ruled that briefing on a motion to stay must be concluded by September 22, 2011 and that if necessary, further scheduling on discovery and other motions would be decided after the stay motion is ruled on. Further delay by Peru in fulfilling this obligation may therefore result in irreparable financial and reputational harm to Renco as the cases proceed.

72. In light of the circumstances described above, Claimant Renco requests an interim award against Peru granting the following relief:

a. A declaration that Peru breached an obligation under Article 10.16(1)(a)(i)(C) of the United States-Peru Trade Promotion Agreement by breaching its obligations under the Stock Transfer Agreement and the Guaranty;

b. A declaration that Peru is required to (1) appear in and defend the Lawsuits and any similar lawsuits, (2) indemnify, release, protect and hold Renco, DRP and

their affiliates harmless from those third-party claims, (3) remediate the soil in and around the town of La Oroya and (4) grant DRP an extension of time to fulfill the PAMA;

c. An award to Renco of all costs associated with the interim proceedings, including attorneys' fees.

73. Claimant Renco requests a final award against Peru granting the following relief:

a. An award for all damages caused to Renco as a result of Peru's breaches of the Treaty;

b. An award for all damages caused to Renco as a result of Peru's failure to assume responsibility and liability for any damages that may be recovered and any judgments that may be issued in the Lawsuits and any similar lawsuits, indemnify, release, protect, and hold Renco, DRP and their affiliates harmless from these third-party claims, and including all costs and attorneys' fees (including expert costs) incurred by Renco, and the Renco Defendants defending the Lawsuits;

c. An award of moral damages to compensate Renco for the non-pecuniary harm that Renco and DRP have suffered due to Peru's violations of the Treaty;

d. An award to Renco of all costs associated with this proceeding, including attorneys' fees;

e. An award of both pre- and post-award interest until the date of payment; and

f. Any other relief that the Tribunal deems just and proper.

74. Claimant reserves the right to amend or supplement the present Amended Notice of Arbitration and Statement of Claim, to make additional claims, and to request such additional or different relief as may be appropriate.

Dated: August 9, 2011

Respectfully submitted,

Edward G. Kehoe
Guillermo Aguilar-Alvarez
Caline Mouawad
Kana Ellis Caplan
Alejandro Cremades
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
(212) 556-2100
(212) 556-2222 (Facsimile)

# Exhibit C-1

# Chapter Ten

# Investment

## Section A: Investment

### Article 10.1: Scope and Coverage[1]

1. This Chapter applies to measures adopted or maintained by a Party relating to:

(a) investors of another Party;

(b) covered investments; and

(c) with respect to Articles 10.9 and 10.11, all investments in the territory of the Party.

2. A Party's obligations under this Section shall apply to a state enterprise or other person when it exercises any regulatory, administrative, or other governmental authority delegated to it by that Party, such as the authority to expropriate, grant licenses, approve commercial transactions, or impose quotas, fees, or other charges.

3. For greater certainty, this Chapter does not bind any Party in relation to any act or fact that took place or any situation that ceased to exist before the date of entry into force of this Agreement.

### Article 10.2: Relation to Other Chapters

1. In the event of any inconsistency between this Chapter and another Chapter, the other Chapter shall prevail to the extent of the inconsistency.

2. A requirement by a Party that a service supplier of another Party post a bond or other form of financial security as a condition of the cross-border supply of a service does not of itself make this Chapter applicable to measures adopted or maintained by the Party relating to such cross-border supply of the service. This Chapter applies to measures adopted or maintained by the Party relating to the posted bond or financial security, to the extent that such bond or financial security is a covered investment.

---

[1] For greater certainty, nothing in this Chapter shall be construed to impose an obligation on a Party to privatize any investment that it owns or controls or to prevent a Party from designating a monopoly, provided that, if a Party adopts or maintains a measure to privatize such an investment or a measure to designate a monopoly, this Chapter shall apply to such measure.

3. This Chapter does not apply to measures adopted or maintained by a Party to the extent that they are covered by Chapter Twelve (Financial Services).

**Article 10.3: National Treatment**

1. Each Party shall accord to investors of another Party treatment no less favorable than that it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments in its territory.

2. Each Party shall accord to covered investments treatment no less favorable than that it accords, in like circumstances, to investments in its territory of its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

3. The treatment to be accorded by a Party under paragraphs 1 and 2 means, with respect to a regional level of government, treatment no less favorable than the most favorable treatment accorded, in like circumstances, by that regional level of government to investors, and to investments of investors, of the Party of which it forms a part.

**Article 10.4: Most-Favored-Nation Treatment**

1. Each Party shall accord to investors of another Party treatment no less favorable than that it accords, in like circumstances, to investors of any other Party or of any non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments in its territory.

2. Each Party shall accord to covered investments treatment no less favorable than that it accords, in like circumstances, to investments in its territory of investors of any other Party or of any non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.[2]

**Article 10.5: Minimum Standard of Treatment[3]**

1. Each Party shall accord to covered investments treatment in accordance with customary international law, including fair and equitable treatment and full protection and security.

---

[2] For greater certainty, treatment "with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments" referred to in paragraphs 1 and 2 of Article 10.4 does not encompass dispute resolution mechanisms, such as those in Section B, that are provided for in international investment treaties or trade agreements.

[3] Article 10.5 shall be interpreted in accordance with Annex 10-A.

2. For greater certainty, paragraph 1 prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to covered investments. The concepts of "fair and equitable treatment" and "full protection and security" do not require treatment in addition to or beyond that which is required by that standard, and do not create additional substantive rights. The obligation in paragraph 1 to provide:

(a) "fair and equitable treatment" includes the obligation not to deny justice in criminal, civil, or administrative adjudicatory proceedings in accordance with the principle of due process embodied in the principal legal systems of the world; and

(b) "full protection and security" requires each Party to provide the level of police protection required under customary international law.

3. A determination that there has been a breach of another provision of this Agreement, or of a separate international agreement, does not establish that there has been a breach of this Article.

**Article 10.6: Treatment in Case of Strife**

1. Notwithstanding Article 10.13.5(b), each Party shall accord to investors of another Party, and to covered investments, non-discriminatory treatment with respect to measures it adopts or maintains relating to losses suffered by investments in its territory owing to armed conflict or civil strife.

2. Notwithstanding paragraph 1, if an investor of a Party, in the situations referred to in paragraph 1, suffers a loss in the territory of another Party resulting from:

(a) requisitioning of its covered investment or part thereof by the latter's forces or authorities; or

(b) destruction of its covered investment or part thereof by the latter's forces or authorities, which was not required by the necessity of the situation,

the latter Party shall provide the investor restitution, compensation, or both, as appropriate, for such loss. Any compensation shall be prompt, adequate, and effective in accordance with Article 10.7.2 through 10.7.4, *mutatis mutandis*.

3. Paragraph 1 does not apply to existing measures relating to subsidies or grants that would be inconsistent with Article 10.3 but for Article 10.13.5(b).

**Article 10.7: Expropriation and Compensation**[4]

1. No Party may expropriate or nationalize a covered investment either directly or indirectly through measures equivalent to expropriation or nationalization ("expropriation"), except:

(a) for a public purpose[5];

(b) in a non-discriminatory manner;

(c) on payment of prompt, adequate, and effective compensation; and

(d) in accordance with due process of law and Article 10.5.

2. The compensation referred to in paragraph 1(c) shall:

(a) be paid without delay;

(b) be equivalent to the fair market value of the expropriated investment immediately before the expropriation took place ("the date of expropriation");

(c) not reflect any change in value occurring because the intended expropriation had become known earlier; and

(d) be fully realizable and freely transferable.

3. If the fair market value is denominated in a freely usable currency, the compensation referred to in paragraph 1(c) shall be no less than the fair market value on the date of expropriation, plus interest at a commercially reasonable rate for that currency, accrued from the date of expropriation until the date of payment.

4. If the fair market value is denominated in a currency that is not freely usable, the compensation referred to in paragraph 1(c) – converted into the currency of payment at the market rate of exchange prevailing on the date of payment – shall be no less than:

(a) the fair market value on the date of expropriation, converted into a freely usable currency at the market rate of exchange prevailing on that date, plus

(b) interest, at a commercially reasonable rate for that freely usable currency, accrued from the date of expropriation until the date of payment.

---

[4] Article 10.7 shall be interpreted in accordance with Annex 10-B.

[5] For greater certainty, for purposes of this article, the term "public purpose" refers to a concept in customary international law. Domestic law may express this or a similar concept using different terms, such as "public necessity," "public interest," or "public use."

5. This Article does not apply to the issuance of compulsory licenses granted in relation to intellectual property rights in accordance with the TRIPS Agreement, or to the revocation, limitation, or creation of intellectual property rights, to the extent that such issuance, revocation, limitation, or creation is consistent with Chapter Sixteen (Intellectual Property Rights).

**Article 10.8: Transfers**

1. Each Party shall permit all transfers relating to a covered investment to be made freely and without delay into and out of its territory. Such transfers include:

(a) contributions to capital;

(b) profits, dividends, capital gains, and proceeds from the sale of all or any part of the covered investment or from the partial or complete liquidation of the covered investment;

(c) interest, royalty payments, management fees, and technical assistance and other fees;

(d) payments made under a contract, including a loan agreement;

(e) payments made pursuant to Article 10.6.1 and 10.6.2 and Article 10.7; and

(f) payments arising out of a dispute.

2. Each Party shall permit transfers relating to a covered investment to be made in a freely usable currency at the market rate of exchange prevailing at the time of transfer.

3. Each Party shall permit returns in kind relating to a covered investment to be made as authorized or specified in a written agreement between the Party and a covered investment or an investor of another Party.

4. Notwithstanding paragraphs 1 through 3, a Party may prevent a transfer through the equitable, non-discriminatory, and good faith application of its laws relating to:

(a) bankruptcy, insolvency, or the protection of the rights of creditors;

(b) issuing, trading, or dealing in securities, futures, options, or derivatives;

(c) criminal or penal offenses;

(d) financial reporting or record keeping of transfers when necessary to assist law enforcement or financial regulatory authorities; or

(e) ensuring compliance with orders or judgments in judicial or administrative proceedings.

**Article 10.9: Performance Requirements**

1. No Party may, in connection with the establishment, acquisition, expansion, management, conduct, operation, or sale or other disposition of an investment of an investor of a Party or of a non-Party in its territory, impose or enforce any requirement or enforce any commitment or undertaking:[6]

(a) to export a given level or percentage of goods or services;

(b) to achieve a given level or percentage of domestic content;

(c) to purchase, use, or accord a preference to goods produced in its territory, or to purchase goods from persons in its territory;

(d) to relate in any way the volume or value of imports to the volume or value of exports or to the amount of foreign exchange inflows associated with such investment;

(e) to restrict sales of goods or services in its territory that such investment produces or supplies by relating such sales in any way to the volume or value of its exports or foreign exchange earnings;

(f) to transfer a particular technology, a production process, or other proprietary knowledge to a person in its territory;[7] or

(g) to supply exclusively from the territory of the Party the goods that such investment produces or the services that it supplies to a specific regional market or to the world market.

2. No Party may condition the receipt or continued receipt of an advantage, in connection with the establishment, acquisition, expansion, management, conduct, operation, or sale or other disposition of an investment in its territory of an investor of a Party or of a non-Party, on compliance with any requirement:

---

[6] For greater certainty, a condition for the receipt or continued receipt of an advantage referred to in paragraph 2 does not constitute a "commitment or undertaking" for the purposes of paragraph 1.

[7] For greater certainty, nothing in paragraph 1 shall be construed to prevent a Party, in connection with the establishment, acquisition, expansion, management, conduct, operation, or sale or other disposition of an investment of an investor of a Party or of a non-Party in its territory, from imposing or enforcing a requirement or enforcing a commitment or undertaking to train workers in its territory, provided that such training does not require the transfer of a particular technology, production process, or other proprietary knowledge to a person in its territory.

(a) to achieve a given level or percentage of domestic content;

(b) to purchase, use, or accord a preference to goods produced in its territory, or to purchase goods from persons in its territory;

(c) to relate in any way the volume or value of imports to the volume or value of exports or to the amount of foreign exchange inflows associated with such investment; or

(d) to restrict sales of goods or services in its territory that such investment produces or supplies by relating such sales in any way to the volume or value of its exports or foreign exchange earnings.

3. (a) Nothing in paragraph 2 shall be construed to prevent a Party from conditioning the receipt or continued receipt of an advantage, in connection with an investment in its territory of an investor of a Party or of a non-Party, on compliance with a requirement to locate production, supply a service, train or employ workers, construct or expand particular facilities, or carry out research and development, in its territory.

(b) Paragraph 1(f) does not apply:

(i) when a Party authorizes use of an intellectual property right in accordance with Article 31 of the TRIPS Agreement, or to measures requiring the disclosure of proprietary information that fall within the scope of, and are consistent with, Article 39 of the TRIPS Agreement; or

(ii) when the requirement is imposed or the commitment or undertaking is enforced by a court, administrative tribunal, or competition authority to remedy a practice determined after judicial or administrative process to be anticompetitive under the Party's competition laws.[8]

(c) Provided that such measures are not applied in an arbitrary or unjustifiable manner, and provided that such measures do not constitute a disguised restriction on international trade or investment, paragraphs 1(b), (c), and (f), and 2(a) and (b), shall not be construed to prevent a Party from adopting or maintaining measures, including environmental measures:

(i) necessary to secure compliance with laws and regulations that are not inconsistent with this Agreement,

(ii) necessary to protect human, animal, or plant life or health, or

[8] The Parties recognize that a patent does not necessarily confer market power.

(iii) related to the conservation of living or non-living exhaustible natural resources.

(d) Paragraphs 1(a), (b), and (c), and 2(a) and (b), do not apply to qualification requirements for goods or services with respect to export promotion and foreign aid programs.

(e) Paragraphs 1(b), (c), (f), and (g), and 2(a) and (b), do not apply to procurement.

(f) Paragraphs 2(a) and (b) do not apply to requirements imposed by an importing Party relating to the content of goods necessary to qualify for preferential tariffs or preferential quotas.

4. For greater certainty, paragraphs 1 and 2 do not apply to any commitment, undertaking, or requirement other than those set out in those paragraphs.

5. This Article does not preclude enforcement of any commitment, undertaking, or requirement between private parties, where a Party did not impose or require the commitment, undertaking, or requirement.

**Article 10.10: Senior Management and Boards of Directors**

1. No Party may require that an enterprise of that Party that is a covered investment appoint to senior management positions natural persons of any particular nationality.

2. A Party may require that a majority of the board of directors, or any committee thereof, of an enterprise of that Party that is a covered investment, be of a particular nationality, or resident in the territory of the Party, provided that the requirement does not materially impair the ability of the investor to exercise control over its investment.

**Article 10.11: Investment and Environment**

Nothing in this Chapter shall be construed to prevent a Party from adopting, maintaining, or enforcing any measure otherwise consistent with this Chapter that it considers appropriate to ensure that investment activity in its territory is undertaken in a manner sensitive to environmental concerns.

**Article 10.12: Denial of Benefits**

1. A Party may deny the benefits of this Chapter to an investor of another Party that is an enterprise of such other Party and to investments of that investor if persons of a non-Party own or control the enterprise and the denying Party:

(a) does not maintain diplomatic relations with the non-Party; or

(b) adopts or maintains measures with respect to the non-Party or a person of the non-Party that prohibit transactions with the enterprise or that would be violated or circumvented if the benefits of this Chapter were accorded to the enterprise or to its investments.

2. A Party may deny the benefits of this Chapter to an investor of another Party that is an enterprise of such other Party and to investments of that investor if the enterprise has no substantial business activities in the territory of any Party, other than the denying Party, and persons of a non-Party, or of the denying Party, own or control the enterprise.

**Article 10.13: Non-Conforming Measures**

1. Articles 10.3, 10.4, 10.9, and 10.10 do not apply to:

(a) any existing non-conforming measure that is maintained by a Party at:

(i) the central level of government, as set out by that Party in its Schedule to Annex I,

(ii) a regional level of government, as set out by that Party in its Schedule to Annex I, or

(iii) a local level of government;

(b) the continuation or prompt renewal of any non-conforming measure referred to in subparagraph (a); or

(c) an amendment to any non-conforming measure referred to in subparagraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with Article 10.3, 10.4, 10.9, or 10.10.

2. Articles 10.3, 10.4, 10.9, and 10.10 do not apply to any measure that a Party adopts or maintains with respect to sectors, subsectors, or activities, as set out in its Schedule to Annex II.

3. No Party may, under any measure adopted after the date of entry into force of this Agreement and covered by its Schedule to Annex II, require an investor of another Party, by reason of its nationality, to sell or otherwise dispose of an investment existing at the time the measure becomes effective.

4. Articles 10.3 and 10.4 do not apply to any measure that is an exception to, or derogation from, the obligations under paragraph 8 of Article 16.1 (General Provisions) as specifically provided in that Article.

5. Articles 10.3, 10.4, and 10.10 do not apply to:

(a) procurement; or

(b) subsidies or grants provided by a Party, including government-supported loans, guarantees, and insurance.

**Article 10.14: Special Formalities and Information Requirements**

1. Nothing in Article 10.3 shall be construed to prevent a Party from adopting or maintaining a measure that prescribes special formalities in connection with covered investments, such as a requirement that investors be residents of the Party or that covered investments be legally constituted under the laws or regulations of the Party, provided that such formalities do not materially impair the protections afforded by a Party to investors of another Party and covered investments pursuant to this Chapter.

2. Notwithstanding Articles 10.3 and 10.4, a Party may require an investor of another Party or its covered investment to provide information concerning that investment solely for informational or statistical purposes. The Party shall protect any confidential business information from any disclosure that would prejudice the competitive position of the investor or the covered investment. Nothing in this paragraph shall be construed to prevent a Party from otherwise obtaining or disclosing information in connection with the equitable and good faith application of its law.

## Section B: Investor-State Dispute Settlement

**Article 10.15: Consultation and Negotiation**

In the event of an investment dispute, the claimant and the respondent should initially seek to resolve the dispute through consultation and negotiation, which may include the use of non-binding, third-party procedures.

**Article 10.16: Submission of a Claim to Arbitration**

1. In the event that a disputing party considers that an investment dispute cannot be settled by consultation and negotiation:

(a) the claimant, on its own behalf, may submit to arbitration under this Section a claim

(i) that the respondent has breached

(A) an obligation under Section A,

(B) an investment authorization, or

(C) an investment agreement;

and

(ii) that the claimant has incurred loss or damage by reason of, or arising out of, that breach; and

(b) the claimant, on behalf of an enterprise of the respondent that is a juridical person that the claimant owns or controls directly or indirectly, may submit to arbitration under this Section a claim

(i) that the respondent has breached

(A) an obligation under Section A,

(B) an investment authorization, or

(C) an investment agreement;

and

(ii) that the enterprise has incurred loss or damage by reason of, or arising out of, that breach,

provided that a claimant may submit pursuant to subparagraph (a)(i)(C) or (b)(i)(C) a claim for breach of an investment agreement only if the subject matter of the claim and the claimed damages directly relate to the covered investment that was established or acquired, or sought to be established or acquired, in reliance on the relevant investment agreement.

2. At least 90 days before submitting any claim to arbitration under this Section, a claimant shall deliver to the respondent a written notice of its intention to submit the claim to arbitration ("notice of intent"). The notice shall specify:

(a) the name and address of the claimant and, where a claim is submitted on behalf of an enterprise, the name, address, and place of incorporation of the enterprise;

(b) for each claim, the provision of this Agreement, investment authorization, or investment agreement alleged to have been breached and any other relevant provisions;

(c) the legal and factual basis for each claim; and

(d) the relief sought and the approximate amount of damages claimed.

3. Provided that six months have elapsed since the events giving rise to the claim, a claimant may submit a claim referred to in paragraph 1:

(a) under the ICSID Convention and the ICSID Rules of Procedures for Arbitration Proceedings, provided that both the respondent and the Party of the claimant are parties to the ICSID Convention;

(b) under the ICSID Additional Facility Rules, provided that either the respondent or the Party of the claimant is a party to the ICSID Convention;

(c) under the UNCITRAL Arbitration Rules; or

(d) if the claimant and respondent agree, to any other arbitration institution or under any other arbitration rules.

4. A claim shall be deemed submitted to arbitration under this Section when the claimant's notice of or request for arbitration ("notice of arbitration"):

(a) referred to in paragraph 1 of Article 36 of the ICSID Convention is received by the Secretary-General;

(b) referred to in Article 2 of Schedule C of the ICSID Additional Facility Rules is received by the Secretary-General;

(c) referred to in Article 3 of the UNCITRAL Arbitration Rules, together with the statement of claim referred to in Article 18 of the UNCITRAL Arbitration Rules, are received by the respondent; or

(d) referred to under any arbitral institution or arbitral rules selected under paragraph 3(d) is received by the respondent.

A claim asserted by the claimant for the first time after such notice of arbitration is submitted shall be deemed submitted to arbitration under this Section on the date of its receipt under the applicable arbitral rules.

5. The arbitration rules applicable under paragraph 3, and in effect on the date the claim or claims were submitted to arbitration under this Section, shall govern the arbitration except to the extent modified by this Agreement.

6. The claimant shall provide with the notice of arbitration:

(a) the name of the arbitrator that the claimant appoints; or

(b) the claimant's written consent for the Secretary-General to appoint that arbitrator.

**Article 10.17: Consent of Each Party to Arbitration**

1. Each Party consents to the submission of a claim to arbitration under this Section in accordance with this Agreement.

2. The consent under paragraph 1 and the submission of a claim to arbitration under this Section shall satisfy the requirements of:

(a) Chapter II of the ICSID Convention (Jurisdiction of the Centre) and the ICSID Additional Facility Rules for written consent of the parties to the dispute;

(b) Article II of the New York Convention for an "agreement in writing;" and

(c) Article I of the Inter-American Convention for an "agreement."

**Article 10.18: Conditions and Limitations on Consent of Each Party**

1. No claim may be submitted to arbitration under this Section if more than three years have elapsed from the date on which the claimant first acquired, or should have first acquired, knowledge of the breach alleged under Article 10.16.1 and knowledge that the claimant (for claims brought under Article 10.16.1(a)) or the enterprise (for claims brought under Article 10.16.1(b)) has incurred loss or damage.

2. No claim may be submitted to arbitration under this Section unless:

(a) the claimant consents in writing to arbitration in accordance with the procedures set out in this Agreement; and

(b) the notice of arbitration is accompanied,

(i) for claims submitted to arbitration under Article 10.16.1(a), by the claimant's written waiver, and

(ii) for claims submitted to arbitration under Article 10.16.1(b), by the claimant's and the enterprise's written waivers

of any right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceeding with respect to any measure alleged to constitute a breach referred to in Article 10.16.

3. Notwithstanding paragraph 2(b), the claimant (for claims brought under Article 10.16.1(a)) and the claimant or the enterprise (for claims brought under Article 10.16.1(b)) may

initiate or continue an action that seeks interim injunctive relief and does not involve the payment of monetary damages before a judicial or administrative tribunal of the respondent, provided that the action is brought for the sole purpose of preserving the claimant's or the enterprise's rights and interests during the pendency of the arbitration.[9]

4. (a) No claim may be submitted to arbitration:

(i) for breach of an investment authorization under Article 10.16.1(a)(i)(B) or Article 10.16.1(b)(i)(B), or

(ii) for breach of an investment agreement under Article 10.16.1(a)(i)(C) or Article 10.16.1(b)(i)(C),

if the claimant (for claims brought under 10.16.1(a)) or the claimant or the enterprise (for claims brought under 10.16.1(b)) has previously submitted the same alleged breach to an administrative tribunal or court of the respondent, or to any other binding dispute settlement procedure.

(b) For greater certainty, if a claimant elects to submit a claim of the type described in subparagraph (a) to an administrative tribunal or court of the respondent, or to any other binding dispute settlement procedure, that election shall be definitive, and the claimant may not thereafter submit the claim to arbitration under Section B.

**Article 10.19: Selection of Arbitrators**

1. Unless the disputing parties otherwise agree, the tribunal shall comprise three arbitrators, one arbitrator appointed by each of the disputing parties and the third, who shall be the presiding arbitrator, appointed by agreement of the disputing parties.

2. The Secretary-General shall serve as appointing authority for an arbitration under this Section.

3. If a tribunal has not been constituted within 75 days from the date that a claim is submitted to arbitration under this Section, the Secretary-General, on the request of a disputing party, shall appoint, in his or her discretion, the arbitrator or arbitrators not yet appointed.

[9] In an action for interim injunctive relief described in paragraph 3 (including an action seeking to preserve evidence or property during the pendency of a dispute submitted to arbitration), a judicial or administrative tribunal of the Party that is the respondent in a dispute submitted to arbitration under Section B may apply the law of that Party, including its rules on the conflict of laws, and such rules of international law as may be applicable.

4. For purposes of Article 39 of the ICSID Convention and Article 7 of Schedule C to the ICSID Additional Facility Rules, and without prejudice to an objection to an arbitrator on a ground other than nationality:

(a) the respondent agrees to the appointment of each individual member of a tribunal established under the ICSID Convention or the ICSID Additional Facility Rules;

(b) a claimant referred to in Article 10.16.1(a) may submit a claim to arbitration under this Section, or continue a claim, under the ICSID Convention or the ICSID Additional Facility Rules, only on condition that the claimant agrees in writing to the appointment of each individual member of the tribunal; and

(c) a claimant referred to in Article 10.16.1(b) may submit a claim to arbitration under this Section, or continue a claim, under the ICSID Convention or the ICSID Additional Facility Rules, only on condition that the claimant and the enterprise agree in writing to the appointment of each individual member of the tribunal.

**Article 10.20: Conduct of the Arbitration**

1. The disputing parties may agree on the legal place of any arbitration under the arbitral rules applicable under Article 10.16.3. If the disputing parties fail to reach agreement, the tribunal shall determine the place in accordance with the applicable arbitral rules, provided that the place shall be in the territory of a State that is a party to the New York Convention.

2. A non-disputing Party may make oral and written submissions to the tribunal regarding the interpretation of this Agreement.

3. The tribunal shall have the authority to accept and consider *amicus curiae* submissions from a person or entity that is not a disputing party. Each submission shall identify the author and any person or entity that has provided, or will provide, any financial or other assistance in preparing the submission.

4. Without prejudice to a tribunal's authority to address other objections as a preliminary question, such as an objection that a dispute is not within the tribunal's competence, a tribunal shall address and decide as a preliminary question any objection by the respondent that, as a matter of law, a claim submitted is not a claim for which an award in favor of the claimant may be made under Article 10.26.[10]

[10] For greater certainty, with respect to a claim submitted under Article 10.16.1(a)(i)(C) or 10.16.1(b)(i)(C), an objection that, as a matter of law, a claim submitted is not a claim for which an award in favor of the claimant may be made under Article 10.26 may include, where applicable, an objection provided for under the law of the respondent.

(a) Such objection shall be submitted to the tribunal as soon as possible after the tribunal is constituted, and in no event later than the date the tribunal fixes for the respondent to submit its counter-memorial (or, in the case of an amendment to the notice of arbitration, the date the tribunal fixes for the respondent to submit its response to the amendment).

(b) On receipt of an objection under this paragraph, the tribunal shall suspend any proceedings on the merits, establish a schedule for considering the objection consistent with any schedule it has established for considering any other preliminary question, and issue a decision or award on the objection, stating the grounds therefor.

(c) In deciding an objection under this paragraph, the tribunal shall assume to be true claimant's factual allegations in support of any claim in the notice of arbitration (or any amendment thereof) and, in disputes brought under the UNCITRAL Arbitration Rules, the statement of claim referred to in Article 18 of the UNCITRAL Arbitration Rules. The tribunal may also consider any relevant facts not in dispute.

(d) The respondent does not waive any objection as to competence or any argument on the merits merely because the respondent did or did not raise an objection under this paragraph or make use of the expedited procedure set out in paragraph 5.

5. In the event that the respondent so requests within 45 days after the tribunal is constituted, the tribunal shall decide on an expedited basis an objection under paragraph 4 and any objection that the dispute is not within the tribunal's competence. The tribunal shall suspend any proceedings on the merits and issue a decision or award on the objection(s), stating the grounds therefor, no later than 150 days after the date of the request. However, if a disputing party requests a hearing, the tribunal may take an additional 30 days to issue the decision or award. Regardless of whether a hearing is requested, a tribunal may, on a showing of extraordinary cause, delay issuing its decision or award by an additional brief period, which may not exceed 30 days.

6. When it decides a respondent's objection under paragraph 4 or 5, the tribunal may, if warranted, award to the prevailing disputing party reasonable costs and attorney's fees incurred in submitting or opposing the objection. In determining whether such an award is warranted, the tribunal shall consider whether either the claimant's claim or the respondent's objection was frivolous, and shall provide the disputing parties a reasonable opportunity to comment.

7. A respondent may not assert as a defense, counterclaim, right of set-off, or for any other reason that the claimant has received or will receive indemnification or other compensation for all or part of the alleged damages pursuant to an insurance or guarantee contract.

8. A tribunal may order an interim measure of protection to preserve the rights of a disputing party, or to ensure that the tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the tribunal's jurisdiction. A tribunal may not order attachment or enjoin the application of a measure alleged to constitute a breach referred to in Article 10.16. For purposes of this paragraph, an order includes a recommendation.

9. (a) In any arbitration conducted under this Section, at the request of a disputing party, a tribunal shall, before issuing a decision or award on liability, transmit its proposed decision or award to the disputing parties and to the non-disputing Parties. Within 60 days after the tribunal transmits its proposed decision or award, the disputing parties may submit written comments to the tribunal concerning any aspect of its proposed decision or award. The tribunal shall consider any such comments and issue its decision or award not later than 45 days after the expiration of the 60-day comment period.

(b) Subparagraph (a) shall not apply in any arbitration conducted pursuant to this Section for which an appeal has been made available pursuant to paragraph 10 or Annex 10-D.

10. If a separate, multilateral agreement enters into force between the Parties that establishes an appellate body for purposes of reviewing awards rendered by tribunals constituted pursuant to international trade or investment arrangements to hear investment disputes, the Parties shall strive to reach an agreement that would have such appellate body review awards rendered under Article 10.26 in arbitrations commenced after the multilateral agreement enters into force between the Parties.

**Article 10.21: Transparency of Arbitral Proceedings**

1. Subject to paragraphs 2 and 4, the respondent shall, after receiving the following documents, promptly transmit them to the non-disputing Parties and make them available to the public:

(a) the notice of intent;

(b) the notice of arbitration;

(c) pleadings, memorials, and briefs submitted to the tribunal by a disputing party and any written submissions submitted pursuant to Article 10.20.2 and 10.20.3 and Article 10.25;

(d) minutes or transcripts of hearings of the tribunal, where available; and

(e) orders, awards, and decisions of the tribunal.

2. The tribunal shall conduct hearings open to the public and shall determine, in consultation with the disputing parties, the appropriate logistical arrangements. However, any disputing party that intends to use information designated as protected information in a hearing shall so advise the tribunal. The tribunal shall make appropriate arrangements to protect the information from disclosure.

3. Nothing in this Section requires a respondent to disclose protected information or to furnish or allow access to information that it may withhold in accordance with Article 22.2 (Essential Security) or Article 22.4 (Disclosure of Information).

4. Any protected information that is submitted to the tribunal shall be protected from disclosure in accordance with the following procedures:

(a) subject to subparagraph (d), neither the disputing parties nor the tribunal shall disclose to any non-disputing Party or to the public any protected information where the disputing party that provided the information clearly designates it in accordance with subparagraph (b);

(b) any disputing party claiming that certain information constitutes protected information shall clearly designate the information at the time it is submitted to the tribunal;

(c) a disputing party shall, at the time it submits a document containing information claimed to be protected information, submit a redacted version of the document that does not contain the information. Only the redacted version shall be provided to the non-disputing Parties and made public in accordance with paragraph 1; and

(d) the tribunal shall decide any objection regarding the designation of information claimed to be protected information. If the tribunal determines that such information was not properly designated, the disputing party that submitted the information may (i) withdraw all or part of its submission containing such information, or (ii) agree to resubmit complete and redacted documents with corrected designations in accordance with the tribunal's determination and subparagraph (c). In either case, the other disputing party shall, whenever necessary, resubmit complete and redacted documents which either remove the information withdrawn under (i) by the disputing party that first submitted the information or redesignate the information consistent with the designation under (ii) of the disputing party that first submitted the information.

5. Nothing in this Section requires a respondent to withhold from the public information required to be disclosed by its laws.

**Article 10.22: Governing Law**

1. Subject to paragraph 3, when a claim is submitted under Article 10.16.1(a)(i)(A) or Article 10.16.1(b)(i)(A), the tribunal shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law.

2. Subject to paragraph 3 and the other terms of this Section, when a claim is submitted under Article 10.16.1(a)(i)(B) or (C), or Article 10.16.1(b)(i)(B) or (C), the tribunal shall apply:

(a) the rules of law specified in the pertinent investment authorization or investment agreement, or as the disputing parties may otherwise agree; or

(b) if the rules of law have not been specified or otherwise agreed:

(i) the law of the respondent, including its rules on the conflict of laws,[11] and

(ii) such rules of international law as may be applicable.

3. A decision of the Commission declaring its interpretation of a provision of this Agreement under Article 20.1.3 (Free Trade Commission) shall be binding on a tribunal, and any decision or award issued by a tribunal must be consistent with that decision.

**Article 10.23: Interpretation of Annexes**

1. Where a respondent asserts as a defense that the measure alleged to be a breach is within the scope of an entry set out in Annex I or Annex II, the tribunal shall, on request of the respondent, request the interpretation of the Commission on the issue. The Commission shall submit in writing any decision declaring its interpretation under Article 20.1.3 (Free Trade Commission) to the tribunal within 60 days of delivery of the request.

2. A decision issued by the Commission under paragraph 1 shall be binding on the tribunal, and any decision or award issued by the tribunal must be consistent with that decision. If the Commission fails to issue such a decision within 60 days, the tribunal shall decide the issue.

**Article 10.24: Expert Reports**

Without prejudice to the appointment of other kinds of experts where authorized by the ap plicable arbitration rules, a tribunal, at the request of a disputing party or, unless the disputing parties disapprove, on its own initiative, may appoint one or more experts to report to it in

---

[11] The "law of the respondent" means the law that a domestic court or tribunal of proper jurisdiction would apply in the same case.

writing on any factual issue concerning environmental, health, safety, or other scientific matters raised by a disputing party in a proceeding, subject to such terms and conditions as the disputing parties may agree.

**Article 10.25: Consolidation**

1. Where two or more claims have been submitted separately to arbitration under Article 10.16.1 and the claims have a question of law or fact in common and arise out of the same events or circumstances, any disputing party may seek a consolidation order in accordance with the agreement of all the disputing parties sought to be covered by the order or the terms of paragraphs 2 through 10.

2. A disputing party that seeks a consolidation order under this Article shall deliver, in writing, a request to the Secretary-General and to all the disputing parties sought to be covered by the order and shall specify in the request:

(a) the names and addresses of all the disputing parties sought to be covered by the order;

(b) the nature of the order sought; and

(c) the grounds on which the order is sought.

3. Unless the Secretary-General finds within 30 days after receiving a request under paragraph 2 that the request is manifestly unfounded, a tribunal shall be established under this Article.

4. Unless all the disputing parties sought to be covered by the order otherwise agree, a tribunal established under this Article shall comprise three arbitrators:

(a) one arbitrator appointed by agreement of the claimants;

(b) one arbitrator appointed by the respondent; and

(c) the presiding arbitrator appointed by the Secretary-General, provided, however, that the presiding arbitrator shall not be a national of any Party.

5. If, within 60 days after the Secretary-General receives a request made under paragraph 2, the respondent fails or the claimants fail to appoint an arbitrator in accordance with paragraph 4, the Secretary-General, on the request of any disputing party sought to be covered by the order, shall appoint the arbitrator or arbitrators not yet appointed. If the respondent fails to appoint an arbitrator, the Secretary-General shall appoint a national of the disputing Party, and if the claimants fail to appoint an arbitrator, the Secretary-General shall appoint a national of a Party of the claimants.

6. Where a tribunal established under this Article is satisfied that two or more claims that have been submitted to arbitration under Article 10.16.1 have a question of law or fact in common, and arise out of the same events or circumstances, the tribunal may, in the interest of fair and efficient resolution of the claims, and after hearing the disputing parties, by order:

(a) assume jurisdiction over, and hear and determine together, all or part of the claims;

(b) assume jurisdiction over, and hear and determine one or more of the claims, the determination of which it believes would assist in the resolution of the others; or

(c) instruct a tribunal previously established under Article 10.19 to assume jurisdiction over, and hear and determine together, all or part of the claims, provided that

(i) that tribunal, at the request of any claimant not previously a disputing party before that tribunal, shall be reconstituted with its original members, except that the arbitrator for the claimants shall be appointed pursuant to paragraphs 4(a) and 5; and

(ii) that tribunal shall decide whether any prior hearing shall be repeated.

7. Where a tribunal has been established under this Article, a claimant that has submitted a claim to arbitration under Article 10.16.1 and that has not been named in a request made under paragraph 2 may make a written request to the tribunal that it be included in any order made under paragraph 6, and shall specify in the request:

(a) the name and address of the claimant;

(b) the nature of the order sought; and

(c) the grounds on which the order is sought.

The claimant shall deliver a copy of its request to the Secretary-General.

8. A tribunal established under this Article shall conduct its proceedings in accordance with the UNCITRAL Arbitration Rules, except as modified by this Section.

9. A tribunal established under Article 10.19 shall not have jurisdiction to decide a claim, or a part of a claim, over which a tribunal established or instructed under this Article has assumed jurisdiction.

10. On application of a disputing party, a tribunal established under this Article, pending its decision under paragraph 6, may order that the proceedings of a tribunal established under Article 10.19 be stayed, unless the latter tribunal has already adjourned its proceedings.

**Article 10.26: Awards**

1. Where a tribunal makes a final award against a respondent, the tribunal may award, separately or in combination, only:

(a) monetary damages and any applicable interest; and

(b) restitution of property, in which case the award shall provide that the respondent may pay monetary damages and any applicable interest in lieu of restitution.

A tribunal may also award costs and attorney's fees in accordance with this Section and the applicable arbitration rules.

2. Subject to paragraph 1, where a claim is submitted to arbitration under Article 10.16.1(b):

(a) an award of restitution of property shall provide that restitution be made to the enterprise;

(b) an award of monetary damages and any applicable interest shall provide that the sum be paid to the enterprise; and

(c) the award shall provide that it is made without prejudice to any right that any person may have in the relief under applicable domestic law.

3. A tribunal may not award punitive damages.

4. An award made by a tribunal shall have no binding force except between the disputing parties and in respect of the particular case.

5. Subject to paragraph 6 and the applicable review procedure for an interim award, a disputing party shall abide by and comply with an award without delay.

6. A disputing party may not seek enforcement of a final award until:

(a) in the case of a final award made under the ICSID Convention,

(i) 120 days have elapsed from the date the award was rendered and no disputing party has requested revision or annulment of the award; or

(ii) revision or annulment proceedings have been completed; and

(b) in the case of a final award under the ICSID Additional Facility Rules, the UNCITRAL Arbitration Rules, or the rules selected pursuant to Article 10.16.3(d),

(i) 90 days have elapsed from the date the award was rendered and no disputing party has commenced a proceeding to revise, set aside, or annul the award; or

(ii) a court has dismissed or allowed an application to revise, set aside, or annul the award and there is no further appeal.

7. Each Party shall provide for the enforcement of an award in its territory.

8. If the respondent fails to abide by or comply with a final award, on delivery of a request by the Party of the claimant, a panel shall be established under Article 21.6 (Request for an Arbitral Panel). The requesting Party may seek in such proceedings:

(a) a determination that the failure to abide by or comply with the final award is inconsistent with the obligations of this Agreement; and

(b) in accordance with Article 21.13 (Initial Report), a recommendation that the respondent abide by or comply with the final award.

9. A disputing party may seek enforcement of an arbitration award under the ICSID Convention, the New York Convention, or the Inter-American Convention regardless of whether proceedings have been taken under paragraph 8.

10. A claim that is submitted to arbitration under this Section shall be considered to arise out of a commercial relationship or transaction for purposes of Article I of the New York Convention and Article I of the Inter-American Convention.

**Article 10.27: Service of Documents**

Delivery of notice and other documents on a Party shall be made to the place named for that Party in Annex 10-C.

## Section C: Definitions

**Article 10.28: Definitions**

For purposes of this Chapter:

**Centre** means the International Centre for Settlement of Investment Disputes ("ICSID") established by the ICSID Convention;

**claimant** means an investor of a Party that is a party to an investment dispute with another Party;

**disputing parties** means the claimant and the respondent;

**disputing party** means either the claimant or the respondent;

**enterprise** means an enterprise as defined in Article 1.3 (Definitions of General Application), and a branch of an enterprise;

**enterprise of a Party** means an enterprise constituted or organized under the law of a Party, and a branch located in the territory of a Party and carrying out business activities there;

**freely usable currency** means "freely usable currency" as determined by the International Monetary Fund under its *Articles of Agreement*;

**ICSID Additional Facility Rules** means the *Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the International Centre for Settlement of Investment Disputes*;

**ICSID Convention** means the *Convention on the Settlement of Investment Disputes between States and Nationals of Other States*, done at Washington, March 18, 1965;

**Inter-American Convention** means the *Inter-American Convention on International Commercial Arbitration*, done at Panama, January 30, 1975;

**investment** means every asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, including such characteristics as the commitment of capital or other resources, the expectation of gain or profit, or the assumption of risk. Forms that an investment may take include:

(a) an enterprise;

(b) shares, stock, and other forms of equity participation in an enterprise;

(c) bonds, debentures, other debt instruments, and loans;[12, 13]

---

[12] Some forms of debt, such as bonds, debentures, and long-term notes, are more likely to have the characteristics of an investment, while other forms of debt, such as claims to payment that are immediately due and result from the sale of goods or services, are less likely to have such characteristics.

[13] Loans issued by one Party to another Party are not investments.

(d) futures, options, and other derivatives;

(e) turnkey, construction, management, production, concession, revenue-sharing, and other similar contracts;

(f) intellectual property rights;

(g) licenses, authorizations, permits, and similar rights conferred pursuant to domestic law;[14, 15] and

(h) other tangible or intangible, movable or immovable property, and related property rights, such as leases, mortgages, liens, and pledges;

**investment agreement** means a written agreement[16] between a national authority[17] of a Party and a covered investment or an investor of another Party, on which the covered investment or the investor relies in establishing or acquiring a covered investment other than the written agreement itself, that grants rights to the covered investment or investor:

(a) with respect to natural resources that a national authority controls, such as for their exploration, extraction, refining, transportation, distribution, or sale;

(b) to supply services to the public on behalf of the Party, such as power generation or distribution, water treatment or distribution, or telecommunications; or

[14] Whether a particular type of license, authorization, permit, or similar instrument (including a concession, to the extent that it has the nature of such an instrument) has the characteristics of an investment depends on such factors as the nature and extent of the rights that the holder has under the law of the Party. Among the licenses, authorizations, permits, and similar instruments that do not have the characteristics of an investment are those that do not create any rights protected under domestic law. For greater certainty, the foregoing is without prejudice to whether any asset associated with the license, authorization, permit, or similar instrument has the characteristics of an investment.

[15] The term "investment" does not include an order or judgment entered in a judicial or administrative action.

[16] "Written agreement" refers to an agreement in writing, executed by both parties, whether in a single instrument or in multiple instruments, that creates an exchange of rights and obligations, binding on both parties under the law applicable under Article 10.22.2. For greater certainty, (a) a unilateral act of an administrative or judicial authority, such as a permit, license, or authorization issued by a Party solely in its regulatory capacity, or a decree, order, or judgment, standing alone; and (b) an administrative or judicial consent decree or order, shall not be considered a written agreement.

[17] For purposes of this definition, "national authority" means an authority at the central level of government.

(c) to undertake infrastructure projects, such as the construction of roads, bridges, canals, dams, or pipelines, that are not for the exclusive or predominant use and benefit of the government;

**investment authorization** means an authorization that the foreign investment authority of a Party grants to a covered investment or an investor of another Party;[18, 19]

**investor of a non-Party** means, with respect to a Party, an investor that attempts through concrete action to make, is making, or has made an investment in the territory of that Party, that is not an investor of a Party;

**investor of a Party** means a Party or state enterprise thereof, or a national or an enterprise of a Party, that attempts through concrete action to make, is making, or has made an investment in the territory of another Party; provided, however, that a natural person who is a dual national shall be deemed to be exclusively a national of the State of his or her dominant and effective nationality;

**national** means a natural person who has the nationality of a Party according to Annex 1.3 (Country-Specific Definitions);

**negotiated restructuring** means the restructuring or rescheduling of a debt instrument that has been effected through (i) a modification or amendment of such debt instrument, as provided for under its terms, or (ii) a comprehensive debt exchange or other similar process in which the holders of no less than 75 percent of the aggregate principal amount of the outstanding debt under such debt instrument have consented to such debt exchange or other process.

**New York Convention** means the *United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, done at New York, June 10, 1958;

**non-disputing Party** means a Party that is not a party to an investment dispute;

**protected information** means confidential business information or information that is privileged or otherwise protected from disclosure under a Party's law;

**respondent** means the Party that is a party to an investment dispute;

**Secretary-General** means the Secretary-General of ICSID; and

---

[18] For greater certainty, actions taken by a Party to enforce laws of general application, such as competition laws, are not encompassed within this definition.

[19] The Parties recognize that no Party has a foreign investment authority that grants investment authorizations, as of the date this Agreement enters into force.

**UNCITRAL Arbitration Rules** means the arbitration rules of the United Nations Commission on International Trade Law.

## Annex 10-A

## Customary International Law

The Parties confirm their shared understanding that "customary international law" generally and as specifically referenced in Article 10.5 results from a general and consistent practice of States that they follow from a sense of legal obligation. With regard to Article 10.5, the customary international law minimum standard of treatment of aliens refers to all customary international law principles that protect the economic rights and interests of aliens.

## Annex 10-B

## Expropriation

The Parties confirm their shared understanding that:

1. An action or a series of actions by a Party cannot constitute an expropriation unless it interferes with a tangible or intangible property right or property interest in an investment.

2. Article 10.7.1 addresses two situations. The first is direct expropriation, where an investment is nationalized or otherwise directly expropriated through formal transfer of title or outright seizure.

3. The second situation addressed by Article 10.7.1 is indirect expropriation, where an action or series of actions by a Party has an effect equivalent to direct expropriation without formal transfer of title or outright seizure.

(a) The determination of whether an action or series of actions by a Party, in a specific fact situation, constitutes an indirect expropriation, requires a case-by-case, fact-based inquiry that considers, among other factors:

(i) the economic impact of the government action, although the fact that an action or series of actions by a Party has an adverse effect on the economic value of an investment, standing alone, does not establish that an indirect expropriation has occurred;

(ii) the extent to which the government action interferes with distinct, reasonable investment-backed expectations; and

(iii) the character of the government action.

(b) Except in rare circumstances, non-discriminatory regulatory actions by a Party that are designed and applied to protect legitimate public welfare objectives, such as public health, safety, and the environment, do not constitute indirect expropriations.[20]

[20] For greater certainty, the list of "legitimate public welfare objectives" in this subparagraph is not exhaustive.

## Annex 10-C

## Service of Documents on a Party under Section B

### Peru

Notices and other documents in disputes under Section B shall be served on Peru by delivery to:

*Dirección General de Asuntos de Economía Internacional,*
*Competencia e Inversión Privada*
*Ministerio de Economía y Finanzas*
*Jirón* Lampa 277, *piso* 5
Lima, Perú

### United States

Notices and other documents in disputes under Section B shall be served on the United States by delivery to:

Executive Director (L/EX)
Office of the Legal Adviser
Department of State
Washington, D.C. 20520
United States of America

## Annex 10-D

### Appellate Body or Similar Mechanism

Within three years after the date of entry into force of this Agreement, the Parties shall consider whether to establish an appellate body or similar mechanism to review awards rendered under Article 10.26 in arbitrations commenced after they establish the appellate body or similar mechanism.

## Annex 10-E

### Special Dispute Settlement Provisions

1. Where a claimant submits a claim to arbitration alleging that a Party other than the United States has breached an obligation under Section A, other than Article 10.3 or 10.4, through the imposition of a restrictive measure with regard to payments and transfers, Section B shall apply, except as follows:

(a) The claimant may not submit any such claim to arbitration until one year after the events that give rise to the claim.

(b) Loss or damages arising from the restrictive measure on capital inflows shall be limited to the reduction in value of the transfers and shall exclude loss of profits or business and any similar consequential or incidental damages.

(c) Subparagraph (a) shall not apply to a claim that arises from restrictions on:

(i) payments or transfers on current transactions,

(ii) payments or transfers associated with equity investments, or

(iii) payments pursuant to a loan or bond,[21] provided that such payments are made in accordance with the terms and conditions of the loan or bond agreement.

(d) If the measure restricts outward payments or transfers:

(i) it shall not prevent investors from earning a market rate of return in the territory of the Party imposing the measure on any restricted assets;

(ii) the Party imposing the measure shall afford investors a reasonable opportunity to mitigate any losses arising from such measure; and

(iii) so long as the Party imposing the measure has complied with its obligations under this paragraph, the claimant may not recover any alleged opportunity costs or any similar consequential or incidental damages from

---

[21] For greater certainty, the term "payments pursuant to a loan or bond" as used in this subparagraph does not include capital account transactions relating to inter-bank loans, including loans to or from financial institutions established in the territory of the Party subject to the claim.

forgoing alternative investments that were incurred during the first year after the events that give rise to the claim.

2. A Party may not request the establishment of a panel under Chapter Twenty-One (Dispute Settlement) relating to the imposition of a restrictive measure with regard to payments and transfers by a Party other than the United States until one year after the imposition of such measure.

## Annex 10-F

## Public Debt

1. The Parties recognize that the purchase of debt issued by a Party entails commercial risk. For greater certainty, no award may be made in favor of a claimant for a claim under Article 10.16.1(a)(i)(A) or Article 10.16.1(b)(i)(A) with respect to default or non-payment of debt issued by a Party unless the claimant meets its burden of proving that such default or non-payment constitutes an uncompensated expropriation for purposes of Article 10.7.1 or a breach of any other obligation under Section A.

2. No claim that a restructuring of debt issued by a Party other than the United States breaches an obligation under Section A may be submitted to, or if already submitted continue in, arbitration under Section B if the restructuring is a negotiated restructuring at the time of submission, or becomes a negotiated restructuring after such submission, except for a claim that the restructuring violates Article 10.3 or 10.4.

3. Notwithstanding Article 10.16.3, and subject to paragraph 2 of this Annex, an investor of another Party may not submit a claim under Section B that a restructuring of debt issued by a Party other than the United States breaches an obligation under Section A (other than Article 10.3 or 10.4) unless 270 days have elapsed from the date of the events giving rise to the claim.

## Annex 10-G

### Submission of a Claim to Arbitration

1. An investor of the United States may not submit to arbitration under Section B a claim that a Party has breached an obligation under Section A either:

(a) on its own behalf under Article 10.16.1(a), or

(b) on behalf of an enterprise of a Party other than the United States that is a juridical person that the investor owns or controls directly or indirectly under Article 10.16.1(b),

if the investor or the enterprise, respectively, has alleged that breach of an obligation under Section A in proceedings before a court or administrative tribunal of that Party.

2. For greater certainty, if an investor of the United States elects to submit a claim of the type described in paragraph 1 to a court or administrative tribunal of a Party other than the United States, that election shall be definitive, and the investor may not thereafter submit the claim to arbitration under Section B.

## Annex 10-H

## Certain Agreements between Peru and Covered Investments or Investors of Another Party[22]

1. Pursuant to Legislative Decrees 662 and 757, Peru may enter into agreements known as "stability agreements" with covered investments or investors of another Party.

2. As part of a stability agreement referred to in paragraph 1, Peru accords certain benefits to the covered investment or the investor that is party to the agreement. These benefits typically include a commitment to maintain the existing income tax regime applicable to such covered investment or investor during a specified period of time.

3. Appendices 10-H.A and 10-H.B set forth, respectively, an illustration of a stability agreement with a covered investment and an illustration of a stability agreement with an investor.

4. A stability agreement referred to in paragraph 1 may constitute one of multiple written instruments that make up an "investment agreement," as defined in Article 10.28.[23] Where that is the case, a breach of such a stability agreement by Peru may constitute a breach of the investment agreement of which it is a part.

5. Where a stability agreement is materially identical to the illustration set forth in Appendix 10-H.A or 10-H.B, and does not constitute one of multiple instruments that make up an "investment agreement," as defined in Article 10.28, a breach of such a stability agreement by Peru shall not constitute a breach of an investment agreement.

---

[22] The fact that this Annex addresses only agreements entered into by Peru shall not prejudice the determination by a tribunal established under Section B regarding whether an agreement entered into by the government of another Party meets the definition of "investment agreement" in Article 10.28.

[23] For greater certainty, for multiple written instruments to make up an "investment agreement," as defined in Article 10.28, one or more of those instruments must grant rights to the covered investment or the investor as defined in subparagraph (a), (b), or (c) of that definition. A stability agreement may constitute one of multiple written instruments that make up an "investment agreement" even if the stability agreement is not itself the instrument in which such rights are granted.

**Appendix 10-H.A**

The following shall constitute a Legal Stability Agreement (hereinafter "the Agreement") concluded between, on the one hand, the Peruvian State, represented by ......................., and hereinafter referred to as "the STATE," and, ............, on the other hand, hereinafter referred to as "the COMPANY," under the terms and conditions set forth in the following Articles:

ONE. The Company has filed with (the appropriate Peruvian agency), an application for entering into a Legal Stability Agreement under the provisions of Title II of Legislative Decree N° 662; Title V, Chapter I of Legislative Decree N° 757 and the regulations thereof approved by Executive Decree N° 162-92- EF (including amending, regulating, and supplementing provisions).

TWO. The COMPANY, by virtue of this Agreement, undertakes to issue shares/interests to the INVESTOR, hereinafter referred to as the INVESTOR. Consequently, it undertakes the following: *(Only the obligations corresponding to the type of investment selected by the Investor should be indicated)*

- To issue shares/interests to the INVESTOR for US$ ..............in exchange for the contributions the INVESTOR shall make within a term of .................. (no greater than two years) from the date of the conclusion of the Legal Stability Agreement by the COMPANY.

- To guarantee that the foreign investments, referred to in section 1, are channeled through the national financial system, as recorded on the certification issued by the bank participating in the transaction. *(Applies only to foreign investments.)*

- To register the foreign investment referred to in section 1, valued in freely convertible currency, with the appropriate Peruvian agency.

- To generate directly no fewer than 20 permanent positions within no more than three years from the date of this Agreement.

- To generate directly US$ ............ (no less than two million) in foreign exchange earnings from exports within no more than three years from the date of this Agreement.

- To apply the investments referred to in paragraph 1 to expanding productive capacity or technological development.

THREE. The STATE, by virtue of this Agreement and during the term thereof, undertakes to guarantee the legal stability of the COMPANY under the following terms:

1. Stability of the tax system with respect to Income Tax, pursuant to the provisions of Article 40 of Legislative Decree N° 757, as amended, which implies that the income tax to be paid by the Company shall not be modified during the term of this Agreement; *(A brief description of the tax security provisions follows, which may vary depending on the tax regime in force on the date of signature of the Agreement.)*

2. Stability of hiring procedures for the COMPANY's workers while this Agreement is in force, under the provisions of Article 12(a) of Legislative Decree N° 662; in the various forms set forth in *(reference to labor regulations in force on date of signature of the Agreement).*

3. Stability of export promotion regimes used by the COMPANY under the provisions of Article 12(b) of Legislative Decree N° 662, currently in force *(reference to the application of current regulations).*

FOUR. In addition, as agreed upon in Two above, the Company undertakes the following: *(Only the obligations corresponding to the type of investment selected by the Investor should be indicated)*

- To prove that the new investment exceeds, as of the date on which this Agreement is concluded, 50% of the COMPANY's capital and reserves as indicated in a report, equivalent to an affidavit, and subject to subsequent verification, prepared by an auditing firm;

- To prove that it has complied with the obligation to receive its investment in capital from abroad, in the amount of US$ ……… by filing *(list of substantiating documents required)*;

- To prove that the new investment has been effectively applied to the expansion of its productive capacity, by the appropriate report issued by an auditing firm;

- To show that it has complied with the obligation to generate….. …….permanent positions in the COMPANY by filing an affidavit subject to subsequent verification;

- To show that it has complied with the obligation to generate US$ ………in foreign exchange earnings from (the COMPANY's) exports, in an affidavit subject to subsequent verification.

Proof of compliance with obligations referred to in the foregoing paragraphs should be submitted to the appropriate Peruvian agency within no more than …. calendar days from the deadline for compliance therewith, pursuant to the provisions of Article Two above.

FIVE. This Legal Stability Agreement shall remain in force for ten years from the date of on which it is concluded. It may not, therefore, be unilaterally amended by either of the parties during such period, even if domestic legislation is amended or if changes more beneficial or more detrimental to either of the parties are incorporated therein.

SIX. The COMPANY shall be entitled to a single waiver of the legal stability system granted hereunder. Such waiver should be formalized by written notice to the (appropriate Peruvian agency), which shall become effective as of the date of receipt of the notice by said agency. If the COMPANY chooses to exercise the right to waive the Stability Agreement acknowledged under this Article, it shall automatically become subject to the provisions of ordinary law.

SEVEN. This Legal Stability Agreement may be amended only by mutual consent of the Parties. It shall not be possible to amend the term established in Article Five, or the investment amount under the limit established in the laws (referred to in Article One). For such purpose, the COMPANY shall file an application with the appropriate Peruvian agency, which shall be processed in accordance with the same procedure used for the conclusion of this Agreement.

EIGHT. It being the intent of the Parties to resolve any matters involving compliance with this Agreement in the most expeditious manner possible, the Parties agree that henceforth, any dispute or claim between them regarding the interpretation, application or validity of this Agreement shall be settled through legal arbitration.

The arbitration shall be carried out in Lima, through the establishment of an Arbitral Tribunal consisting of three members. Each Contracting Party shall appoint an arbitrator, and the two shall in turn appoint the third. The arbitrators shall be expressly empowered to rule on the dispute subject of the arbitration.

If one of the Contracting Parties has not appointed its arbitrator within ten working days of receipt of the request by the party or parties requesting the arbitration, or if, within ten working days of the appointment of the second arbitrator by the parties, the two arbitrators cannot reach an agreement as to the choice of the third arbitrator, the latter shall be appointed, upon request of either Party, by the Lima Chamber of Commerce.

The term for completion of the arbitral procedure shall not exceed sixty (60) working days from the date of appointment of the last arbitrator; said procedure shall be governed by the provisions of the General Law on Arbitration, and/or any modifying or replacing regulations.

Each Contracting Party shall bear the costs incurred by the application of the provisions agreed upon herein in equal parts.

NINE. This Legal Stability Agreement shall be terminated *ipso jure* without any notification requirement on the following grounds:

1. Failure by The COMPANY to comply with any of the obligations stipulated in Article Two.

2. Failure by The COMPANY to comply any of the obligations set forth in Article Four.

3. The transfer by The COMPANY of its contractual status.

4. Failure by the company to generate the positions pursuant to Article Two.

5. Failure by the company to generate the foreign exchange earnings from exports pursuant to Article Two.

If the COMPANY is responsible for any of the above-mentioned grounds for termination of this Agreement, and if, as a result of the legal stability granted thereunder, it enjoyed a lower tax burden than what it would have been entitled to without this Agreement, it shall be required to reimburse the State the adjusted amount of any taxes that it would have owed had it not concluded the Agreement, in addition to the appropriate surcharges referred to in the Tax Code.

It is hereby understood that in the case referred to in the foregoing paragraph, if a greater tax burden has been imposed on the COMPANY by virtue of this Agreement, the State shall not be required to reimburse any amount whatsoever.

The Parties, having agreed on all its terms, have signed this Agreement at Lima in triplicate, all three copies being identical in content.

**Appendix 10-H.B**

The following shall constitute a Legal Stability Agreement concluded between, on the one hand, the Peruvian State, represented by ................, and hereinafter referred to as the "STATE", and, on the other hand, ....................., hereinafter referred to as the "INVESTOR" under the terms and conditions set forth in the following Articles:

ONE. The COMPANY has filed with the appropriate Peruvian agency an application for the conclusion of a Legal Stability Agreement under the provisions of , Title II of Legislative Decree N° 662; Title V, Chapter I, of Legislative Decree N° 757; and the Regulations Governing Private Investment Guarantee Regimes, approved by Executive Decree N° 162-92-EF, (including amending, regulating, and supplementing provisions).

TWO. The COMPANY, by virtue of this Agreement (consistent with the form of investment stipulated in the Regulations) undertakes the following: *(Only the obligations corresponding to the type of investment selected by the Investor should be included.)*

- To make cash contributions to the capital of ................, in the amount of US$ ......., within a term of .................... (no more than two years) from the date of the conclusion of this Agreement;

- To channel the foreign investment referred to in paragraph 1 through the National Financial System, as recorded on the certification issued by the bank participating in the transaction.

- To register the foreign investment referred to in section 1, valued in freely convertible currency, with PROINVERSIÓN *(Only for foreign direct investment.)*;

- To make venture capital investments with third parties, in the amount of US$...... within a term of ............ (no more than two years) from the date of the conclusion of this Agreement;

- To generate directly no fewer than 20 permanent positions within no more than three years from the date the conclusion of this Agreement;

- To generate directly US$ .................. (no less than two million) in foreign exchange earnings from exports within no more than three years from the date of this Agreement.

THREE. The STATE, by virtue of this Agreement and during the term thereof, undertakes to guarantee the legal security of THE INVESTOR, with respect to the investment referred to in Article Two, under the following terms:

1. Stability of the tax system referred to the income tax, pursuant to the provisions of Article 10(a) of Legislative Decree N° 662; *(A brief description of the tax security provisions follows, which may vary depending on the tax regime in force on the date of signature of the agreement.)*

2. *(Only applicable to foreign investment.)* Stability of the freely availably currency regime, pursuant to the provisions of Article 10(b) of Legislative Decree N° 662, which provides that the INVESTOR may freely access foreign currency on the exchange market at the most favorable exchange rate, while the STATE may not apply to the investment referred to in Article Two any exchange market regulation system or mechanism restricting this right or involving a less favorable treatment for the INVESTOR than that applied to any natural or legal person carrying out any type of exchange transaction.

3. *(Only applicable to foreign investment.)* Stability of the right of free remittance of profits and capital pursuant to the provisions of Article 10(b) of Legislative Decree N° 662, which provides that the INVESTOR may effect transfers abroad in freely convertible currency without previous authorization of national, regional or local government entities, provided that the pertinent investment has been registered with the appropriate Peruvian agency, and that the corresponding tax obligations have been met, it being prohibited for the State to establish any further restriction or limitations on this right, such transfers being permitted as follows:

(a) The total amount of the INVESTOR's foreign capital, including capital generated by the sale of its stocks, interest shares, or options, from capital reduction and partial or total liquidation of any companies, derived from the investment referred to in Article Two;

(b) The total amount of dividends or proven net profits generated by the investment referred to in Article Two, as well as the profits obtained from considerations for the use or enjoyment of goods or assets physically located in the investment target country; and

(c) The total amount of royalties and considerations for the use and transfer of technology, trademarks and patents and any other aspects of industrial property authorized by the appropriate Peruvian agency.

4. Stability of the right to use the most favorable exchange rate in accordance with the provisions of Article 10(b) of Legislative Decree N° 662, which provides that the INVESTOR may access foreign currency in the exchange market at the most favorable exchange rate, while the STATE may not compel the INVESTOR to carry out its exchange transactions under a system or mechanism which grants a less favorable treatment than that applied to any natural or legal person in the execution of any exchange transaction, pursuant to the following:

(a) In the case of conversion of foreign currency to Peruvian currency: THE INVESTOR may sell such currency to any natural or legal person at the most favorable purchase exchange rate on the exchange market at the time of the exchange transaction; and

(b) In the case of conversion of local currency to foreign currency: THE INVESTOR may purchase such currency from any natural or legal person at the most favorable exchange rate on the exchange market at the time of the exchange transaction.

5. The stability of the right to non-discrimination pursuant to the provisions of Article 10(c) of Legislative Decree N° 662, which provides that the STATE, at none of its levels, whether they be national, regional or local government entities or companies, may apply to the INVESTOR different treatment based on nationality, the sector or type of economic activity pursued, or the geographic location of the companies in which it invests, or in the following matters:

(a) *(Only applicable to foreign investment.)* Currency exchange, in that the State may not apply to the INVESTOR, with respect to the investments referred to in Article Two, an exchange regime that involves a less favorable treatment than that applied to any natural or legal person for the execution of any kind of exchange transaction.

(b) Prices, tariffs or non-tariff duties, in that the STATE may not apply different amounts or rates in this regard to the INVESTOR for the investment referred to in Article Two.

(c) *(Not applicable to banking and insurance.)*

(d) Form of Incorporation, in that the STATE may not require that the INVESTOR invest in a company that adopts a specific form of incorporation.

(e) The INVESTOR's individual or corporate status, in that the STATE may not apply to the INVESTOR a different treatment in this regard; and

(f) Any other equivalent grounds, such as the application of discriminatory treatment to the INVESTOR resulting from any combination of the various sections of this item.

This item shall be applied notwithstanding the limits established in Article 3° of the Regulations.

FOUR. The INVESTOR undertakes, in addition to the provisions agreed upon in Article Two, the following:

*(Only the obligations corresponding to the type of investment described in Article Two are included.)*

- To prove that he has complied with a cash contribution of US$ ............to the capital of (name of company) ............................... by filing (list of substantiating documents)

- To prove that he has complied with a venture capital investment of US$ ...........in the company named ..... by filing (list of substantiating documents)

- To prove that he has complied with the obligation to generate .... permanent positions in (name of company) by submitting an affidavit, subject to subsequent verification.

- To prove that he has complied with the obligation to generate US$.........in foreign exchange earnings from exports from (name of company) by submitting an affidavit, subject to subsequent verification.

Proof of compliance with the obligations referred to in the foregoing paragraphs should be submitted to the appropriate Peruvian agency within no more than .......... calendar days from the deadline for compliance therewith, pursuant to the provisions of Article Two above. Non-compliance with these provisions shall be grounds for termination of this Agreement.

FIVE. This Legal Stability Agreement shall remain in force for ten years from the date on which it is concluded. It may not, therefore, be unilaterally amended by either of the parties during such period, even if domestic legislation is amended or if changes more beneficial or more detrimental to either of the parties are incorporated therein.

SIX. The INVESTOR shall be entitled to a single waiver of the legal stability system granted hereunder. Such waiver should be formalized by written notice to the appropriate Peruvian agency, which shall become effective as of the date of receipt of the notice by said agency.

If the INVESTOR chooses to exercise the right to waive the Legal Stability Agreement acknowledged under this Article, it shall automatically become subject to the provisions of ordinary law.

SEVEN. The INVESTOR shall have the right to assign his contractual status under this Agreement, with the prior authorization of the appropriate Peruvian agency, to be formalized by means of an addendum to this Agreement.

It is hereby understood that the assignment of contractual status by the INVESTOR to another shall not extend the term of the Agreement stipulated in Article Five.

EIGHT. This Legal Stability Agreement may be amended only by mutual consent of the Parties. It shall not be possible to amend the term established in Article Five, or the investment amount under the limit established in (*specify pertinent regulation*).

For such purpose, the INVESTOR shall file an application with the appropriate Peruvian agency, which shall be processed in accordance with the same procedure used for the conclusion of this Agreement.

NINE. It being the intent of the Parties to resolve any matters involving compliance with this Agreement in the most expeditious manner possible, the Parties agree that henceforth, any dispute or claim between them regarding the interpretation, application or validity of this Agreement shall be settled through legal arbitration.

The arbitration shall be carried out in Lima, through the establishment of an Arbitral Tribunal consisting of three members. Each Contracting Party shall appoint an arbitrator, and the two shall in turn appoint the third. The arbitrators shall be expressly empowered to rule on the dispute subject of the arbitration.

If one of the Contracting Parties has not appointed its arbitrator within ten working days of receipt of the request by the party or parties requesting the arbitration, of if, within ten working days of the appointment of the second arbitrator by the parties, the two arbitrators cannot reach an agreement as to the choice of the third arbitrator, the latter shall be appointed, upon request of either Party, by the Lima Chamber of Commerce.

The term for completion of the arbitral procedure shall not exceed sixty (60) working days from the date of appointment of the last arbitrator; said procedure shall be governed by the provisions of the General Law on Arbitration, and/or any modifying or replacing regulations.

Each Contracting Party shall bear the costs incurred by the application of the provisions agreed upon herein in equal parts.

TEN. This Legal Stability Agreement shall be terminated *ipso jure* on the following grounds:

1. Failure by the INVESTOR to comply with any of the obligations stipulated in Article Two;

2. Failure by the INVESTOR to comply any of the obligations set forth in Article Four;

3. The assignment by the INVESTOR of its contractual status to another investor without the pertinent prior authorization of the appropriate Peruvian agency, as stipulated in Article Seven;

4. Failure by the COMPANY to generate the positions pursuant to Article Two;

5. Failure by the COMPANY to generate the foreign exchange earnings from exports pursuant to Article Two.

If the INVESTOR is responsible for any of the above-mentioned grounds for termination of this Agreement, and if, as a result of the legal stability granted thereunder, it enjoyed a lower tax

burden than what it would have been entitled to without this Agreement, it shall be required to reimburse the State the adjusted amount of any taxes that it would have owed had it not concluded the Agreement, in addition to the appropriate surcharges referred to in the Tax Code.

It is hereby understood that in the case referred to in the foregoing paragraph, if a greater tax burden has been imposed on the INVESTOR by virtue of this Agreement, the State shall not be required to reimburse any amount whatsoever.

The Parties, having agreed on all its terms, have signed this Agreement at Lima in duplicate, both copies of which are identical in content.

# Capítulo Diez

# Inversión

## Sección A: Inversión

### Artículo 10.1: Ámbito de Aplicación y Cobertura[1]

1. Este Capítulo se aplica a las medidas que adopte o mantenga una Parte relativas a:

(a) los inversionistas de otra Parte;

(b) inversiones cubiertas; y

(c) todas las inversiones en el territorio de la Parte, en lo relativo a los Artículos 10.9 y 10.11.

2. Las obligaciones de una Parte bajo esta Sección se aplicarán a una empresa estatal u otra persona cuando ésta ejerza cualquier autoridad regulatoria, administrativa u otra autoridad gubernamental que le hubiera sido delegada por esa Parte, tales como la autoridad de expropiar, otorgar licencias, aprobar transacciones comerciales o imponer cuotas, tasas u otros cargos.

3. Para mayor certeza, este Capítulo no obliga a Parte alguna en relación con cualquier acto o hecho que tuvo lugar, o cualquier situación que cesó de existir, antes de la fecha de entrada en vigor de este Acuerdo.

### Artículo 10.2: Relación con Otros Capítulos

1. En el caso de existir cualquier incompatibilidad entre este Capítulo y otro Capítulo, el otro Capítulo prevalecerá en la medida de la incompatibilidad.

2. El requerimiento de una Parte de que un proveedor de servicios de otra Parte constituya una fianza u otra forma de garantía financiera como condición para proveer un servicio transfronterizo, no hace, en sí mismo, que este Capitulo sea aplicable a las medidas adoptadas o mantenidas por la Parte respecto al suministro transfronterizo del servicio. Este Capítulo se aplica a las medidas adoptadas o mantenidas por la Parte respecto a la fianza o garantía financiera, en la medida en que dicha fianza o garantía financiera constituya una inversión cubierta.

3. Este Capítulo no se aplica a las medidas adoptadas o mantenidas por una Parte en la medida de que estén cubiertas por el Capítulo Doce (Servicios Financieros).

---

[1] Para mayor certeza, nada en este Capítulo se interpretará en el sentido de imponer a una Parte la obligación de privatizar cualquier inversión de su propiedad o bajo su control o de prohibir a una Parte la designación de un monopolio, siempre que, si una Parte adopta o mantiene una medida para privatizar tal inversión o una medida para designar un monopolio, este Capítulo se aplicará a dicha medida.

**Artículo 10.3: Trato Nacional**

1. Cada Parte concederá a los inversionistas de otra Parte un trato no menos favorable que el que conceda, en circunstancias similares, a sus propios inversionistas en lo referente al establecimiento, adquisición, expansión, administración, conducción, operación y venta u otra disposición de las inversiones en su territorio.

2. Cada Parte concederá a las inversiones cubiertas un trato no menos favorable que el que conceda, en circunstancias similares, a las inversiones en su territorio de sus propios inversionistas en lo referente al establecimiento, adquisición, expansión, administración, conducción, operación y venta u otra disposición de las inversiones.

3. El trato concedido por una Parte de conformidad con los párrafos 1 y 2 significa, respecto a un gobierno de nivel regional, un trato no menos favorable que el trato más favorable que ese gobierno de nivel regional conceda, en circunstancias similares, a los inversionistas e inversiones de inversionistas de la Parte de la que forma parte.

**Artículo 10.4: Trato de Nación Más Favorecida**

1. Cada Parte concederá a los inversionistas de otra Parte un trato no menos favorable que el que conceda, en circunstancias similares, a los inversionistas de cualquier otra Parte o de un país que no sea Parte en lo referente al establecimiento, adquisición, expansión, administración, conducción, operación y venta u otra forma de disposición de inversiones en su territorio.

2. Cada Parte concederá a las inversiones cubiertas un trato no menos favorable que el que conceda, en circunstancias similares, a las inversiones en su territorio de inversionistas de cualquier otra Parte o de cualquier país que no sea Parte en lo referente al establecimiento, adquisición, expansión, administración, conducción, operación y venta u otra forma de disposición de inversiones.[2]

**Artículo 10.5: Nivel Mínimo de Trato[3]**

1. Cada Parte concederá a las inversiones cubiertas un trato acorde con el derecho internacional consuetudinario, incluido el trato justo y equitativo, así como protección y seguridad plenas.

2. Para mayor certeza, el párrafo 1 prescribe que el nivel mínimo de trato a los extranjeros, según el derecho internacional consuetudinario, es el nivel mínimo de trato que pueda ser proporcionado a las inversiones cubiertas. Los conceptos de "trato justo y equitativo" y "protección y seguridad plenas" no requieren un trato adicional o más allá del requerido por ese estándar y no crean derechos adicionales significativos. La obligación en el párrafo 1 de proveer:

---

2 Para mayor certeza, el trato "con respecto al establecimiento, adquisición, expansión, administración, conducción, operación y venta u otra forma de disposición de las inversiones", a que hacen referencia los párrafos 1 y 2 del Artículo 10.4, no incluye mecanismos de solución de controversias, tales como los señalados en la Sección B, que se encuentren estipulados en acuerdos internacionales comerciales o de inversiones.

3 El Artículo 10.5 será interpretado de conformidad con el Anexo 10-A.

(a) "trato justo y equitativo" incluye la obligación de no denegar justicia en procedimientos criminales, civiles o contencioso administrativos, de acuerdo con el principio del debido proceso incorporado en los principales sistemas legales del mundo; y

(b) "protección y seguridad plenas" exige a cada Parte proveer el nivel de protección policial que es exigido por el derecho internacional consuetudinario.

3. La determinación de que se ha violado otra disposición de este Acuerdo o de otro acuerdo internacional separado, no establece que se haya violado este Artículo.

**Artículo 10.6: Tratamiento en Caso de Contienda**

1. Sin perjuicio de lo dispuesto en el Artículo 10.13.5(b), cada Parte concederá a los inversionistas de otra Parte y a las inversiones cubiertas, trato no discriminatorio respecto de cualquier medida que adopte o mantenga en relación con pérdidas sufridas por inversiones en su territorio como resultado de conflictos armados o contiendas civiles.

2. Sin perjuicio de lo dispuesto en el párrafo 1, si un inversionista de una Parte que, en las situaciones referidas en el párrafo 1, sufra una pérdida en el territorio de otra Parte eomo resultado de:

(a) la requisición de su inversión cubierta o de parte de ella por las fuerzas o autoridades de esta última Parte; o

(b) la destrucción de su inversión cubierta o de parte de ella por las fuerzas o autoridades de esta última Parte, no requeridas por la necesidad de la situación,

esta última Parte proveerá al inversionista la restitución, compensación o ambas, según sea apropiado, por tal pérdida. Toda compensación será pronta, adecuada y efectiva, de acuerdo con lo dispuesto desde el Artículo 10.7.2 al 10.7.4, *mutatis mutandis*.

3. El párrafo 1 no se aplica a las medidas existentes relacionadas con subsidios o donaciones que pudieran ser incompatibles con lo dispuesto en el Artículo 10.3, a excepción del Artículo 10.13.5(b).

**Artículo 10.7: Expropiación e Indemnización[4]**

1. Ninguna de las Partes puede expropiar ni nacionalizar una inversión cubierta, sea directa o indirectamente mediante medidas equivalentes a la expropiación o nacionalización ("expropiación"), salvo que sea:

(a) por motivos de propósito público[5];

---

[4] El Artículo 10.7 será interpretado de acuerdo con lo dispuesto en el Anexo 10-B.

(b) de una manera no discriminatoria;

(c) mediante el pago pronto, adecuado y efectivo de la indemnización; y

(d) con apego al principio del debido proceso y al Artículo 10.5.

2. La indemnización referida en el párrafo 1(c) deberá:

(a) ser pagada sin demora;

(b) ser equivalente al valor justo de mercado que tenga la inversión expropiada inmediatamente antes de que la expropiación se haya llevado a cabo ("fecha de expropiación");

(c) no reflejará ningún cambio en el valor debido a que la intención de expropiar se conoció con antelación a la fecha de expropiación; y

(d) ser completamente liquidable y libremente transferible.

3. Si el valor justo de mercado es denominado en una moneda de libre uso, la indemnización referida en el párrafo 1(c) no será menor que el valor justo de mercado en la fecha de expropiación, más intereses a una tasa comercialmente razonable para esa moneda, acumulada desde la fecha de la expropiación hasta la fecha de pago.

4. Si el valor justo de mercado se denomina en una moneda que no es de libre uso, la indemnización a que se refiere el párrafo 1(c) – convertida a la moneda de pago, al tipo de cambio del mercado vigente en la fecha de pago – no será menor que:

(a) el valor justo de mercado en la fecha de expropiación, convertido a una moneda de libre uso, al tipo de cambio de mercado vigente en esa fecha, más

(b) intereses a una tasa comercialmente razonable para esa moneda de libre uso, acumulados desde la fecha de la expropiación hasta la fecha de pago.

5. Este Artículo no se aplica a la expedición de licencias obligatorias otorgadas con relación a derechos de propiedad intelectual conforme con el Acuerdo ADPIC, o a la revocación, limitación o creación de derechos de propiedad intelectual en la medida que dicha expedición, revocación, limitación o creación sea compatible con el Capítulo Dieciséis (Derechos de Propiedad Intelectual).

**Artículo 10.8: Transferencias**

---

[5] Para mayor certeza, para los propósitos de este Artículo, el término "propósito público" se refiere a un concepto del derecho internacional consuetudinario. La legislación interna puede expresar este concepto o uno similar usando diferentes términos, tales como "necesidad pública" , "interés público" o "utilidad pública.".

1. Cada Parte permitirá que todas las transferencias relacionadas con una inversión cubierta se hagan libremente y sin demora desde y hacia su territorio. Dichas transferencias incluyen:

(a) aportes de capital;

(b) ganancias, dividendos, ganancias de capital y productos derivados de la venta o liquidación, total o parcial, de la inversión cubierta;

(c) intereses, pagos por regalía, gastos de administración y asistencia técnica y otros cargos;

(d) pagos realizados conforme a un contrato, incluyendo un convenio de préstamo;

(e) pagos realizados conforme al Artículo 10.6.1 y 10.6.2 y el Artículo 10.7; y

(f) los pagos que surjan de una controversia.

2. Cada Parte permitirá que las transferencias relacionadas con una inversión cubierta se realicen en moneda de libre uso al tipo de cambio vigente en el mercado en la fecha de la transferencia.

3. Cada Parte permitirá que las ganancias en especie relacionadas con una inversión cubierta se ejecuten conforme a lo autorizado o especificado en un acuerdo escrito entre una Parte y una inversión cubierta o un inversionista de otra Parte.

4. Sin perjuicio de lo dispuesto en los párrafos 1 al 3, una Parte podrá impedir la realización de una transferencia por medio de la aplicación equitativa, no discriminatoria y de buena fe de sus leyes relacionadas a:

(a) quiebra, insolvencia o protección de los derechos de los acreedores;

(b) emisión, comercio u operaciones de valores, futuros, opciones o derivados;

(c) infracciones criminales o penales;

(d) reportes financieros o mantenimiento de registros de transferencias cuando sea necesario para colaborar con el cumplimiento de la ley o con las autoridades financieras regulatorias; o

(e) garantizar el cumplimiento de sentencias o laudos dictados en procedimientos judiciales o administrativos.

**Artículo 10.9: Requisitos de Desempeño**

1. Ninguna Parte podrá, en relación con el establecimiento, adquisición, expansión, administración, conducción, operación, venta u otra disposición de una

inversión de un inversionista de una Parte o de un país que no sea Parte en su territorio, imponer ni hacer cumplir cualquier requisito o hacer cumplir cualquier obligación o compromiso de[6]:

(a) exportar un determinado nivel o porcentaje de mercancías o servicios;

(b) alcanzar un determinado grado o porcentaje de contenido nacional;

(c) comprar, utilizar u otorgar preferencia a las mercancías producidas en su territorio, o comprar mercancías de personas en su territorio;

(d) relacionar en cualquier forma el volumen o valor de las importaciones con el volumen o valor de las exportaciones, o con el monto de las entradas de divisas asociadas con dicha inversión;

(e) restringir las ventas en su territorio de las mercancías o los servicios que tal inversión produce o presta, relacionando de cualquier manera dichas ventas al volumen o valor de sus exportaciones o a las ganancias que generen en divisas;

(f) transferir a una persona en su territorio una tecnología particular, un proceso productivo u otro conocimiento de su propiedad[7]; o

(g) proveer exclusivamente del territorio de una Parte las mercancías que produce la inversión o los servicios que presta para un mercado específico regional o al mercado mundial.

2. Ninguna Parte puede condicionar la recepción de una ventaja o que se continúe recibiendo una ventaja, en relación con el establecimiento, adquisición, expansión, administración, conducción, operación, venta u otra disposición de una inversión en su territorio por parte de un inversionista de una Parte o de un país que no sea Parte, al cumplimiento de cualquier requisito para:

(a) alcanzar un determinado grado o porcentaje de contenido nacional;

(b) comprar, utilizar u otorgar preferencias a mercancías producidas en su territorio o a comprar mercancías de personas en su territorio;

(c) relacionar, en cualquier forma, el volumen o valor de las importaciones con el volumen o valor de las exportaciones, o con el monto de las entradas de divisas asociadas con dicha inversión; o

---

[6] Para mayor certeza, una condición para la recepción o la continnidad de la recepción de una ventaja a la que se refiere el párrafo 2 no constituye una "obligación o compromiso" para propósitos del párrafo 1.

[7] Para mayor certeza, nada en el párrafo 1 deberá interpretarse en el sentido de impedir a una Parte, con relación al establecimiento, adquisición, expansión, administración, conducción, operación o venta u otra disposición de una inversión de un inversionista de una Parte o de un país que no sea Parte, en su territorio, que imponga o haga cumplir un requerimiento o haga cumplir una obligación o compromiso de capacitar trabajadores en su territorio, siempre que tal capacitación no requiera la transferencia de alguna tecnología particular, proceso productivo u otro conocimiento patentado, a una persona en su territorio.

(d) restringir las ventas en su territorio de las mercancías o los servicios que tal inversión produce o presta, relacionando de cualquier manera dichas ventas al volumen o valor de sus exportaciones o a ganancias que generen en divisas.

3. (a) Nada de lo dispuesto en el párrafo 2 se interpretará como impedimento para que una Parte condicione la recepción de una ventaja o que se continúe recibiendo una ventaja, en relación con una inversión en su territorio por parte de un inversionista de una Parte o de un país que no sea Parte, al cumplimiento de un requisito de que ubique la producción, preste servicios, capacite o emplee trabajadores, construya o amplíe instalaciones particulares o lleve a cabo investigación y desarrollo, en su territorio.

(b) El párrafo 1(f) no se aplica:

(i) cuando una Parte autoriza el uso de un derecho de propiedad intelectual de conformidad con el Artículo 31 del Acuerdo ADPIC o a medidas que requieran la divulgación de información de propiedad que caen dentro del ámbito de aplicación de, y son compatibles con, el Artículo 39 del Acuerdo ADPIC; o

(ii) cuando el requisito sea impuesto o el compromiso u obligación sea ordenado por un tribunal judicial o administrativo o una autoridad de competencia, para remediar una práctica que ha sido determinada después de un proceso judicial o administrativo como anticompetitiva conforme a las leyes de competencia de una Parte[8].

(c) Siempre que dichas medidas no se apliquen de manera arbitraria o injustificada y a condición que esas medidas no constituyan una restricción encubierta al comercio o inversión internacional, nada de lo dispuesto en los párrafos 1(b), (c) y (f) y 2(a) y (b) se interpretará en el sentido de impedir a una Parte adoptar o mantener medidas, incluidas las de naturaleza ambiental, que sean:

(i) necesarias para asegurar el cumplimiento de leyes y regulaciones que no sean incompatibles con las disposiciones de este Acuerdo;

(ii) necesarias para proteger la vida o salud humana, animal o vegetal; o

(iii) relacionadas con la preservación de recursos naturales no renovables vivos o no.

(d) Los párrafos 1(a), (b), y (c) y 2(a) y (b) no se aplican a los requisitos para calificación de las mercancías o los servicios con respecto a programas de promoción a las exportaciones y programas de ayuda externa.

---

[8] Las Partes reconocen que una patente no confiere necesariamente poder de mercado.

(c) Los párrafos 1(b), (c), (f) y (g), y 2(a) y (b) no se aplican a la contratación pública.

(f) Los párrafos 2(a) y (b) no se aplican a los requisitos impuestos por una Parte importadora con respecto al contenido de las mercancías necesario para calificar para aranceles o cuotas preferenciales.

4. Para mayor certeza, los párrafos 1 y 2 no se aplican a ningún otro compromiso, obligación o requisito distinto a los señalados en esos mismos párrafos.

5. Este Artículo no excluye la aplicación de cualquier compromiso, obligación o requisito entre partes privadas, cuando una Parte no impuso ni requirió el compromiso, obligación o requisito.

**Artículo 10.10: Altos Ejecutivos y Juntas Directivas**

1. Ninguna Parte puede exigir que una empresa de esa Parte, que sea una inversión cubierta, designe a personas naturales de una nacionalidad en particular para ocupar puestos de alta dirección.

2. Una Parte puede exigir que la mayoría de los miembros de las juntas directivas o comités de los mismos, de una empresa de esa Parte que sea una inversión cubierta, sean de una nacionalidad en particular o residentes en el territorio de la Parte, a condición que el requisito no menoscabe significativamente la capacidad del inversionista para ejercer el control sobre su inversión.

**Artículo 10.11: Inversión y el Medio Ambiente**

Nada en este Capítulo se interpretará en el sentido de impedir que una Parte adopte, mantenga o haga cumplir cualquier medida por lo demás compatible con este Capítulo, que considere apropiada para asegurar que las inversiones en su territorio se efectúen tomando en cuenta inquietudes en materia ambiental.

**Artículo 10.12: Denegación de Beneficios**

1. Una Parte puede denegar los beneficios del presente Capítulo a un inversionista de otra Parte que sea una empresa de esa otra Parte y a las inversiones de dicho inversionista, si personas de un país que no es Parte son propietarias o controlan la empresa y la Parte que deniega los beneficios:

(a) no mantiene relaciones diplomáticas con el país que no es Parte; o

(b) adopta o mantiene medidas en relación con el país que no es Parte o una persona del país no Parte que prohíbe las transacciones con la empresa o que serían infringidas o eludidas si los beneficios del presente Capítulo se otorgan a esa empresa o a sus inversiones.

2. Una Parte puede denegar los beneficios del presente Capítulo a un inversionista de otra Parte que sea una empresa de esa otra Parte y a las inversiones de dicho

inversionista, si la empresa no tiene actividades comerciales sustanciales en el territorio de ninguna de las Partes, salvo la Parte que deniega los beneficios, y personas de un país que no es Parte, o de la Parte que deniega, sean propietarias o controlan la empresa.

**Artículo 10.13: Medidas Disconformes**

1. Los Artículos 10.3, 10.4, 10.9 y 10.10 no se aplicarán a:

(a) cualquier medida disconforme existente mantenida por una Parte en:

(i) el nivel central de gobierno, según lo estipulado por esa Parte en su Lista del Anexo I,

(ii) el nivel regional de gobierno, según lo estipulado por esa Parte en su Lista en el Anexo I, o

(iii) un nivel local de gobierno;

(b) la continuación o pronta renovación de cualquier medida disconforme a que se refiere el subpárrafo (a); o

(c) la modificación de cualquier medida disconforme a que se refiere el subpárrafo (a) siempre que dicha modificación no disminuya el grado de conformidad de la medida, tal y como estaba en vigor inmediatamente antes de la modificación, con los Artículos 10.3, 10.4, 10.9 ó 10.10.

2. Los Artículos 10.3, 10.4, 10.9, y 10.10 no se aplicarán a cualquier medida que una Parte adopte o mantenga, en relación con los sectores, subsectores o actividades, tal como se indica en su Lista del Anexo II.

3. Ninguna de las Partes puede exigir, de conformidad con cualquier medida adoptada después de la fecha de entrada en vigor de este Acuerdo y comprendida en su Lista del Anexo II, a un inversionista de otra Parte, por razón de su nacionalidad, que venda o disponga de alguna otra manera de una inversión existente al momento en que la medida cobre vigencia.

4. Los Artículos 10.3 y 10.4 no se aplican a las medidas que constituyan excepción o derogación de las obligaciones conforme al párrafo 8 del Artículo 16.1 (Disposiciones Generales), según lo dispuesto específicamente en ese Artículo.

5. Los Artículos 10.3, 10.4 y 10.10, no son aplicables con respecto a:

(a) contratación pública; o

(b) subsidios o donaciones otorgados por una Parte, incluyendo los préstamos, garantías y seguros respaldados por el gobierno.

**Artículo 10.14: Formalidades Especiales y Requisitos de Información**

1. Nada de lo dispuesto en el Artículo 10.3 se interpretará en el sentido de impedir a una Parte adoptar o mantener una medida que prescriba formalidades especiales conexas a una inversión cubierta, tales como un requerimiento que los inversionistas sean residentes de la Parte o que las inversiones cubiertas se constituyan conforme a la legislación o regulación de la Parte, a condición que dichas formalidades no menoscaben significativamente la protección otorgada por una Parte a inversionistas de otra Parte y a inversiones cubiertas de conformidad con este Capítulo.

2. No obstante lo dispuesto en los Artículos 10.3 y 10.4, una Parte puede exigir de un inversionista de otra Parte o de su inversión cubierta que proporcione información referente a esa inversión, exclusivamente con fines informativos o estadísticos. La Parte protegerá la información que sea confidencial de cualquier divulgación que pudiera afectar negativamente la situación competitiva del inversionista o de la inversión cubierta. Nada de lo dispuesto en este párrafo se interpretará como un impedimento para que una Parte obtenga o divulgue información referente a la aplicación equitativa y de buena fe de su legislación.

## Sección B: Solución de Controversias Inversionista-Estado

### Artículo 10.15: Consultas y Negociación

En caso de una controversia relativa a una inversión, el demandante y el demandado deben primero tratar de solucionar la controversia mediante consultas y negociación, lo que puede incluir el empleo de procedimientos de carácter no obligatorio con la participación de terceras partes.

### Artículo 10.16: Sometimiento de una Reclamación a Arbitraje

1. En caso de que una parte contendiente considere que no puede resolverse una controversia relativa a una inversión mediante consultas y negociación:

(a) el demandante, por cuenta propia, puede someter a arbitraje una reclamación en la que se alegue

(i) que el demandado ha violado

(A) una obligación de conformidad con la Sección A,

(B) una autorización de inversión, o

(C) un acuerdo de inversión;

y

(ii) que el demandante ha sufrido pérdidas o daños en virtud de dicha violación o como resultado de ésta; y

(b) el demandante, en representación de una empresa del demandado que sea una persona jurídica propiedad del demandante o que esté bajo su control

directo o indirecto, puede, de conformidad con esta Sección, someter a arbitraje una reclamación en la que alegue

(i) que el demandado ha violado

(A) una obligación de conformidad con la Sección A,

(B) una autorización de inversión, o

(C) un acuerdo de inversión;

y

(ii) que la empresa ha sufrido pérdidas o daños en virtud de dicha violación o como resultado de ésta,

a condición de que el demandante pueda someter una reclamación bajo el subpárrafo (a)(i)(C) o (b)(i)(C) por la violación de un acuerdo de inversión solamente si la materia de la reclamación y los daños reclamados se relacionan directamente con la inversión cubierta que fue establecida o adquirida, o se pretendió establecer o adquirir, con base en el acuerdo de inversión relevante.

2. Por lo menos 90 días antes de que se someta una reclamación a arbitraje de conformidad con esta Sección, el demandante entregará al demandado una notificación escrita de su intención de someter la reclamación a arbitraje ("notificación de intención"). En la notificación se especificará:

(a) el nombre y la dirección del demandante y, en el caso de que la reclamación se someta en representación de una empresa, el nombre, dirección y lugar de constitución de la empresa;

(b) por cada reclamación, la disposición de este Acuerdo, la autorización de inversión o el acuerdo de inversión presuntamente violado y cualquier otra disposición aplicable;

(c) las cuestiones de hecho y de derecho en que se funda cada reclamación; y

(d) la reparación que se solicita y el monto aproximado de los daños reclamados.

3. Siempre que hayan transcurrido seis meses desde que tuvieron lugar los hechos que motivan la reclamación, el demandante puede someter la reclamación a la que se refiere el párrafo 1:

(a) de conformidad con el Convenio del CIADI y las Reglas de Procedimiento para Procedimientos Arbitrales del CIADI, siempre que tanto el demandado como la Parte del demandante sean partes del Convenio del CIADI;

(b) de conformidad con las Reglas del Mecanismo Complementario del CIADI, siempre que el demandado o la Parte del demandante, sean parte del Convenio del CIADI;

(c) de conformidad con las Reglas de Arbitraje de la CNUDMI; o

(d) si el demandante y el demandado lo acuerdan, ante cualquier otra institución de arbitraje o bajo cualesquiera otras reglas de arbitraje.

4. Una reclamación se considerará sometida a arbitraje conforme a esta Sección, cuando la notificación o la solicitud de arbitraje ("notificación de arbitraje") del demandante:

(a) a que se refiere el párrafo 1 del Artículo 36 del Convenio del CIADI sea recibida por el Secretario General;

(b) a que se refiere el Artículo 2 del Anexo C de las Reglas del Mecanismo Complementario del CIADI sea recibida por el Secretario General;

(c) a que se refiere el Artículo 3 de las Reglas de Arbitraje de la CNUDMI, conjuntamente con el escrito de demanda a que se refiere el Artículo 18 de las Reglas de Arbitraje de la CNUDMI, sea recibida por el demandado; o

(d) a que se refiera cualquier otra institución de arbitraje o bajo cualesquiera reglas de arbitraje seleccionadas bajo el párrafo 3(d) sea recibida por el demandado.

Una reclamación presentada por el demandante por primera vez después de que tal notificación de arbitraje haya sido sometida, se considerará sometida a arbitraje bajo esta Sección en la fecha de su recepción bajo las reglas de arbitraje aplicables.

5. Las reglas de arbitraje aplicables de conformidad con el párrafo 3, y que estén vigentes en la fecha del reclamo o reclamos que hayan sido sometidos a arbitraje conforme a esta Sección, regirán el arbitraje salvo en la medida en que sea modificado por este Acuerdo.

6. El demandante entregará junto con la notificación de arbitraje:

(a) el nombre del árbitro designado por el demandante; o

(b) el consentimiento escrito del demandante para que el Secretario General nombre tal árbitro.

**Artículo 10.17: Consentimiento de Cada Una de las Partes al Arbitraje**

1. Cada Parte consiente en someter una reclamación al arbitraje, con arreglo a esta Sección y de conformidad con este Acuerdo.

2. El consentimiento a que se refiere el párrafo 1 y el sometimiento de la reclamación a arbitraje con arreglo a esta Sccción cumplirá con los requisitos señalados en:

(a) el Capítulo II del Convenio del CIADI (Jurisdicción del Centro) y las Reglas del Mecanismo Complementario del CIADI, que exigen el consentimiento por escrito de las partes de la controversia;

(b) el Artículo II de la Convención de Nueva York, que exige un "acuerdo por cscrito"; y

(c) el Artículo I de la Convención Interamericana, que requiere un "acuerdo".

**Artículo 10.18: Condiciones y Limitaciones al Consentimiento de las Partes**

1. Ninguna reclamación puede someterse a arbitraje conforme a esta Sección, si han transcurrido más de tres años a partir de la fecha en que el demandante tuvo o debió haber tenido conocimiento de la violación alegada conforme a lo establecido en el Artículo 10.16.1 y conocimiento de que el demandante (por las reclamaciones entabladas en virtud del Artículo 10.16.1(a)) o la empresa (por las reclamaciones entabladas en virtud del Artículo 10.16.1(b)) sufrió pérdidas o daños.

2. Ninguna reclamación puede someterse a arbitraje conforme a esta Sección a menos que:

(a) el demandante consienta por escrito someterse al arbitraje, dc conformidad con los procedimientos previstos en este Acuerdo; y

(b) la notificación de arbitraje esté acompañada,

(i) de la renuncia por escrito del demandante a las reclamaciones sometidas a arbitraje en virtud dcl Artículo 10.16.1(a); y

(ii) de las renuncias por escrito del demandante y de la empresa a las reclamaciones sometidas a arbitraje en virtud del Artículo 10. 16.1(b).

de cualquier derecho a iniciar o continuar ante cualquier tribunal judicial o administrativo conforme a la ley dc cualquier Parte, u otros procedimientos de solución de controversias, cualquier actuación respecto de cualquier medida que se alcgue haber constituido una violación a las que se refiere el Artículo 10.16.

3. Sin perjuicio de lo dispuesto en el párrafo 2(b), el demandante (por reclamaciones iniciadas bajo el Artículo 10.16.1(a)) y el demandante o la empresa (por reclamaciones iniciadas bajo el Artículo 10.16.1(b)) pueden iniciar o continuar una medida cautelar, que no involucre el pago de daños monetarios, ante un tribunal judicial o administrativo del demandado, siempre que tal medida se interponga con el único

propósito de preservar los derechos e intereses del demandante o de la empresa mientras continúe la tramitación del arbitraje[9].

4. (a) Ninguna reclamación puede ser sometida a arbitraje:

(i) por una violación de una autorización de inversión, según el Artículo 10.16.1(a)(i)(B) o el Artículo 10.16.1(b)(i)(B); o

(ii) por una violación de un acuerdo de inversión, según el Artículo 10.16.1(a)(i)(C) o el Artículo 10.16.1(b)(i)(C).

si el demandante (por reclamaciones iniciadas bajo el Artículo 10.16.1(a)) o el demandante o la empresa (por reclamaciones iniciadas bajo el Artículo 10.16.1(b)) ha sometido previamente la misma violación alegada ante un tribunal administrativo o corte del demandado, o ante cualquier otro procedimiento de solución de controversias vinculante.

(b) Para mayor certeza, si el demandante elige someter una reclamación del tipo descrito en el subpárrafo (a), ante una corte judicial o tribunal administrativo del demandado o ante cualquier otro procedimiento de solución de controversias vinculante, esa elección será definitiva y el demandante no puede, a partir de ese momento, someter la reclamación a arbitraje conforme a la Sección B.

**Artículo 10.19: Selección de los Árbitros**

1. A menos que las partes contendientes convengan otra cosa, el tribunal estará integrado por tres árbitros, un árbitro designado por cada una de las partes contendientes y el tercero, que será el árbitro que presida, será designado por acuerdo de las partes contendientes.

2. El Secretario General designará a los árbitros en los procedimientos de arbitraje, de conformidad con esta Sección.

3. Si un tribunal no se ha constituido en un plazo de 75 días contados a partir de la fecha en que la reclamación fue sometida a arbitraje de conformidad con esta Sección, el Secretario General, a petición de una parte contendiente, designará, a su discreción, al árbitro o árbitros que aún no hayan sido designados.

4. Para los propósitos del Artículo 39 del Convenio del CIADI y del Artículo 7 de la Parte C de las Reglas del Mecanismo Complementario del CIADI, y sin perjuicio de objetar a un árbitro por motivos que no sean de nacionalidad:

---

[9] En una medida cautelar como alguna de las descritas en el párrafo 3 (incluyendo las medidas que buscan preservar evidencia y propiedad mientras esté pendiente la tramitación de la reclamación sometida a arbitraje), un tribunal judicial o administrativo de la Parte demandada en una controversia sometida a arbitraje de conformidad con la Sección B, aplicará la legislación de dicha Parte, incluyendo sus reglas sobre conflicto de leyes, así como las normas de Derecho Internacional que puedan ser aplicables.

(a) el demandado acepta la designación de cada uno de los miembros del tribunal establecido de conformidad con el Convenio del CIADI o con las Reglas del Mecanismo Complementario del CIADI;

(b) el demandante a que se refiere el Artículo 10.16.1(a) puede someter a arbitraje una reclamación conforme a esta Sección, o continuar una reclamación de conformidad con el Convenio del CIADI o a las Reglas del Mecanismo Complementario del CIADI, únicamente a condición de que el demandante manifieste su consentimiento por escrito sobre la designación de cada uno de los miembros del tribunal; y

(c) un demandante a que se refiere el Artículo 10.16.1(b) puede someter una reclamación a arbitraje conforme a esta Sección, o continuar una reclamación de conformidad con el Convenio del CIADI o las Reglas del Mecanismo Complementario del CIADI, únicamente a condición de que el demandante y la empresa manifiesten su consentimiento por escrito sobre la designación de cada uno de los miembros del tribunal.

**Artículo 10.20: Realización del Arbitraje**

1. Las partes contendientes pueden convenir en la sede legal donde haya de celebrarse cualquier arbitraje conforme a las reglas arbitrales aplicables de acuerdo con el Artículo 10.16.3. A falta de acuerdo entre las partes contendientes, el tribunal determinará dicho lugar de conformidad con las reglas arbitrales aplicables, siempre que el lugar se encuentre en el territorio de un Estado que sea parte de la Convención de Nueva York.

2. Una Parte no contendiente puede presentar comunicaciones orales o escritas ante el tribunal respecto a la interpretación de este Acuerdo.

3. El tribunal estará facultado para aceptar y considerar comunicaciones *amicus curiae* que provengan de una persona o entidad que no sea una parte contendiente. Cada comunicación deberá identificar su titular y cualquier persona u organización que ha proveído o proveerá cualquier asistencia financiera o de otro tipo en la preparación de la comunicación.

4. Sin perjuicio de la facultad del tribunal para conocer otras objeciones como cuestiones preliminares, tales como una objeción de que la controversia no se encuentra dentro de la competencia del tribunal, un tribunal conocerá y decidirá como una cuestión preliminar cualquier objeción del demandado de que, como cuestión de derecho, la reclamación sometida no es una reclamación respecto de la cual se pueda dictar un laudo favorable para el demandante de acuerdo con el Artículo 10.26.[10]

(a) Dicha objeción se presentará al tribunal tan pronto como sea posible después de la constitución del tribunal, y en ningún caso más tarde de la fecha que el tribunal fije para que el demandado presente su contestación

[10] Para mayor certeza, respecto a las demandas sometidas bajo el Artículo 10.16.1(a)(i)(C) o 10.16.1(b)(i)(C), una objeción de que, como cuestión de derecho, una reclamación sometida no es una por la cual sea posible emitir un laudo a favor del demandante según el Artículo 10.26, puede incluir, cuando sea aplicable, una objeción que esté contemplada en la ley del demandado.

de la demanda (o en el caso de una modificación de la notificación de arbitraje, la fecha que el tribunal fije para que el demandado presente su respuesta a la modificación).

(b) En el momento en que se reciba una objeción conforme a este párrafo, el tribunal suspenderá cualquier actuación sobre el fondo del litigio, establecerá un cronograma para la consideración de la objeción que será compatible con cualquier cronograma que se haya establecido para la consideración de cualquier otra cuestión preliminar y emitirá una decisión o laudo sobre la objeción, exponiendo los fundamentos de éstos.

(c) Al decidir acerca de una objeción de conformidad con este párrafo, el tribunal asumirá como ciertos los alegatos de hecho presentados por el demandante con el objeto de respaldar cualquier reclamación que aparezca en la notificación de arbitraje (o cualquier modificación de ésta) y, en controversias presentadas de conformidad con las Reglas de Arbitraje de la CNUDMI, el escrito de demanda a que se refiere el Artículo 18 de las Reglas de Arbitraje de la CNUDMI. El tribunal puede considerar también cualquier otro hecho pertinente que no esté bajo disputa.

(d) El demandado no renuncia a formular ninguna objeción con respecto a la competencia o a cualquier argumento de fondo, simplemente porque haya formulado o no una objeción conforme a este párrafo, o haga uso del procedimiento expedito establecido en el párrafo 5.

5. En el caso de que el demandado así lo solicite, dentro de los 45 días siguientes a la constitución del tribunal, el tribunal decidirá, de una manera expedita, acerca de una objeción de conformidad con el párrafo 4 y cualquier otra objeción en el sentido de que la controversia no se encuentra dentro de la competencia del tribunal. El tribunal suspenderá cualquier actuación sobre el fondo del litigio y emitirá una decisión o laudo sobre dicha objeción, exponiendo el fundamento de éstos, a más tardar 150 días después de la fecha de la solicitud. Sin embargo, si una parte contendiente solicita una audiencia, el tribunal puede tomar 30 días adicionales para emitir la decisión o laudo. Independientemente de si se ha solicitado una audiencia, el tribunal puede, demostrando un motivo extraordinario, retardar la emisión de su decisión o laudo por un breve plazo adicional, el cual no puede exceder de 30 días.

6. Cuando el tribunal decida acerca de la objeción de un demandado de conformidad con los párrafos 4 ó 5, puede, si se justifica, conceder a la parte contendiente vencedora costas y honorarios de abogado razonables en que se haya incurrido al presentar la objeción u oponerse a ésta. Al determinar si dicho laudo se justifica, el tribunal considerará si la reclamación del demandante o la objeción del demandado eran frívolas, y concederá a las partes contendientes oportunidad razonable para presentar sus comentarios.

7. El demandado no opondrá como defensa, contrademanda o derecho compensatorio o por cualquier otro motivo que el demandante ha recibido o recibirá indemnización u otra compensación por la totalidad o una parte de los daños alegados de conformidad con un seguro o contrato de garantía.

8. El tribunal puede ordenar una medida provisional de protección para preservar los derechos de una parte contendiente, o con el objeto de garantizar el pleno ejercicio de la competencia del tribunal, incluida una orden para preservar las pruebas que se encuentren en poder o bajo el control de una parte contendiente o para proteger la competencia del tribunal. El tribunal no puede ordenar el embargo o impedir la aplicación de una medida que se considere una violación mencionada en el Artículo 10.16. Para efectos de este párrafo, una orden incluye una recomendación.

9. (a) En cualquier arbitraje realizado de conformidad con esta Sección, a solicitud de cualquiera de las partes contendientes, el tribunal, antes de dictar una decisión o laudo sobre responsabilidad, comunicará su propuesta de decisión o laudo a las partes contendientes y las Partes no contendientes. Dentro del plazo de 60 días después de comunicada dicha propuesta de decisión o laudo, las partes contendientes pueden presentar comentarios escritos al tribunal en relación con cualquier aspecto de su propuesta de decisión o laudo. El tribunal considerará dichos comentarios y dictará su decisión o laudo a más tardar a los 45 días siguientes de haberse vencido el plazo de 60 días para presentar comentarios.

(b) El subpárrafo (a) no se aplicará a cualquier arbitraje conducido de conformidad con esta Sección en el cual una apelación esté disponible en virtud del párrafo 10 o el Anexo 10-D.

10. Si entre las Partes entrara en vigor un tratado multilateral separado en el que se estableciere un órgano de apelación con el propósito de revisar los laudos dictados por tribunales constituidos conforme a acuerdos internacionales de comercio o inversión para conocer controversias de inversión, las Partes procurarán alcanzar un acuerdo que haga que tal órgano de apelación revise los laudos dictados de conformidad con el Artículo 10.26 en los arbitrajes que se hubieren iniciado después de que el acuerdo multilateral entre en vigor entre las Partes.

**Artículo 10.21: Transparencia de las Actuaciones Arbitrales**

1. Con sujeción a los párrafos 2 y 4, el demandado, después de recibir los siguientes documentos, los entregará con prontitud a las Partes no contendientes y los pondrá a disposición del público:

(a) la notificación de intención;

(b) la notificación de arbitraje;

(c) los alegatos, escritos de demanda y notas explicativas presentados al tribunal por una parte contendiente y cualquier comunicación escrita presentada de conformidad con el Artículo 10.20.2 y 10.20.3 y el Artículo 10.25;

(d) las actas o transcripciones de las audiencias del tribunal, cuando estén disponibles; y

(e) las órdenes, laudos y decisiones del tribunal.

2. El tribunal realizará audiencias abiertas al público y determinará, en consulta con las partes contendientes, los arreglos logísticos pertinentes. Sin embargo, cualquier parte contendiente que pretenda usar en una audiencia información catalogada como información protegida deberá informarlo así al tribunal. El tribunal realizará los arreglos pertinentes para proteger la información de su divulgación.

3. Nada de lo dispuesto en esta Sección exige al demandado que ponga a disposición información protegida o que proporcione o permita el acceso a información que pudiese retener de conformidad con el Artículo 22.2 (Seguridad Esencial) o Artículo 22.4 (Divulgación de Información).

4. Cualquier información protegida que sea sometida al tribunal deberá ser protegida de divulgación de acuerdo con los siguientes procedimientos:

(a) sujeto al subpárrafo (d), ni las partes contendientes ni el tribunal revelarán a ninguna Parte no contendiente o al público ninguna información protegida cuando la parte contendiente que proporciona la información la designe claramente de esa manera de acuerdo con el subpárrafo (b);

(b) cualquier parte contendiente que reclame que determinada información constituye información protegida, lo designará claramente al momento de ser presentada al tribunal;

(c) una parte contendiente deberá, en el mismo momento que presenta un documento que contiene información alegada como información protegida, presentar una versión redactada del documento que no contenga la información. Sólo la versión redactada será proporcionada a las Partes no contendientes y será pública de acuerdo al párrafo 1; y

(d) el tribunal decidirá acerca de cualquier objeción en relación con la designación de información alegada como información protegida. Si el tribunal determina que dicha información no fue designada apropiadamente, la parte contendiente que presentó la información puede: (i) retirar todo o parte de la presentación que contiene tal información, o (ii) convenir en volver a presentar documentos completos y redactados con designaciones corregidas de acuerdo con la determinación del tribunal y con el subpárrafo (c). En todo caso, la otra parte contendiente deberá, cuando sea necesario, volver a presentar documentos completos y redactados, los cuales omitan la información retirada de conformidad con el (i) por la parte contendiente que presentó primero la información o redesignar la información de forma compatible con la designación realizada de conformidad con el (ii) de la parte contendiente que presentó primero la información.

5. Nada de lo dispuesto en esta Sección requiere al demandado negarle acceso al público a información que, de acuerdo a su legislación, debe ser divulgada.

**Artículo 10.22: Derecho Aplicable**

1. Sujeto al párrafo 3, cuando una reclamación se presenta de conformidad con el Artículo 10.16.1(a)(i)(A) o con el Artículo 10.16.1(b)(i)(A), el tribunal decidirá las cuestiones en controversia de conformidad con este Acuerdo y con las normas aplicables del Derecho Internacional.

2. Sujeto al párrafo 3 y las otras condiciones de esta Sección, cuando una reclamación se presenta de conformidad con el Artículo 10.16.1(a)(i)(B) o (C) o con el Artículo 10.16.1(b)(i)(B) o (C), el tribunal deberá aplicar:

(a) las normas legales especificadas en el acuerdo de inversión o en la autorización de inversión pertinentes, o de la manera como las partes contendientes puedan haber acordado; o

(b) si las normas legales no han sido especificadas o acordadas de otra manera:

(i) la legislación del demandado, incluidas sus normas sobre los conflictos de leyes[11]; y

(ii) las normas del Derecho Internacional, según sean aplicables.

3. Una decisión de la Comisión en la que se declare la interpretación de una disposición de este Acuerdo, conforme al Artículo 20.1.3 (Comisión de Libre Comercio), será obligatoria para un tribunal y toda decisión o laudo emitido por un tribunal deberá ser compatible con esa decisión.

**Artículo 10.23: Interpretación de los Anexos**

1. Cuando el demandado exponga como defensa que la medida que se alega como violatoria se encuentra dentro del ámbito de aplicación del Anexo I o el Anexo II, a petición del demandado, el tribunal solicitará a la Comisión una interpretación sobre el asunto. Dentro del plazo de los 60 días siguientes a la entrega de la solicitud, la Comisión presentará por escrito al tribunal cualquier decisión en la que se declare su interpretación, conforme al Artículo 20.1.3 (Comisión de Libre Comercio).

2. La decisión emitida por la Comisión, conforme al párrafo 1, será obligatoria para el tribunal y cualquier decisión o laudo emitido por el tribunal deberá ser compatible con esa decisión. Si la Comisión no emitiera dicha decisión dentro del plazo de 60 días, el tribunal decidirá sobre el asunto.

**Artículo 10.24: Informes de Expertos**

Sin perjuicio de la designación de otro tipo de expertos cuando lo autoricen las reglas de arbitraje aplicables, el tribunal, a petición de una parte contendiente o, a

[11] La "legislación del demandado" significa la legislación que un tribunal judicial doméstico o un tribunal que tenga la jurisdicción apropiada aplicaría en el mismo caso.

menos que las partes contendientes no lo acepten, por iniciativa propia, puede designar uno o más expertos para informar por escrito sobre cualquier cuestión de hecho relativa a asuntos ambientales, de salud, seguridad u otros asuntos científicos que haya planteado una parte contendiente en un proceso, de acuerdo a los términos y condiciones que acuerden las partes contendientes.

**Artículo 10.25: Acumulación de Procedimientos**

1. En los casos en que se hayan presentado a arbitraje dos o más reclamaciones por separado, conforme al Artículo 10.16.1, y las reclamaciones planteen en común una cuestión de hecho o de derecho y surjan de los mismos hechos o circunstancias, cualquier parte contendiente puede tratar de obtener una orden de acumulación, de conformidad con el acuerdo de todas las partes contendientes respecto de las cuales se pretende obtener la orden de acumulación o conforme con los términos de los párrafos 2 a 10.

2. La parte contendiente que pretenda obtener una orden de acumulación de conformidad con este Artículo, entregará una solicitud, por escrito, al Secretario General y a todas las partes contendientes respecto de las cuales se pretende obtener la orden de acumulación y especificará en la solicitud lo siguiente:

(a) el nombre y la dirección de todas las partes contendientes respecto de las cuales se pretende obtener la orden de acumulación;

(b) la naturaleza de la orden de acumulación solicitada; y

(c) el fundamento en que se apoya la solicitud.

3. A menos que el Secretario General determine, dentro del plazo de 30 días posteriores a la recepción de una solicitud de conformidad con el párrafo 2, que la misma es manifiestamente infundada, se establecerá un tribunal en virtud de este Artículo.

4. A menos que todas las partes contendientes respecto de las cuales se pretende obtener la orden de acumulación convengan otra cosa, el tribunal que se establezca de conformidad con este Artículo se integrará por tres árbitros:

(a) un árbitro designado por acuerdo de los demandantes;

(b) un árbitro designado por el demandado; y

(c) el árbitro presidente designado por el Secretario General, quien no será nacional de ninguna de las Partes.

5. Si, dentro del plazo de los 60 días siguientes a la recepción por el Secretario General de la solicitud formulada de conformidad con el párrafo 2, el demandado o los demandantes no designan a un árbitro conforme al párrafo 4, el Secretario General, a petición de cualquier parte contendiente respecto de las cuales se pretende obtener la orden de acumulación, designará al árbitro o a los árbitros que aún no se hayan designado. Si el demandado no designa a un árbitro, el Secretario General designará a

un nacional de la Parte contendiente y, en caso de que los demandantes no designen a un árbitro, el Secretario General designará a un nacional de una Parte de los demandantes.

6. En el caso de que el tribunal establecido de conformidad con este Artículo haya constatado que se hubieren presentado a arbitraje dos o más reclamaciones conforme al Artículo 10.16.1, que planteen una cuestión común de hecho o de derecho, y que surja de los mismos hechos o circunstancias, el tribunal puede, en interés de alcanzar una resolución justa y eficiente de las reclamaciones y después de oír a las partes contendientes, por orden:

(a) asumir la competencia y conocer y determinar conjuntamente sobre la totalidad o una parte de las reclamaciones;

(b) asumir la competencia y conocer y determinar una o más reclamaciones, cuya determinación considera que contribuiría a la resolución de las demás; o

(c) instruir a un tribunal establecido conforme al Artículo 10.19 a que asuma competencia y conozca y determine conjuntamente, sobre la totalidad o una parte de las reclamaciones, siempre que

(i) ese tribunal, a solicitud de cualquier demandante que no haya sido anteriormente parte contendiente ante ese tribunal, se reintegre con sus miembros originales, excepto que el árbitro por la parte de los demandantes se designará conforme a los párrafos 4(a) y 5; y

(ii) ese tribunal decida si se ha de repetir cualquier audiencia anterior.

7. En el caso en que se haya establecido un tribunal conforme a este Artículo, un demandante que haya presentado una reclamación a arbitraje conforme al Artículo 10.16.1, y cuyo nombre no aparezca mencionado en una solicitud formulada conforme al párrafo 2, puede formular una solicitud por escrito al tribunal a los efectos de que dicho demandante se incluya en cualquier orden que se dicte conforme al párrafo 6 y especificará en la solicitud:

(a) el nombre y dirección del demandante;

(b) la naturaleza de la orden solicitada; y

(c) los fundamentos en que se apoya la solicitud.

El demandante entregará una copia de su solicitud al Secretario General.

8. Un tribunal que se establezca conforme a este Artículo dirigirá las actuaciones conforme a lo previsto en las Reglas de Arbitraje de la CNUDMI, excepto en cuanto sea modificado por esta Sección.

9. Un tribunal que se establezca conforme al Artículo 10.19 no tendrá competencia para resolver una reclamación, o parte de una reclamación, respecto de la cual haya asumido competencia un tribunal establecido o instruido de conformidad con este Artículo.

10. A solicitud de una parte contendiente, un tribunal establecido de conformidad con este Artículo puede, en espera de su decisión conforme al párrafo 6, disponer que los procedimientos de un tribunal establecido de acuerdo al Artículo 10.19 se aplacen, a menos que ese último tribunal ya haya suspendido sus procedimientos.

**Artículo 10.26: Laudos**

1. Cuando un tribunal dicte un laudo definitivo desfavorable al demandado, el tribunal puede otorgar, por separado o en combinación, únicamente:

(a) daños pecuniarios y los intereses quc procedan; y

(b) restitución dc la propiedad, en cuyo caso el laudo dispondrá que el demandado puede pagar daños pecuniarios, más los intereses que procedan en lugar de la restitución.

Un tribunal puede también conceder costas y honorarios de abogado de conformidad con esta Sección y con las reglas de arbitraje aplicables.

2. Sujeto al párrafo 1, cuando se presente a arbitraje una reclamación conforme al Artículo 10.16.1(b):

(a) el laudo que prevea la restitución de la propiedad, dispondrá que la restitución se otorgue a la empresa;

(b) el laudo que conceda daños pecuniarios e intereses que procedan, dispondrá que la suma de dinero se pague a la empresa; y

(c) el laudo dispondrá que el mismo se dicta sin perjuicio de cualquier derecho que cualquier persona tenga sobre la reparación conforme al derecho interno aplicable.

3. Un tribunal no está autorizado para ordenar el pago de daños que tengan carácter punitivo.

4. El laudo dictado por un tribunal será obligatorio sólo para las partes contendientes y únicamente respecto del caso concreto.

5. Sujeto al párrafo 6 y al procedimiento de revisión aplicable a un laudo provisional, la parte contendiente acatará y cumplirá el laudo sin demora.

6. La parte contendiente no puede solicitar la ejecución del laudo definitivo hasta que:

(a) en el caso de un laudo definitivo dictado de conformidad con el Convenio del CIADI

(i) hayan transcurrido 120 días a partir de la fecha en que se dictó el laudo y ninguna parte contendiente haya solicitado la revisión o anulación del mismo; o

(ii) hayan concluido los procedimientos de revisión o anulación; y

(b) en el caso de un laudo definitivo dictado de conformidad con las Reglas del Mecanismo Complementario del CIADI o las Reglas de Arbitraje de la CNUDMI o las reglas seleccionadas en consecución con el Artículo 10.16.3(d),

(i) hayan transcurrido 90 días desde la fecha en que se dictó el laudo y ninguna parte contendiente haya iniciado un procedimiento para revisarlo, revocarlo o anularlo; o

(ii) un tribunal haya desechado o admitido una solicitud de revisión, revocación o anulación del laudo y esta resolución no pueda recurrirse.

7. Cada Parte dispondrá la debida ejecución de un laudo en su territorio.

8. Cuando el demandado incumpla o no acate un laudo definitivo, a la entrega de una solicitud de la Parte del demandante, se establecerá un panel de conformidad con el Artículo 21.6 (Solicitud de Integración de un Panel Arbitral). La Parte solicitante puede solicitar en dichos procedimientos:

(a) una determinación en el sentido de que el incumplimiento o desacato de los términos del laudo definitivo es contrario a las obligaciones de este Acuerdo; y

(b) de conformidad con el Artículo 21.13 (Informe Inicial), una recomendación en el sentido de que el demandado acate o cumpla el laudo definitivo.

9. Una parte contendiente puede recurrir a la ejecución de un laudo arbitral de conformidad con el Convenio del CIADI, la Convención de Nueva York o la Convención Interamericana, independientemente de que se hayan iniciado o no los procedimientos contemplados en el párrafo 8.

10. Para los efectos del Artículo I de la Convención de Nueva York y del Artículo I de la Convención Interamericana, se considerará que la reclamación que se somete a arbitraje conforme a esta Sección surge de una relación u operación comercial.

**Artículo 10.27: Entrega de Documentos**

La entrega de la notificación y otros documentos a una Parte se hará en el lugar designado por ella en el Anexo 10-C.

## Sección C: Definiciones

### Artículo 10.28: Definiciones

Para los efectos de este Capítulo:

**acuerdo de inversión** significa un acuerdo escrito[12] entre una autoridad nacional[13] de una Parte y una inversión cubierta o un inversionista de otra Parte, en virtud del cual la inversión cubierta o el inversionista se base para establecer o adquirir una inversión cubierta diferente al acuerdo escrito en sí mismo, que otorga derechos a la inversión cubierta o al inversionista:

(a) respecto a los recursos naturales que una autoridad nacional controla, como para su explotación, extracción, refinamiento, transporte, distribución o venta;

(b) para proveer servicios al público en representación de la Parte, como generación o distribución de energía, tratamiento o distribución de agua o telecomunicaciones; o

(c) para realizar proyectos de infraestructura, tales como construcción de vías, puentes, canales, presas u oleoductos o gasoductos que no sean de uso y beneficio exclusivo o predominante del gobierno;

**autorización de inversión** significa una autorización otorgada por la autoridad de inversiones extranjeras de una Parte a una inversión cubierta o a un inversionista de otra Parte[14] [15];

**Centro** significa el Centro Internacional para el Arreglo de Diferencias relativas a Inversiones ("CIADI") establecido por el Convenio del CIADI;

**Convención de Nueva York** significa la Convención de las Naciones Unidas sobre el Reconocimiento y Ejecución de las Sentencias Arbitrales Extranjeras, celebrada en Nueva York el 10 de junio de 1958;

---

[12] "acuerdo escrito" se refiere a un acuerdo escrito, ejecutado por ambas partes, donde en un solo instrumento o en múltiples instrumentos se crea un intercambio de derechos y obligaciones vinculando a ambas partes bajo la ley aplicable estipulada en el Artículo 10.22.2. Para mayor certeza, (a) un acto unilateral de una autoridad administrativa o judicial, tales como un permiso, licencia o una autorización emitida por una Parte solamente en función de su capacidad regulatoria, o un decreto, orden o sentencia, por sí misma; y (b) un decreto u orden de consentimiento administrativo o judicial, no deberán ser considerados un acuerdo escrito.

[13] Para efectos de esta definición, "autoridad nacional" significa una autoridad del nivel central de gobierno.

[14] Para mayor certeza, las acciones tomadas por una Parte con el fin de hacer cumplir las leyes de aplicación general, tales como leyes en materia de competencia, no están incluidas en esta definición.

[15] Las Partes reconocen que, en la fecha de entrada en vigor de este Acuerdo, ninguna de las Partes tiene una autoridad de inversiones extranjeras que otorgue autorizaciones de inversión.

**Convención Interamericana** significa la Convención Interamericana sobre Arbitraje Comercial Internacional, celebrada en Panamá el 30 de enero de 1975;

**Convenio del CIADI** significa el Convenio sobre el Arreglo de Diferencias relativas a Inversiones entre Estados y Nacionales de otros Estados, celebrado en Washington el 18 de marzo de 1965;

**demandado** significa la Parte que es parte de una controversia relativa a una inversión;

**demandante** significa el inversionista de una Parte que es parte de una controversia relativa a inversioncs con otra Parte;

**empresa** significa una empresa tal como se define en el Artículo 1.3 ( Definiciones de Aplicación General) y una sucursal de una empresa;

**empresa de una Parte** significa una empresa constituida u organizada de conformidad con la legislación de una Parte y una sucursal localizada en el territorio de una Parte y que lleven a cabo actividades de negocios en ese territorio;

**información protegida** significa información de negocios confidencial o información privilegiada o que de otra manera se encuentre protegida de divulgación de conformidad con la legislación de la Parte;

**inversión** significa todo activo de propiedad de un inversionista o controlado por el mismo, directa o indirectamente, que tenga las características de una inversión, incluyendo características tales como el compromiso de capitales u otros recursos, la expectativa de obtener ganancias o utilidades, o la asunción de riesgo. Las formas que puede adoptar una inversión incluyen:

(a) una empresa;

(b) acciones, capital y otras formas de participación en el patrimonio de una empresa;

(c) bonos, obligaciones, otros instrumentos de deuda y préstamos;[16] [17]

(d) futuros, opciones y otros derivados;

(e) contratos de llave en mano, de construcción, de gestión, de producción, de concesión, de participación en los ingresos y otros contratos similares;

(f) derechos de propiedad intelectual;

---

[16] Es más probable que algunas formas de deuda, como bonos, obligaciones y pagarés a largo plazo, tengan las características de una inversión, mientras que es menos probable que otras formas de deuda, tales como reclamos de pago de vencimiento inmediato y como resultado de la venta de bienes o servicios, tengan estas características.

[17] Los préstamos otorgados por una Parte a otra Parte no son considerados inversiones.

(g) licencias, autorizaciones, permisos y derechos similares otorgados de conformidad con la legislación interna[18] [19]; y

(h) otros derechos de propiedad tangibles o intangibles, muebles o inmuebles y los derechos relacionados con la propiedad, tales como arrendamientos, hipotecas, gravámenes y garantías en prenda;

**inversionista de una Parte** significa una Parte o una empresa del Estado de la misma, o un nacional o empresa de la Parte, que intenta realizar, a través de acciones concretas, está realizando o ha realizado una inversión en el territorio de otra Parte; considerando, sin embargo, que una persona natural que tiene doble nacionalidad se considerará exclusivamente un nacional del Estado de su nacionalidad dominante y efectiva.

**inversionista de un país que no sea Parte** significa, respecto de una Parte, un inversionista que intenta realizar, a través de acciones concretas, que está realizando o que ha realizado una inversión en el territorio de esa Parte, que no es un inversionista de una Parte;

**moneda de libre uso** significa la "divisa de libre uso" tal como se determina de conformidad con los Artículos del Acuerdo del Fondo Monetario Internacional;

**nacional** significa una persona natural que tiene la nacionalidad de una Parte de conformidad con el Anexo 1.3 (Definiciones de Aplicación General);

**partes contendientes** significa el demandante y el demandado;

**parte contendiente** significa ya sea el demandante o el demandado;

**Parte no contendiente** significa la Parte que no es parte de una controversia relativa a una inversión;

**Reglas de Arbitraje del CNUDMI** significa las Reglas de Arbitraje de la Comisión de Naciones Unidas sobre Derecho Internacional Mercantil;

**Reglas del Mecanismo Complementario del CIADI** significa el Reglamento del Mecanismo Complementario para la Administración de Procedimientos por el Secretariado del Centro Internacional de Arreglo de Diferencias relativas a Inversiones;

**reestructuración negociada** significa la reestructuración o reprogramación de un instrumento de deuda que ha sido realizada a través de (i) una modificación o enmienda

---

[18] El hecho de que un tipo de licencia, autorización, permiso o un instrumento similar (incluida una concesión, en la medida que ésta tenga la naturaleza de este tipo de instrumento) tenga las características de una inversión, depende de factores tales como la naturaleza y el alcance de los derechos del tenedor de conformidad con la legislación de la Parte. Entre las licencias, autorizaciones, permisos o instrumentos similares que no tienen las características de una inversión están aquellos que no generan derechos protegidos mediante la legislación interna. Para mayor certeza, lo anterior es sin perjuicio de que un activo asociado con dicha licencia, autorización, permiso o instrumento similar tenga las características de una inversión.

[19] El término de "inversión" no incluye una orden o sentencia presentada en una acción judicial o administrativa.

de dicho instrumento de deuda, de conformidad con sus términos, o (ii) un intercambio de deuda comprehensivo u otro proceso similar en el cual los acreedores de por lo menos el 75 por ciento del monto agregado principal de la deuda insoluta bajo este instrumento han consentido a ese proceso de cambio de deuda u otro proceso similar; y

**Secretario General** significa el Secretario General del CIADI.

## Anexo 10-A

### Derecho Internacional Consuetudinario

Las Partes confirman su común entendimiento que el "derecho internacional consuetudinario", de manera general y tal como está específicamente referido en el Artículo 10.5, resulta de una práctica general y consistente de los Estados, seguida por ellos en el sentido de una obligación legal. Con respecto al Artículo 10.5, el trato mínimo otorgado a los extranjeros por el derecho internacional consuetudinario se refiere a todos los principios del derecho internacional consuetudinario que protegen los derechos económicos e intereses de los extranjeros.

## Anexo 10-B

## Expropiación

Las Partes confirman su común entendimiento de que:

1. Un acto o una serie de actos de una Parte no pueden constituir una expropiación a menos que interfiera con un derecho de propiedad tangible o intangible o con los atributos o facultades esenciales del dominio de una inversión.

2. El Artículo 10.7.1 aborda dos situaciones. La primera es la expropiación directa, en donde una inversión es nacionalizada o de otra manera expropiada directamente mediante la transferencia formal del título o del derecho de dominio.

3. La segunda situación abordada por el Artículo 10.7.1 es la expropiación indirecta, en donde un acto o una serie de actos de una Parte tienen un efecto equivalente al de una expropiación directa sin la transferencia formal del título o del derecho de dominio.

(a) La determinación de si un acto o una serie de actos de una Parte, en una situación de hecho específica, constituye una expropiación indirecta, requiere de una investigación factual, caso por caso, que considere entre otros factores:

(i) el impacto económico del acto gubernamental, aunque el hecho de que un acto o una serie de actos de una Parte tenga un efecto adverso sobre el valor económico de una inversión, por sí solo, no establece que una expropiación indirecta haya ocurrido;

(ii) la medida en la cual la acción del gobierno interfiere con expectativas inequívocas y razonables de la inversión; y

(iii) el carácter de la acción gubernamental.

(b) Salvo en circunstancias excepcionales, no constituyen expropiaciones indirectas los actos regulatorios no discriminatorios de una Parte que son diseñados y aplicados para proteger objetivos legítimos de bienestar público, tales como la salud pública, la seguridad y el medioambiente[20].

---

[20] Para mayor certeza, la lista de "objetivos de bienestar público" en el subpárrafo no es exhaustiva.

**Anexo 10-C**

**Entrega de Documentos a una Parte bajo la Sección B**

**Perú**

Las notificaciones y otros documentos referidos a las diferencias bajo la Sección B, serán atendidos en Perú mediante su entrega a:

Dirección General de Asuntos de Economía Internacional,
Competencia e Inversión Privada
Ministerio de Economía y Finanzas
Jirón Lampa 277, piso 5
Lima, Perú

**Estados Unidos**

Las notificaciones y otros documentos referidos a las diferencias bajo la Sección B, serán atendidos en los Estados Unidos mediante su entrega a:

*Executive Director* (L/E10)
*Office of the Legal Adviser*
*Department of State*
Washington, D.C. 20520
Estados Unidos de América

**Anexo 10-D**

**Órgano de Apelación o Mecanismo Similar**

Durante un plazo de tres años a partir de la fecha de entrada en vigor de este Acuerdo, las Partes considerarán la posibilidad de establecer un órgano de apelaciones o mecanismo similar para revisar los laudos dictados de conformidad con el Artículo 10.26, en los arbitrajes iniciados después de haber establecido el órgano de apelaciones o mecanismo similar.

## Anexo 10-E

### Disposiciones Especiales de Solución de Controversias

1. Cuando un demandante presente una reclamación alegando que una Parte que no sea Estados Unidos ha violado una obligación de la Sección A, distinta del Artículo 10.3 ó 10.4, que surja de la imposición de medidas restrictivas con respecto a pagos al exterior y transferencias, se aplicará la Sección B, salvo lo siguiente:

(a) Un demandante no puede someter cualquiera de tales reclamaciones a arbitraje, sino hasta después de un año de los eventos que ocasionaron la reclamación;

(b) Las pérdidas o daños que resulten de la aplicación de medidas restrictivas a la entrada de capitales, se limitarán a la reducción en el valor de las transferencias y excluirán el lucro cesante o las pérdidas de oportunidades de negocios y cualquier daño semejante consecuencial o incidental;

(c) El subpárrafo (a) no se aplicará a reclamos que surjan como consecuencia de restricciones a:

(i) pagos o transferencias de transacciones corrientes;

(ii) pagos o transferencias asociados con inversiones en el capital de sociedades; o

(iii) pagos provenientes de préstamos o bonos[21], siempre que tales pagos sean efectuados de acuerdo a los términos y condiciones del acuerdo de préstamo o de la emisión de bonos.

(d) Si una medida restringe los pagos o transferencias al extranjero:

(i) no impedirá a los inversionistas obtener, en el territorio de la Parte que impone la medida, una tasa de retorno de mercado sobre cualquier activo restringido;

(ii) la Parte que impone la medida deberá proporcionar a los inversionistas una oportunidad razonable de mitigar cualquier pérdida ocasionada por tal medida; y

(iii) mientras que la Parte que impone la medida cumpla con las obligaciones referidas en este párrafo, el demandante no podrá recuperar cualquier costo de oportunidad alegado o cualquier daño semejante, consecuencial o incidental, por haber renunciado a inversiones alternativas en que se haya incurrido durante el

[21] Para mayor certeza, el término "pago proveniente de préstamos o bonos", utilizado en este subpárrafo, no incluye transacciones de cuentas de capital en préstamos interbancarios, incluyendo los préstamos a y de instituciones financieras establecidas en el territorio la Parte sujeta a reclamación.

primer año después de los eventos que ocasionaron la reclamación.

2. Una Parte no puede requerir el establecimiento de un panel arbitral de conformidad con el Capítulo Veintiuno (Solución de Controversias) relacionado con la imposición de medidas restrictivas por una Parte distinta a los Estados Unidos con respecto a pagos y transferencias, sino hasta después de un año de la imposición de la referida medida.

## Anexo 10-F

## Deuda Pública

1. Las Partes reconocen que la compra de deuda emitida por una Parte implica un riesgo comercial. Para mayor certeza, ningún laudo podrá ser emitido a favor del demandante por una reclamación bajo el Artículo 10.16.1(a)(i)(A) o el Artículo 10.16.1(b)(i)(A), con respecto a un incumplimiento de pago de deuda emitida por una Parte, salvo que el demandante cumpla con probar que tal incumplimiento constituye una expropiación no indemnizada para efectos del Artículo 10.7.1 o una violación de cualquier otra obligación de la Sección A.

2. Ninguna reclamación de que una reestructuración de deuda emitida por una Parte distinta a los Estados Unidos viola una obligación de la Sección A podrá ser sometida a arbitraje bajo la Sección B, o si ya se encuentra sometida, continuar en el mismo, si la reestructuración ha sido negociada al momento del sometimiento, o se convierte en una reestructuración negociada después de dicho sometimiento, salvo el caso de la reclamación de que la reestructuración viola el Artículo 10.3 ó 10.4.

3. Sin perjuicio de lo dispuesto en el Artículo 10.16.3, y sujeto a lo dispuesto en el párrafo 2 de este Anexo, un inversionista de otra Parte no puede someter una reclamación a arbitraje bajo la Sección B alegando que la reestructuración de deuda emitida por una Parte distinta a los Estados Unidos viola una obligación de la Sección A (aparte del Artículo 10.3 ó 10.4), salvo que hayan transcurrido 270 días desde el día en que ocurrieron los eventos que ocasionaron la reclamación.

## Anexo 10-G

### Sometimiento de una Reclamación a Arbitraje

1. Un inversionista de los Estados Unidos no puede someter a arbitraje bajo la Sección B una reclamación de que una Parte ha violado una obligación de la Sección A:

(a) por su propia cuenta, según el Artículo 10.16.1(a); o

(b) por cuenta de una empresa de la Parte distinta a los Estados Unidos que es una persona jurídica que el inversionista posee o controla directa o indirectamente, según el Artículo 10.16.1(b),

si el inversionista o la empresa, respectivamente, ha alegado, la violación de una obligación de la Sección A en procedimientos ante un tribunal judicial o administrativo de dicha Parte.

2. Para mayor certeza, si un inversionista dc los Estados Unidos elige someter una reclamación del tipo descrito en el párrafo 1 ante un tribunal judicial o administrativo de una Parte distinta a los Estados Unidos, dicha elección será definitiva y el inversionista no puede a partir de ese momento, someter la reclamación a un arbitraje bajo la Sección B.

## Anexo 10-H

### Determinados Acuerdos entre el Perú e Inversiones Cubiertas o Inversionistas de otra Parte[22]

1. De conformidad con los Decretos Legislativos 662 y 757, el Perú puede celebrar acuerdos denominados "convenios de estabilidad jurídica" con inversiones cubiertas o inversionistas de otra Parte.

2. Como parte de un convenio de estabilidad jurídica referido en el párrafo 1, el Perú otorga ciertos beneficios a las inversiones cubiertas o a los inversionistas que son parte en el convenio. Estos beneficios típicamente incluyen un compromiso de mantener el régimen del impuesto a la renta vigente aplicable a dichas inversiones cubiertas o inversionistas durante un período de tiempo específico.

3. Los Apéndices 10-H.A y 10-H.B adjuntos, constituyen modelos de los convenios de estabilidad jurídica, referidos en el párrafo 1, celebrados con las inversiones cubiertas y con los inversionistas, respectivamente.

4. Un convenio de estabilidad jurídica, referido en el párrafo 1, puede constituir uno de los múltiples instrumentos escritos que conforman un acuerdo de inversión, definido en el Artículo 10.28[23]. En ese caso, una violación del referido convenio de estabilidad jurídica, por el Perú, puede constituir una violación del acuerdo de inversión del que forma parte.

5. Cuando el convenio de estabilidad jurídica es materialmente igual a los modelos incluidos en el Apéndice 10-H.A o 10-H.B, y cuando no constituya uno de los múltiples instrumentos que conforman un "acuerdo de inversión", definido en el Artículo 10.28, una violación del referido convenio de estabilidad jurídica, por el Perú, no constituye una violación del acuerdo de inversión.

---

[22] El hecho de que este Anexo se refiera sólo a convenios celebrados por el Perú no deberá prejuzgar la determinación hecha por un tribunal establecido bajo la Sección B, respecto de si un convenio celebrado por otra Parte cumple con la definición de "acuerdo de inversión", según el Artículo 10.28.

[23] Para mayor certeza, para ser considerado como uno de los múltiples acuerdos escritos que conforman un "acuerdo de inversión", tal como está definido en el Artículo 10.28, uno o más de estos múltiples instrumentos deben otorgar derechos a los inversionistas o a sus inversiones cubiertas, tal como está dispuesto en los subpárrafos (a), (b), o (c) de esa definición. Un acuerdo de estabilidad jurídica puede constituir uno de los múltiples acuerdos escritos que conforman un "acuerdo de inversión", aun cuando el convenio de estabilidad jurídica no sea, en sí mismo, el instrumento en el cual tales derechos sean otorgados.

**Apéndice 10-H.A**

Conste por el presente documento el Convenio de Estabilidad Jurídica, en adelante el Convenio, que celebran, de una parte, el **ESTADO PERUANO**, representado ............................., a quien en adelante se le denominará el **ESTADO**; y, de la otra parte, ............................., representado por **........................**, a quien en adelante se le denominará **(LA EMPRESA)** ; en los términos y condiciones que constan en las siguientes cláusulas:

**PRIMERA**.- **(LA EMPRESA)** ha presentado ante **(el organismo nacional competente)**, una solicitud para la suscripción de un Convenio de Estabilidad Jurídica al amparo de lo dispuesto en el Decreto Legislativo N° 662, en el Título II y en el Capítulo Primero del Título V del Decreto Legislativo N° 757, en el Reglamento de los mismos aprobado por el Decreto Supremo N° 162-92-EF, ***(se incluyen las normas modificatorias, reglamentarias y complementarias).***

**SEGUNDA**.- **(LA EMPRESA)**, en virtud del presente Convenio, se compromete a emitir acciones/participaciones a favor de **(EL INVERSIONISTA)**, a quien en adelante se denominará **(EL INVERSIONISTA)** y se obliga a lo siguiente:

***(Se incluye sólo las obligaciones que corresponden según la forma de inversión adoptada por el inversionista)***

- Emitir acciones/participaciones a favor de **(EL INVERSIONISTA)** por un monto de US$ ............................(...... y 00/100 Dólares de Estados Unidos de América) contra la recepción de los aportes que **(EL INVERSIONISTA),** deberá efectuar en un plazo de.....................(no mayor dos (02) años), contado a partir del día de celebración del Convenio de Estabilidad Jurídica celebrado por **(EL INVERSIONISTA).**

- Asegurar que los aportes provenientes del exterior, a que se refiere el numeral 1 sean canalizados a través del Sistema Financiero Nacional, conforme deberá constar en la certificación que emita el banco interviniente en la operación. ***(sólo en el caso de inversión extranjera)***

- Registrar su inversión proveniente del exterior, a que se refiere el numeral 1, valorizada en moneda de libre convertibilidad, en (el organismo nacional competente).

- Generar directamente más de 20 puestos de trabajo permanentes en un plazo no mayor de tres años, contado a partir de la fecha de celebración del presente convenio.

- Generar directamente no menos de US$ .....................(no menos de dos millones) de ingreso de divisas por concepto de exportaciones en un plazo no mayor de tres años, contado a partir de la fecha de celebración del presente convenio.

- Destinar los aportes, a que se refiere el numeral 1, a la ampliación de la capacidad productiva / al desarrollo tecnológico.

**TERCERA**.- El **ESTADO**, en virtud del presente Convenio y mientras éste se encuentre vigente, se obliga, a garantizar la estabilidad jurídica para **(LA EMPRESA)**, en los siguientes términos:

1. Estabilidad del régimen tributario referido al Impuesto a la Renta, conforme a lo prescrito en el Artículo 40° del Decreto Legislativo N° 757 y normas modificatorias, que implica que el Impuesto a la Renta que le corresponda abonar a **(LA EMPRESA)** no será modificado mientras se encuentre en vigencia el presente Convenio de Estabilidad Jurídica, ***(continúa una breve descripción de la estabilidad tributaria, que depende del régimen tributario vigente a la fecha de suscripción).***

2. Estabilidad de los regímenes de contratación de los trabajadores de **(LA EMPRESA)** mientras se encuentre vigente el presente Convenio, al amparo de lo dispuesto en el Inciso a) del Artículo 12° del Decreto Legislativo N° 662, en las distintas modalidades contempladas en ***(continúa una referencia a la legislación laboral vigente a la fecha de suscripción).***

3. Estabilidad de los regímenes de promoción de exportaciones utilizada por **(LA EMPRESA),** al amparo de lo dispuesto en el Inciso b) del Artículo 12 del D. Legislativo N° 662, que se encuentre vigente ***(continúa la referencia a la aplicación de normas vigentes)***.

**CUARTA**.- Adicionalmente, a lo establecido en la CLAUSULA SEGUNDA **(LA EMPRESA),** se obliga a lo siguiente:

***(Se incluye sólo las obligaciones que corresponden según la forma de inversión adoptada por el inversionista)***

- Acreditar que la nueva inversión, supera a la fecha de celebración del presente Convenio el 50% de su Capital y Reservas, presentando un Informe que, con carácter de Declaración Jurada y sujeto a fiscalización posterior, emita una sociedad de auditoria.

- Acreditar que ha cumplido con recibir el aporte dinerario de capital proveniente del exterior por un monto de US$ ................, mediante la presentación de ***(detalle de los documentos probatorios requeridos)***.

- Acreditar que la nueva inversión ha sido efectivamente destinada a la ampliación de su capacidad productiva, mediante la presentación del correspondiente Informe que emita una sociedad de auditoria.

- Acreditar que ha cumplido con generar los ......... puestos de trabajo permanentes en **(LA EMPRESA)**, mediante la presentación de un Declaración Jurada sujeta a Fiscalización posterior.

- Acreditar que ha cumplido con generar US$ ..................... de ingreso de divisas por concepto de exportaciones de **(LA EMPRESA),** mediante la presentación de un Declaración Jurada sujeta a Fiscalización posterior.

Las obligaciones, a que se refieren los numerales anteriores, deberán acreditarse ante (el organismo nacional competente ) en un plazo máximo de ............................días calendario, contado a partir de la fecha límite para su cumplimiento, conforme a lo establecido en la CLAUSULA SEGUNDA.

**QUINTA**.- El presente Convenio de Estabilidad Jurídica tendrá una vigencia de diez (10) años contados a partir de la fecha de su celebración. En consecuencia, no podrá ser modificado unilateralmente por ninguna de las partes durante dicho período, ni aunque la legislación nacional sea modificada, así se trate de modificaciones más beneficiosas o perjudiciales para alguna de las partes que las pactadas en este Convenio.

**SEXTA**.- **(LA EMPRESA)** tendrá derecho a renunciar por única vez al régimen de estabilidad jurídica que se le otorga al amparo del presente Convenio, debiendo formalizar dicha renuncia mediante una comunicación por escrito dirigida ante (el organismo nacional competente) la que se hará efectiva desde la fecha de recepción de la comunicación por este último.

Si **(LA EMPRESA)** opta por ejercer el derecho de renuncia al Convenio de Estabilidad, que se le reconoce al amparo de la presente cláusula, automáticamente pasará a regirse por la legislación común.

**SEPTIMA**.- El presente Convenio de Estabilidad Jurídica sólo podrá ser modificado de común acuerdo por las partes. No podrá modificarse el plazo de vigencia establecido en la CLAUSULA QUINTA ni el monto de los aportes por debajo del límite establecido las leyes (referidas en la Cláusula Primera) .

Para tal efecto, **(LA EMPRESA)** presentará una solicitud ante (el organismo nacional competente), que se tramitará conforme al mismo procedimiento utilizado para la celebración del presente Convenio.

**OCTAVA**.- Siendo la intención de las partes que los problemas que se presenten en relación con el cumplimiento del presente Convenio se resuelvan de la manera más expeditiva posible, se conviene desde ahora que cualquier litigio, controversia o reclamación entre ellos, relativa a la interpretación, ejecución o validez del presente Convenio, será resuelta mediante arbitraje de derecho.

El arbitraje se llevará a cabo en la ciudad de Lima, mediante la constitución de un Tribunal Arbitral conformado por tres (3) miembros, de los cuales cada una de las partes nombrará a uno (1) y los dos (2) árbitros así designados nombrarán al tercer árbitro. Los árbitros quedan expresamente facultados para determinar la controversia materia del arbitraje.

Si una parte no nombra árbitro dentro de los diez (10) días hábiles de recibido el requerimiento de la parte o partes que soliciten el arbitraje o si dentro de un plazo igualmente de diez (10) días hábiles, contado a partir del nombramiento del último árbitro por las partes, los dos (2) árbitros no consiguen ponerse de acuerdo sobre el tercer árbitro, la designación del árbitro faltante será hecha, a petición de cualquiera de las partes, por la Cámara de Comercio de Lima.

El plazo de duración del proceso arbitral no deberá exceder de sesenta (60) días hábiles contados desde la fecha de designación del último árbitro, y, se regirá por lo dispuesto en la Ley General de Arbitraje, y/o las normas que la sustituyan o modifiquen.

Los gastos que se generen por la aplicación de lo pactado en la presente Cláusula serán sufragados por las partes contratantes en igual medida.

**NOVENA**.- Constituyen causales de resolución de pleno derecho del presente Convenio, sin mediar requisito de comunicación previa las siguientes:

1. El incumplimiento por parte de **(LA EMPRESA)** de las obligaciones establecidas en la CLAUSULA SEGUNDA.

2. El incumplimiento por parte de **(LA EMPRESA)** de las obligaciones establecidas en la CLAUSULA CUARTA.

3. La cesión de posición contractual que realice **(LA EMPRESA)** .

4. El incumplimiento de generar los puestos de trabajo, de conformidad a lo establecido en la CLAUSULA SEGUNDA.

5. El incumplimiento de generar los ingresos de divisas por exportaciones, de conformidad a lo establecido en la CLAUSULA SEGUNDA.

En el caso que **(LA EMPRESA)** incurra en una de las mencionadas causales de resolución del presente Convenio, si por efecto de la estabilidad jurídica concedida al amparo del mismo hubiera gozado de una carga fiscal menor a la que le hubiera correspondido de no estar amparada por dicho Convenio, estará obligada a reembolsar al **ESTADO** el monto actualizado de los tributos que le hubieran afectado de no haber suscrito el Convenio, más los recargos correspondientes a que se refiere el Código Tributario.

Queda entendido que en el caso a que se refiere el párrafo anterior, si **(LA EMPRESA)** hubiera soportado una carga fiscal mayor por efectos del presente Convenio, no existirá obligación de reembolso de suma alguna por parte del **ESTADO**.

Estando las partes de acuerdo en todos los términos del presente Convenio, lo suscriben, en Lima, en tres (3) copias de igual contenido.

**Apéndice 10-H.B**

Conste por el presente documento el Convenio de Estabilidad Jurídica, en adelante el "Convenio", que celebran, de una parte, el **ESTADO PERUANO**, representado ..........................., a quien en adelante se le denominará el **ESTADO**; y, de la otra parte ................................., representado por .........................a quien en adelante se le denominará **(EL INVERSIONISTA)** en los términos y condiciones que constan en las siguientes cláusulas:

**PRIMERA**.- **(EL INVERSIONISTA)** ha presentado ante **(el organismo nacional competente)**, una solicitud para la suscripción de un Convenio de Estabilidad Jurídica al amparo de lo dispuesto en el Decreto Legislativo N° 662, en el Título II y en el Capítulo Primero del Título V del Decreto Legislativo N° 757, en el Reglamento de los Regímenes de Garantía a la Inversión Privada, aprobado por el Decreto Supremo N° 162-92-EF, ***...(se incluyen las normas modificatorias, reglamentarias y complementarias)...***

**SEGUNDA**.- **(EL INVERSIONISTA)** en virtud del presente Convenio, *(se acoge a la modalidad de inversión prescrita en el Reglamento. En consecuencia),* se obliga a lo siguiente:

***(Se incluye sólo las obligaciones que corresponden según la forma de inversión adoptada por el inversionista)***

- Efectuar aportes dinerarios al capital de ............................ por un monto de US$ .................. en un plazo de ...............(no mayor de dos años), contado desde la fecha de suscripción del presente convenio.

- Canalizar el aporte proveniente del exterior a que se refiere el numeral 1, a través del Sistema Financiero Nacional, conforme deberá constar en la certificación que emita el banco interviniente en la operación.

- Registrar su inversión, proveniente del exterior, a que se refiere el numeral 1, valorizada en moneda de libre convertibilidad, en PROINVERSIÓN (sólo en el caso de inversión extranjera directa)

- Realizar inversiones de riesgo que formalicen con terceros, por un monto de US $ ................, en un plazo de (no mayor de dos años) contado a partir de la fecha de celebración del presente Convenio.

- Generar directamente más de veinte (20) puestos de trabajo permanentes en un plazo no mayor de tres (03) años, contado a partir de la fecha de celebración del presente Convenio.

- Generar directamente US $ ..................(no menos de dos millones) de ingreso de divisas por concepto de exportaciones en un plazo no mayor de tres (03) años contado a partir de la fecha de suscripción del convenio de estabilidad.

**TERCERA**.- El **ESTADO**, en virtud del presente Convenio y mientras éste se encuentre vigente, se obliga, en relación con la inversión a que se refiere la

CLAUSULA SEGUNDA, a garantizar la estabilidad jurídica para **(EL INVERSIONISTA)** en los siguientes términos:

1. Estabilidad del régimen tributario referido al Impuesto a la Renta, conforme a lo prescrito en el Inciso a) del Artículo 10° del Decreto Legislativo N° 662 .... ***(continúa breve descripción de la estabilidad tributaria, que depende del régimen tributario vigente a la fecha de suscripción del convenio)...***

2. ***(Sólo aplicable a la inversión extranjera)*** Estabilidad del régimen de libre disponibilidad de divisas conforme a lo prescrito en el Inciso b) del Artículo 10° del Decreto Legislativo N° 662, que implica que **(EL INVERSIONISTA)** podrá acceder libremente a la moneda extranjera en el mercado cambiario al tipo de cambio más favorable que pueda conseguir, sin que el **ESTADO** pueda aplicarle con relación a la inversión a que se refiere la CLAUSULA SEGUNDA, cualquier régimen o mecanismo de regulación del mercado cambiario que limite o restrinja este derecho o que implique un tratamiento menos favorable para **(EL INVERSIONISTA)** que el que se aplique a cualquier persona natural o jurídica por la realización de cualquier clase de operación cambiaria.

3. ***(Sólo aplicable a la inversión extranjera)*** Estabilidad del derecho de libre remesa de sus utilidades y capitales conforme a lo prescrito en el Inciso b) del Artículo 10° del Decreto Legislativo N° 662, que implica que **(EL INVERSIONISTA)** podrá transferir al exterior en divisas libremente convertibles, sin requerir autorización previa de ninguna entidad del Gobierno Nacional, Gobiernos Regionales o Locales, siempre que la inversión correspondiente haya sido registrada ante el Organismo Nacional Competente y se haya cumplido con las obligaciones tributarias correspondientes, y sin que el **ESTADO** pueda establecer restricción o limitación alguna a este derecho, lo siguiente:

   a) El íntegro de sus capitales provenientes del exterior, incluyendo el capital proveniente de la venta de sus acciones, participaciones o derechos sobre empresas, de la reducción del capital y de la liquidación parcial o total de empresas, provenientes de la inversión a que se refiere la CLAUSULA SEGUNDA;

   b) El íntegro de los dividendos o las utilidades netas comprobadas provenientes de la inversión a que se refiere la CLAUSULA SEGUNDA, así como las utilidades obtenidas por concepto de contraprestaciones por el uso o disfrute de bienes ubicados físicamente en el país destinados a dicha inversión; y,

   c) El íntegro de las regalías y contraprestaciones por el uso y transferencia de tecnología, marcas y patentes y cualquier otro elemento de la propiedad industrial que autorice el Organismo Nacional Competente.

4. Estabilidad del derecho de utilizar el tipo de cambio más favorable conforme a lo prescrito en el Inciso b) del Artículo 10° del Decreto Legislativo N° 662, que implica que **(EL INVERSIONISTA)** podrá acceder a la moneda extranjera en el mercado cambiario al tipo de cambio más favorable que pueda conseguir, sin que el **ESTADO** pueda obligarla a realizar sus operaciones cambiarias bajo un régimen o mecanismo que otorgue un tratamiento menos favorable que el que se aplique a

cualquier persona natural o jurídica por la realización de cualquier operación cambiaria, de acuerdo a lo siguiente:

a) Cuando se trate de conversión de la moneda extranjera a nacional: **(EL INVERSIONISTA)** podrá venderla a cualquier persona natural o jurídica al tipo de cambio compra más favorable que encuentre en el mercado cambiario al momento de efectuar la operación cambiaria; y,

b) Cuando se trate de conversión de la moneda nacional a extranjera: **(EL INVERSIONISTA)**podrá comprarla a cualquier persona natural o jurídica al tipo de cambio venta más favorable que encuentre en el mercado cambiario al momento de efectuar la operación cambiaria.

5. Estabilidad del derecho a la no discriminación conforme a lo prescrito en el Inciso c) del Artículo 10° del Decreto Legislativo N° 662, que implica que el **ESTADO** en ninguno de sus niveles, ya se trate de entidades o empresas del Gobierno Nacional, Gobiernos Regionales o Locales, podrá aplicar a **(EL INVERSIONISTA)** un tratamiento diferenciado atendiendo a su nacionalidad, los sectores o tipos de actividad económica que desarrolle o la ubicación geográfica de la empresa en que invierta, ni en las siguientes materias:

a) ***(Sólo aplicable a la inversión extranjera)*** Cambiaria, de tal modo que el **ESTADO** no podrá aplicar a **(EL INVERSIONISTA)** en lo relativo a la inversión a que se refiere la CLAUSULA SEGUNDA, un régimen cambiario que implique un tratamiento menos favorable que el que se aplique a cualquier persona natural o jurídica por la realización de cualquier clase de operación cambiaria;

b) Precios, tarifas o derechos no arancelarios, de tal modo que el **ESTADO** no podrá aplicar por estos conceptos a **(EL INVERSIONISTA)** en lo relativo a la inversión a que se refiere la CLAUSULA SEGUNDA, montos o tasas diferenciados;

c) ***(No aplicable en el caso de banca y seguros)*** Forma de constitución empresarial, de tal modo que el **ESTADO** no podrá exigir a **(EL INVERSIONISTA)** que la empresa .............................................. en la que va a invertir, adopte una determinada modalidad empresarial;

d) Su condición de persona natural o jurídica, de tal modo que el **ESTADO** no podrá aplicar a **(EL INVERSIONISTA)** un tratamiento diferenciado por este concepto; y,

e) Ninguna otra causa de efectos equivalentes, como es el caso de la aplicación de tratamientos discriminatorios para **(EL INVERSIONISTA)** resultantes de cualquier combinación de los diversos acápites del presente numeral.

El presente numeral se aplica sin perjuicio de las limitaciones establecidas en el Artículo 3° del REGLAMENTO.

**CUARTA.- (EL INVERSIONISTA)** asume adicionalmente, de conformidad con lo pactado en la CLAUSULA SEGUNDA, la obligación de:

***(Sólo se incluyen las obligaciones que corresponden a la forma de inversión descrita en la Cláusula Segunda)***

- Acreditar que ha cumplido con la realización del aporte dinerario por US$ ...................... (................................ y 00/100 Dólares de Estados Unidos de América) al capital de la empresa ..........................................., mediante la presentación de (detalle de los documentos probatorios requeridos)

- Acreditar que ha cumplido con realizar el aporte de capital de riesgo por US$ ............en la empresa ..........., mediante la presentación de (detalle de los documentos probatorios requeridos)

- Acreditar que ha cumplido con generar los ........ puestos de trabajo permanentes en la empresa ................, mediante la presentación de una declaración jurada sujeta a fiscalización posterior.

- Acreditar que ha cumplido con generar US$ .................... de ingreso de divisas por concepto de exportaciones de la empresa .................., mediante la presentación de una declaración jurada sujeta a fiscalización posterior.

Las obligaciones referidas en la presente cláusula, deberán acreditarse ante (el organismo competente) en un plazo máximo de ................ días calendario, contado a partir de la fecha límite para su cumplimiento, conforme a lo establecido en la CLAUSULA SEGUNDA. El incumplimiento de estas obligaciones constituye causal de resolución del Convenio.

**QUINTA.-** El presente Convenio de Estabilidad Jurídica tendrá una vigencia de diez (10) años, contado a partir de la fecha de su celebración. En consecuencia, no podrá ser modificado unilateralmente por ninguna de las partes durante dicho período, ni aunque la legislación nacional sea modificada, así se trate de modificaciones más beneficiosas o perjudiciales para alguna de las partes que las pactadas en este Convenio.

**SEXTA.- (EL INVERSIONISTA)** tendrá derecho a renunciar por única vez al régimen de estabilidad jurídica que se le otorga al amparo del presente Convenio, debiendo formalizar dicha renuncia mediante una comunicación por escrito dirigida a (el organismo competente), la que se hará efectiva desde la fecha de recepción de la comunicación por este último.

Si **(EL INVERSIONISTA)** opta por ejercer el derecho de renuncia al Convenio, que se le reconoce al amparo de la presente Cláusula, automáticamente pasará a regirse por la legislación común.

**SEPTIMA.- (EL INVERSIONISTA)** tendrá derecho a ceder su posición contractual en el presente Convenio, debiendo obtener previamente la autorización correspondiente de (el organismo competente). Dicha cesión se formalizará mediante una adenda al presente Convenio.

Queda entendido que la cesión de posición contractual que realice **(EL INVERSIONISTA)** a otro inversionista no extiende el plazo de duración del Convenio a que se refiere la CLAUSULA QUINTA.

**OCTAVA.-** El presente Convenio sólo podrá ser modificado de común acuerdo por las partes. No podrá modificarse el plazo de vigencia establecido en la CLAUSULA QUINTA ni el monto de los aportes por debajo del límite establecido en ***(se cita la norma pertinente).***

Para tal efecto, **(EL INVERSIONISTA)** presentará una solicitud ante (el organismo competente) que se tramitará conforme al mismo procedimiento utilizado para la celebración del presente Convenio.

**NOVENA.-** Siendo la intención de las partes que los problemas que se presenten en relación con el cumplimiento del presente Convenio se resuelvan de la manera más expeditiva posible, se conviene desde ahora que cualquier litigio, controversia o reclamación entre ellos, relativa a la interpretación, ejecución o validez del presente Convenio, será resuelta mediante arbitraje de derecho.

El arbitraje se llevará a cabo en la ciudad de Lima, mediante la constitución de un Tribunal Arbitral conformado por tres (3) miembros, de los cuales cada una de las partes nombrará a uno (1) y los dos (2) árbitros así designados nombrarán al tercer árbitro. Los árbitros quedan expresamente facultados para determinar la controversia materia del arbitraje.

Si una parte no nombra árbitro dentro de los diez (10) días hábiles de recibido el requerimiento de la parte o partes que soliciten el arbitraje o si dentro de un plazo igualmente de diez (10) días hábiles, contado a partir del nombramiento del último árbitro por las partes, los dos (2) árbitros no consiguen ponerse de acuerdo sobre el tercer árbitro, la designación del árbitro faltante será hecha, a petición de cualquiera de las partes, por la Cámara de Comercio de Lima.

El plazo de duración del proceso arbitral no deberá exceder de sesenta (60) días hábiles contados desde la fecha de designación del último árbitro, y, se regirá por lo dispuesto en la Ley General de Arbitraje.

Los gastos que se generen por la aplicación de lo pactado en la presente Cláusula serán sufragados por las partes contratantes en igual medida.

**DECIMA.-** Constituyen causales de resolución de pleno derecho del presente Convenio, sin mediar requisito de comunicación previa, las siguientes:

1. El incumplimiento por parte de **(EL INVERSIONISTA)** de las obligaciones establecidas en la CLAUSULA SEGUNDA
2. El incumpliendo por parte de (EL INVERSIONISTA) de las obligaciones contenidas en la CLAUSULA CUARTA.

3. La cesión de posición contractual que realice **(EL INVERSIONISTA)** a favor de otro inversionista sin obtener la correspondiente autorización previa de (el organismo nacional competente) conforme a lo pactado en la CLAUSULA SEPTIMA.

4. El incumplimiento de **(EL INVERSIONISTA)** de generar los puestos de trabajo de conformidad con la Cláusula Segunda.

5. El incumplimiento de **(EL INVERSIONISTA)** de generar los ingresos de divisas por concepto de exportaciones conforme a lo pactado en la cláusula segunda.

En el caso que **(EL INVERSIONISTA)** incurra en una de las mencionadas causales de resolución del presente Convenio, si por efecto de la estabilidad jurídica concedida al amparo del mismo hubiera gozado de una carga fiscal menor a la que le hubiera correspondido de no estar amparada por dicho Convenio, estará obligada a reembolsar al **ESTADO** el monto actualizado de los tributos que le hubieran afectado de no haber suscrito el Convenio, más los recargos correspondientes a que se refiere el Código Tributario.

Queda entendido que en el caso a que se refiere el párrafo anterior, si **(EL INVERSIONISTA)** hubiera soportado una carga fiscal mayor por efectos del presente Convenio, no existirá obligación de reembolso de suma alguna por parte del **ESTADO.**

Estando las partes de acuerdo lo suscriben en dos (2) copias de igual contenido.